COPY

1  Richard M. Heimann (State Bar No. 063607)
   Joy A. Kruse (State Bar No. 142799)
2  Eric B. Fastiff (State Bar No. 182260)
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
3  275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
4  Telephone: (415) 956-1000
   Facsimile: (415) 956-1008
5
   Steven E. Fineman (State Bar No. 140335)
6  Daniel P. Chiplock
   Michael J. Miarmi
7  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   250 Hudson Street, 8th Floor
8  New York, New York 10013
   Telephone: (212) 355-9500
9  Facsimile: (212) 355-9592
10  Lowell Haky (State Bar No. 178526)
   Vice President and Associate General Counsel
11  CHARLES SCHWAB & CO., INC.
   211 Main Street
12  San Francisco, CA 94105
   Telephone: (415) 667-0622
13  Facsimile: (415) 667-1638

14  *Attorneys for Plaintiffs*

EDL

15

16                  UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

   SCHWAB S&P 500 INDEX FUND, SCHWAB           CV 11      5016
18  1000 INDEX FUND, SCHWAB INSTITUTIONAL      No. _____
   SELECT S&P 500 FUND, SCHWAB DIVIDEND
19  EQUITY FUND, SCHWAB CORE EQUITY
   FUND, SCHWAB PREMIER EQUITY FUND,
20  SCHWAB FUNDAMENTAL US LARGE
   COMPANY INDEX FUND, SCHWAB TOTAL
21  STOCK MARKET INDEX FUND, SCHWAB            **COMPLAINT**
   FINANCIAL SERVICES FUND, SCHWAB S&P
22  500 INDEX PORTFOLIO, SCHWAB
   MARKETTRACK GROWTH PORTFOLIO,
23  SCHWAB MARKETTRACK BALANCED                **JURY TRIAL DEMANDED**
   PORTFOLIO, SCHWAB INVESTMENTS, and
24  SCHWAB CAPITAL TRUST,
25
26              Plaintiffs,
27  v.
28

935174.3                                                    COMPLAINT
                                              CASE NO. _____

BANK OF AMERICA CORPORATION,
KENNETH D. LEWIS, JOSEPH L. PRICE,
NEIL A. COTTY, MERRILL LYNCH & CO.,
INC., and JOHN A. THAIN,

Defendants.

935174.3

**TABLE OF CONTENTS**

**Page**

I.    SUMMARY OF THE ACTION ............................................................. 2

    A.   Defendants Made Material Misrepresentations, Omitted Material
        Facts And Failed To Correct Material Misstatements In The Proxy
        Statement And Related Solicitation Materials. ........................................ 9

    B.   Defendants Also Knowingly And/Or Recklessly Made Materially
        False And Misleading Statements And Omitted Material Facts
        Concerning BOA's Acquisition Of Merrill Lynch During The
        Relevant Period. ..................................................................................... 12

    C.   Defendants Gradually Disclosed Previously Withheld And/Or
        Misrepresented Material Facts. ............................................................... 15

II.   JURISDICTION AND VENUE ............................................................. 17

III.  THE PARTIES ...................................................................................... 17

    A.   Plaintiffs .................................................................................................. 17

    B.   Defendants ............................................................................................... 21

        1.   Corporate Defendants................................................................... 21

        2.   Officer Defendants ....................................................................... 21

IV.   FACTUAL BACKGROUND ................................................................. 24

    A.   Pre-Merger BOA ..................................................................................... 24

    B.   Pre-Merger Merrill .................................................................................. 25

    C.   The Lehman Meetings.............................................................................. 26

    D.   Merrill Initiates Merger Discussions With BOA .................................... 28

    E.   Defendants' Purported Due Diligence On The Merger ........................... 28

    F.   The Merger Valuation And Pricing Negotiations .................................... 29

    G.   BOA Secretly Agrees To Permit Merrill To Pay Up To $5.8 Billion
        In Bonuses To Merrill Employees Prior To The Merger Closing
        Date. ........................................................................................................ 29

    H.   The Merger Presentation To The BOA Board ......................................... 33

V.    SUMMARY OF CLAIMS ..................................................................... 34

VI.   DEFENDANTS' VIOLATIONS OF SECTION 14(a) OF THE
    EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER ..... 34

**TABLE OF CONTENTS**
(continued)

Page

A.   Materially False And Misleading Statements And Omissions Of Material Fact In The Proxy Statement And Related Solicitation Materials.................................................................................. 34

    1.   Defendants Announce the Merger ............................................... 34

    2.   The Merger Presentation to Investors ......................................... 35

    3.   The September 15, 2008 Analyst Conference Call...................... 36

    4.   The Undisclosed Agreement to Permit Billions of Dollars in Bonuses to Merrill Employees ...................................................... 38

    5.   The Proxy Statement.................................................................... 39

    6.   The Fairness Opinions ................................................................. 43

    7.   The Proxy Statement's Disclosure of Government Financing..... 45

B.   The Merger Agreement Provided Defendants With The Means To Protect BOA Shareholders, Which Defendants Neglected to Do........... 46

    1.   Defendants' Continuous Access to Merrill's Financial Information.................................................................................... 46

C.   Defendants Fail To Correct The Material Misstatements And Omissions In The Proxy Statement............................................................ 52

    1.   The November 21, 2008 Amendment to the Proxy Statement.................................................................................... 52

    2.   The November 26, 2008 Amendment to the Proxy Statement.................................................................................... 53

    3.   The November 26, 2008 Press Release........................................ 55

    4.   BOA Shareholders Vote to Approve the Merger........................ 55

    5.   Defendant Lewis Abruptly Fires Timothy Mayopoulos as BOA's General Counsel After He Sought Information on Merrill's Growing Losses. ........................................................ 56

    6.   BOA Consults with Merrill on Paying Undisclosed Bonuses to Merrill Employees.................................................................. 57

    7.   Defendant Lewis' Undisclosed December 17, 2008 Meeting with Federal Regulators and Subsequent Undisclosed Negotiations to Prevent Merrill's Losses from Derailing the Merger ......................................................................................... 58

935174.3

COMPLAINT

CASE NO. _____

1

**TABLE OF CONTENTS**
(continued)

2

Page

3   D.  BOA Finally Discloses Merrill's Fourth Quarter Losses And
4       BOA's Request For, And Receipt Of, Additional Federal
        Financing.................................................................................... 67

5           1.  Defendant Lewis' Memorandum to BOA Employees................ 68

6           2.  BOA's Fourth Quarter 2008 Press Release................................ 69

7           3.  BOA's Fourth Quarter Earnings Conference Call ..................... 71

8   E.  Ensuing Investigations ....................................................................... 73

9           1.  The New York State Attorney General's Investigation of
                BOA's Failure to Disclose Either the Merrill Bonuses or
10              Merrill's Fourth Quarter 2008 Losses....................................... 73

11          2.  The Oversight Committee Investigation and the SEC Action
                Further Confirm Defendants' Failure to Disclose Either the
12              Merrill Bonuses or Merrill's Fourth Quarter 2008 Losses.......... 75

13  VII.  TOLLING OF THE STATUTE OF LIMITATIONS.......................................... 77

14  COUNT I    For Violation of § 14(a) of the Exchange Act and Rule 14a-9
               Promulgated Thereunder Against All Defendants ......................... 78

15  COUNT II   For Violation of § 20(a) of the Exchange Act Against Defendants
16             Lewis, Price, Cotty and Thain......................................................... 80

17  VIII.  DEFENDANTS' VIOLATION OF SECTION 10(b) OF THE
          EXCHANGE ACT AND RULE 10b-5 PROMULGATED
18        THEREUNDER ............................................................................................ 82

19  A.  Defendants Knowingly And/Or Recklessly Made Materially False
        And Misleading Statements And Failed To Disclose Material Facts. ..... 82

20  B.  Defendants Eventually Disclose The Truth ............................................. 92

21  C.  Additional Scienter Allegations For Claims Under Section 10(b)
22      And Rule 10b-5 Of The Exchange Act ..................................................... 93

23          1.  BOA's Senior Officers Were Fully Aware Of Merrill's
                Staggering Losses Before The Shareholder Vote ........................ 94

24          2.  Internal BOA Documents And Sworn Testimony Establish
                That Defendants Recognized That Merrill's Losses Should
25              Be Disclosed In Advance Of The Shareholder Vote ................... 96

26          3.  As Merrill's Losses Mount, Defendants Acknowledge That
27              Disclosure Of Merrill's Losses Would Cause Shareholders
                To Vote Against The Merger—And Abruptly Reverse Their
28              Decision To Disclose The Losses ................................................ 99

COMPLAINT

CASE NO. _____

1

**TABLE OF CONTENTS**
(continued)

2

Page

3      4.    As The Vote Approaches, Senior Management Is Informed
             That Merrill's Quarterly Losses Will Exceed $16 Billion,
4            And Ignores Repeated Entreaties To Disclose The Losses ........ 101

5      5.    While Merrill Deteriorates, The Billions In Merrill Bonuses
             Are Finalized .................................................................. 104
6

7      6.    Almost Immediately After Shareholders Approve The
             Merger, Mayopoulos Learns That Merrill's Pre-Vote Losses
8            Are Materially Higher Than What He Has Been Told, Seeks
             To Confront Price About That Discrepancy, And Is
9            Immediately Fired ............................................................ 105

10     7.    Lewis Secretly Decides to Invoke The MAC And Terminate
             The Deal, But Agrees To Consummate The Transaction
11           After Federal Regulators Threaten To Fire Him ...................... 106

12     8.    Internal BOA Emails Establish That, At The Same Time
             BOA's Senior Officers Decided Not To Disclose The
13           Bailout Prior To The Merger's Close, They Internally
             Acknowledged That The Market Was Being Misled As To
14           Merrill's True Financial Condition ....................................... 111

15     9.    Additional Evidence Of Lewis's Scienter ............................... 113
16

17     10.   Additional Evidence Of Price's Scienter ............................... 119

18     11.   Additional Evidence Of Thain's Scienter .............................. 121

19  D.  Loss Causation For Claims Under Section 10(b) And Rule 10b-5 Of
        The Exchange Act ........................................................................ 121
20

21  E.  Group Pleading .............................................................................. 122

22  F.  Fraud On The Market Presumption ................................................ 123

23  G.  The Safe Harbor Provision Of The PSLRA Is Inapplicable To
        Plaintiffs' Claims Under Section 10(b) And Rule 10b-5 Of The
24      Exchange Act ................................................................................ 124

    COUNT III   For Violations Of Section 10(b) Of The Exchange Act And Rule
25              10b-5  (Against Defendants BOA, Lewis, And Price For
                Misstatements And Omissions Regarding The Secret Bonus
26              Agreement, Merrill's Pre-Vote Losses, and BOA's Pre-Vote
                Losses) ......................................................................... 126

27

28

**TABLE OF CONTENTS**
**(continued)**

Page

COUNT IV    For Violations Of Section 10(b) Of The Exchange Act And Rule
            10b-5  (Against Defendants Merrill And Thain for Misstatements
            Regarding  The Secret Bonus Agreement)................................... 129

COUNT V     For Violations Of Section 20(a) Of The Exchange Act (Against
            Defendants Lewis and Price) ....................................................... 131

COUNT VI    For Violations Of Section 20(a) Of The Exchange Act (Against
            Thain) ....................................................................................... 132

PRAYER FOR RELIEF............................................................................................. 133

JURY DEMAND ...................................................................................................... 133

1    Plaintiffs Schwab S&P 500 Index Fund, Schwab 1000 Fund, Schwab Institutional Select

2    S&P 500 Fund, Schwab Dividend Equity Fund, Schwab Core Equity Fund, Schwab Premier

3    Equity Fund, Schwab Fundamental US Large Company Index Fund, Schwab Total Stock Market

4    Index Fund, Schwab Financial Services Fund, Schwab S&P 500 Index Portfolio, Schwab

5    MarketTrack Growth Portfolio, Schwab MarketTrack Balanced Portfolio, Schwab Investments,

6    and Schwab Capital Trust (collectively, "Plaintiffs" or "the Schwab Funds") allege the following

7    upon information and belief, except for those facts pertaining to Plaintiffs, which are based upon

8    personal knowledge.

9    Plaintiffs' information and belief is based upon, among other things, a continuing

10   investigation, directed and supervised by Plaintiffs and conducted by and through Plaintiffs'

11   undersigned counsel, into the facts and circumstances alleged herein concerning the merger

12   announced on September 15, 2008 (the "Merger") between Bank of America Corporation

13   ("BOA" or the "Company") and Merrill Lynch & Co., Inc. ("Merrill") including, without

14   limitation, review and analysis of:

15        i.    BOA's Registration Statement, filed on Form S-4 with the U.S.
16              Securities and Exchange Commission ("SEC") on October 2, 2008, as amended on October 22, 2008 and October 29, 2008 on forms S-
17              4/A (collectively, the "Proxy Registration Statement");

18        ii.   the Schedule 14A Definitive Joint Proxy Statement dated October 31, 2008 and filed with the SEC on November 3, 2008, and
19              all appendices thereto and documents incorporated by reference therein (together with the Proxy Registration Statement, the "Proxy
20              Statement" or the "Proxy");

21        iii.  the SEC Form 425 filings by BOA dated November 21, 2008 and
22              November 26, 2008, purporting to amend the Proxy Statement;

23        iv.  press conferences, analyst conference calls and conferences, and
24              corresponding transcripts thereof, conducted by or concerning BOA and/or Merrill;

25        v.   press releases, public statements, news articles, and other
26              publications disseminated by and/or concerning BOA, Merrill, and/or the other defendants named herein (collectively, the
27              "Defendants");

28        vi.  analyst reports concerning BOA and its operations;

935174.3
- 1 -

vii.    the corporate websites of BOA, Merrill, and related parties;

viii.   documents, press releases, and additional materials regarding investigations conducted by the SEC and the Attorney General of the State of New York ("New York Attorney General") concerning, among other things, the veracity of Defendants' public statements in connection with the Merger, including the New York Attorney General's complaint against BOA and related parties filed on February 4, 2010;

ix.     testimony of persons with knowledge of, and/or who participated in, the consummation of the Merger, pursuant to the investigation conducted by the Domestic Policy Subcommittee of the House of Representatives' Oversight and Government Reform Committee (the "Oversight Committee Investigation"), and certain documents produced to the Oversight Committee as part of its Investigation;

x.      BOA internal documents, including e-mails, notes, and minutes from BOA Board of Directors ("BOA Board") meetings that BOA has produced to Congress, the New York Attorney General, the SEC, and/or other regulators in connection with investigations into the facts and circumstances surrounding the Merger; and

xi.     other public information concerning BOA and the other Defendants.

Many additional facts supporting the allegations herein are known only to Defendants and are within their exclusive custody or control.  Plaintiffs believe that additional evidentiary support for the allegations herein will exist after a reasonable opportunity to conduct discovery.

# I.      SUMMARY OF THE ACTION

1.      This action arises from Defendants' failure to communicate with BOA's shareholders, including Plaintiffs, completely and truthfully in connection with the Merger between BOA and Merrill as required under the federal securities laws. Defendants obtained shareholder approval for the Merger based upon materially false and misleading statements and omissions of material fact in the Proxy Statement and related solicitation materials, which Defendants failed to correct.

2.      BOA shareholders, like Plaintiffs, who were entitled to vote on the Merger did so without knowledge of critical facts, including, but not limited to: (i) BOA failure to conduct adequate due diligence in connection with the Merger; (ii) the extent of Merrill's tremendous

COMPLAINT

CASE NO. _____

1   fourth quarter 2008 losses, which Defendants knew to be at least $15.3 billion on a pre-tax basis

2   prior to the December 5, 2008 shareholder vote approving the Merger (the "Shareholder Vote");

3   and (iii) BOA and Merrill's undisclosed agreement to permit Merrill to pay up to $5.8 billion in

4   bonuses to Merrill employees prior to the January 1, 2009 Merger closing date (the "Closing

5   Date"), out of which $3.6 billion was paid on or before December 31, 2008. These undisclosed

6   facts were material to BOA shareholders' votes in connection with the Merger.

7          3.      Under the weight of Merrill's undisclosed losses, the Merger was only salvaged

8   through a $138 billion taxpayer bailout, consisting of an emergency infusion of more than

9   $20 billion in government capital and $118 billion in asset guarantees. This funding was in direct

10  contrast to BOA's statements before the Merger that the Company did not need government

11  assistance.

12         4.      From the time the Merger was first announced on September 15, 2008 (the

13  "Merger Announcement") through the Shareholder Vote on December 5, 2008 and the Closing

14  Date on January 1, 2009, Defendants misrepresented and failed to disclose material facts

15  concerning the Merger, and failed to correct the Proxy Statement as required by law. Defendants

16  did not begin to disclose the truth until weeks after the Closing Date, thus ensuring that BOA

17  shareholders entitled to vote on the Merger lacked material information required for a fully

18  informed decision.

19         5.      Plaintiffs suffered substantial damages as a result of Defendants' material

20  misrepresentations and omissions in connection with the Merger. Plaintiffs assert claims under

21  Section 14(a) and Rule 14a-9 of the Securities Exchange Act of 1934 (the "Exchange Act")

22  because they were entitled to vote for the approval of the Agreement and Plan of Merger between

23  Merrill and BOA, dated September 15, 2008 (the "Merger Agreement"), and Plaintiffs voted

24  those shares of BOA common stock that they owned on October 10, 2008 (the "Record Date") in

25  favor of the Merger.

26         6.      As alleged herein, Defendants violated Section 14(a) of the Exchange Act and

27  Rule 14a-9 promulgated thereunder by negligently misrepresenting and omitting material facts in

28  the Proxy Statement and related solicitation statements concerning, among other things:

935174.3                                    - 3 -

CASE NO. _____

COMPLAINT

- the adequacy of the due diligence conducted in connection with the Merger;

- the exposure to substantial losses and corresponding negative impact upon the fairness of the Merger to BOA shareholders resulting from, among other things, troubled assets on Merrill's balance sheet; and

- the secret agreement between BOA and Merrill permitting Merrill to pay up to $5.8 billion in bonuses to Merrill employees prior to the Closing Date.

7.     Defendants further violated Section 14(a) and Rule 14a-9 of the Exchange Act by negligently failing to correct the Proxy Statement and related solicitation materials to prevent the statements therein from being materially false and misleading when Defendants had reason to know, among other things, that:

- as of November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $9 billion and increased to $15.3 billion prior to the Shareholder Vote;

- BOA met with its attorneys to consider whether Merrill's astronomical losses for the fourth quarter of 2008 permitted or required BOA to abandon the Merger prior to the Shareholder Vote;

- on December 8, 2008 – the first business day after the Shareholder Vote approving the Merger – BOA permitted Merrill to make $3.6 billion in undisclosed bonus payments to Merrill employees prior to the Closing Date;

- after consulting with the BOA Board, BOA's Chief Executive Officer, Defendant Kenneth Lewis ("Lewis"), met with Treasury Secretary Henry Paulson ("Paulson") and Federal Reserve Chairman Benjamin Bernanke ("Bernanke") in Washington, D.C. on December 17, 2008 to discuss BOA's desire to terminate the Merger based upon Merrill's losses; and

- as a result of Defendant Lewis' secret meetings with federal regulators, BOA obtained more than $20 billion in additional federal funding and $118 billion in related financial guarantees, without which the Merger would have unraveled.

8.     In addition to their negligent misstatements and omissions identified above, Defendants BOA, Merrill, Lewis, John A. Thain ("Thain"), and Joseph L. Price ("Price"), BOA's then Chief Financial Officer, violated Section 10(b) and Rule 10b-5 of the Exchange Act by knowingly and/or recklessly making materially false and misleading statements and omissions of material fact during the period from September 15, 2008 through January 21, 2009 (the "Relevant Period") concerning the Merger and its purportedly positive impact on BOA.  Plaintiffs purchased

1  more than 1.3 million shares of BOA common stock on the open market during the Relevant

2  Period and suffered damages thereby.

3       9.      The Merger, which BOA touted to its shareholders as creating a "company

4  unrivaled in its breadth of financial services and global reach," has instead resulted in substantial

5  damages to Plaintiffs. Additionally, the Merger spawned congressional investigations, other

6  federal and state regulatory investigations, lawsuits by the SEC and the New York Attorney

7  General, and resignations of multiple BOA Board members, including Defendant Lewis'

8  December 31, 2009 resignation as Chief Executive Officer of BOA.

9       10.     At BOA's April 29, 2009 annual meeting, BOA shareholders voted to strip

10  Defendant Lewis of his position as Chairman of the BOA Board based upon his conduct in

11  connection with the Merger. *Business Week* reported that same day that the "vote marked the first

12  time that a company in the Standard & Poor's 500-stock index [had] been forced by shareholders

13  to strip a CEO of chairman duties. . . ." At the shareholder meeting, Defendant Lewis conceded

14  that BOA's shareholders "have carried a heavy burden" as a result of the Merger.

15       11.     In June 2009, the Oversight Committee Investigation commenced with testimony

16  from persons with knowledge of, and/or who participated in, the consummation of the Merger,

17  including, among others, Paulson, Bernanke, and Defendants Lewis, Price, and Neil A. Cotty

18  ("Cotty"), BOA's Chief Accounting Officer. The Investigation focused on Defendants' failure to

19  timely disclose:

20            ●    Merrill's mounting fourth quarter 2008 losses;

21            ●    the secret agreement to pay up to $5.8 billion in bonuses to Merrill
                   employees, of which $3.6 billion was paid prior to the Closing Date; and
22                 BOA's arrangement with federal regulators to receive a combined $138
                   billion taxpayer bailout to save the Merger.
23

24       12.     On August 3, 2009, the SEC sued BOA for violating Section 14(a) and Rule 14a-9

25  of the Exchange Act (the "SEC Action"), alleging that "Bank of America's failure to disclose [its

26  agreement before the merger closed] to allow Merrill to pay up to $5.8 billion in discretionary

27  bonuses" violated the federal securities laws because "this omission made statements in Bank of

28  America's proxy materials materially false and misleading."

935174.3                                    - 5 -                          COMPLAINT
                                                             CASE NO. _____

13.     On the same day that the SEC filed its complaint, it announced that BOA had agreed to settle the SEC Action and pay a $33 million fine. However, on September 14, 2009, the Honorable Jed. S. Rakoff, United States District Court Judge for the Southern District of New York, rejected the settlement, determining that, given the apparent strength of the allegations, the proposed settlement was "neither fair, nor reasonable, nor adequate." Judge Rakoff also called the proposed settlement a breach of "justice and morality" and ordered the parties to appear for trial on February 1, 2010.

14.     On February 4, 2010, the SEC and BOA agreed to a new settlement requiring BOA to pay a $150 million fine and to implement certain internal control procedures. On February 22, 2010, Judge Rakoff "reluctantly" granted the parties' settlement. After reviewing hundreds of pages of deposition testimony and other evidentiary material, Judge Rakoff noted that: (i) the Proxy Statement "failed adequately to disclose [BOA's] agreement to let Merrill pay . . . $5.8 billion in bonuses at a time when Merrill was suffering huge losses"; and (ii) BOA "failed adequately to disclose [prior to the Shareholder Vote or Closing Date BOA's] ever-increasing knowledge that Merrill was suffering historically great losses during the fourth quarter of 2008." While characterizing the $150 million settlement as "half-baked justice at best" and "far from ideal" given that it was paltry in light of the circumstances, Judge Rakoff nevertheless approved the settlement. In so doing, Judge Rakoff gave "substantial deference" to the SEC "as the regulatory body having primary responsibility for policing the securities markets" and exercised "judicial restraint" to not impose the Court's "own preferences."

15.     On September 8, 2009, New York Attorney General Cuomo sent a letter to BOA's outside counsel noting that the New York Attorney General's ongoing investigation had identified, at a minimum, the following four instances in the fourth quarter of 2008 where the Defendants failed to disclose material non-public information to BOA's shareholders:

      i.      BOA's knowledge just prior to December 5, 2008 of Merrill's more than $14 billion in fourth quarter 2008 losses;

      ii.     Merrill's goodwill charge of more than $2 billion associated with subprime-related losses prior to the Shareholder Vote;

iii.   BOA's determination eight business days after the Shareholder Vote that it had a strong legal basis to terminate the Merger because of Merrill's enormous losses; and

iv.   the $3.6 billion in accelerated undisclosed bonus payments to Merrill employees on December 8, 2008 that BOA approved.

The New York Attorney General concluded:  "[t]he facts of the cascading losses and bonus payments – and the facts of [BOA's] senior executives' knowledge of these events–are straightforward."[1]

16.   Pursuant to the ongoing investigations by the Oversight Committee, the New York Attorney General, and the SEC, BOA agreed on October 12, 2009 to waive the attorney-client privilege and produced certain documents to these parties. Among other things, those documents confirm that Defendants knew of Merrill's fourth quarter 2008 losses before both the Shareholder Vote and the Closing Date.

17.   For example, Defendant Cotty, BOA's Chief Accounting Officer, wrote an e-mail on November 5, 2008 – one month before the Shareholder Vote—to Defendant Price that included Merrill's October 2008 financial report. The e-mail, which estimated Merrill markdowns and "other large items" of $5.3 billion, included Defendant Cotty's comment:  "***Read and weep***." Two days after the Shareholder Vote, on December 7, 2008, Gary Carlin, Merrill's then Chief Accounting Officer, e-mailed Defendant Cotty with Merrill's updated financials through December 5 and stated:  "***What a disaster!***" As detailed more fully herein, these documents confirm that Defendants had reason to know that the Proxy materials, pursuant to which BOA shareholders approved the Merger, were materially false and misleading.

18.   Similarly, an October 14, 2009 article in *The New York Times* cited a January 15, 2009 e-mail from BOA Board member Charles Gifford ("Gifford") to BOA Board member Thomas May ("May") stating that the Merger "***screw[ed] the shareholders!***" May replied "***[n]o trail***," suggesting that Gifford should not write messages that could later be detrimental to BOA if produced in litigation.

---

[1] Throughout this Complaint, all emphasis to quoted statements is added unless otherwise noted.

19.     Before many of the facts alleged herein emerged, the General Counsel of the Federal Reserve, Scott Alvarez ("Alvarez"), highlighted in a December 23, 2008 e-mail to Bernanke Defendants' likely liability for BOA's failure to disclosure Merrill's fourth quarter losses and massive bonuses prior to the Shareholder Vote:

> Management may be exposed if it doesn't properly disclose information that is material to investors. There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . . **His [Lewis'] potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [BOA] made its disclosures to get the shareholder vote on the [Merrill] deal in early December**.

As the facts alleged herein demonstrate, Defendants had access to daily information demonstrating Merrill's massive fourth quarter 2008 losses before the Shareholder Vote, and they are liable for failing to disclose these losses. In fact, by November 12, 2008, Defendants were consulting internally with BOA's attorneys as to whether they needed to disclose Merrill's then-known fourth quarter 2008 losses to BOA's shareholders. Defendants, however, failed to make any disclosures regarding Merrill's known fourth quarter 2008 losses until after both the Shareholder Vote and Closing Date.

20.     On February 4, 2010, the New York Attorney General filed a complaint against Defendants BOA, Lewis, and Price asserting causes of action under the New York Martin Act and New York Executive Law for securities fraud and "persistent fraud or illegality" arising from the facts and circumstances detailed herein. In a press release issued that day, the New York Attorney General stated:

> Bank of America, through its top management, engaged in a concerted effort to deceive shareholders and American taxpayers at large. This was an arrogant scheme hatched by the bank's top executives who believed they could play by their own set of rules. In the end, they committed an enormous fraud and American taxpayers ended up paying billions for Bank of America's misdeeds.

COMPLAINT

CASE NO. _____

**A.      Defendants Made Material Misrepresentations, Omitted Material Facts And Failed To Correct Material Misstatements In The Proxy Statement And Related Solicitation Materials.**

21.     On September 13, 2008, out of concern that Merrill, like Lehman Brothers Holdings, Inc. ("Lehman"), was facing imminent collapse, Merrill's Chief Executive Officer John Thain initiated discussions with BOA that resulted in the Merger. The terms of the Merger that allowed Merrill to stave off its demise were negotiated in hastily arranged meetings between BOA and Merrill, which transpired over the course of a day-and-a-half. BOA and its outside financial advisors, J.C. Flowers & Co. LLC ("J.C. Flowers") and Fox-Pitt Kelton Cochran Caronia Waller LLC ("Fox-Pitt") (together, the "Financial Advisors"), purportedly conducted due diligence in connection with the Merger, including an examination of Merrill's financial condition, during this same brief period of time. The BOA Board unanimously approved the terms of the transaction on September 14, 2008 after the purported due diligence was completed. Thus, over the course of approximately 36 hours, a merger of two of the largest financial services institutions in the world was proposed and agreed upon by the BOA Board.

22.     Early on September 15, 2008, BOA and Merrill executed the Merger Agreement, which set forth the terms of the transaction. Among other things, the Merger Agreement gave BOA and its agents complete access to Merrill's books and records throughout the period leading up to the January 1, 2009 Closing Date. Thus, from the date that the Merger was announced through the Closing Date, BOA and its agents had the ability to monitor Merrill's financial performance and the status of its assets, the impairment of which necessitated the Merger.

23.     Following Defendants' purportedly adequate due diligence, BOA agreed to purchase Merrill in an all-stock transaction pursuant to which BOA would exchange 0.8595 shares of the Company's common stock for each share of Merrill (the "Exchange Ratio"). Based upon BOA's September 12, 2008 closing price of $33.74 per share, Merrill shareholders would receive consideration of $29.00 for each share of Merrill stock, which represented a premium of approximately 70% over the $17.05 closing price of Merrill's common stock on September 12, 2008, the last trading day before the Merger was announced. At this time, the value of the transaction was approximately $50 billion.

24.     On November 3, 2008, BOA filed the Proxy Statement dated October 31, 2008 with the SEC and mailed copies of it to BOA shareholders, including Plaintiffs. The Proxy Statement enumerated the putative steps taken by BOA and the Financial Advisors in conducting due diligence of Merrill, and contained the BOA Board's unanimous recommendation that BOA shareholders approve the Merger.

25.     The Proxy Statement contained materially false and misleading statements and failed to disclose material facts necessary to make the statements therein not misleading. For example, the Proxy Statement materially misstated the adequacy of the due diligence conducted by BOA and the Financial Advisors suggesting, among other things, that their collective, purportedly extensive prior knowledge of both Merrill and BOA was an adequate substitute for a more thorough analysis. Further, despite referencing "material factors" that Defendants considered in approving the Merger, the Proxy Statement did not disclose the likelihood that Merrill would continue to suffer the significant losses in its trading and investment securities portfolios that necessitated the Merger.

26.     The Proxy Statement, like Defendants' public statements preceding it and following it, also failed to disclose BOA's agreement to permit Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date.

27.     Making matters worse, Defendants failed to honor their continuing legal obligation to update and correct the Proxy Statement to reflect what they knew or should have known about, including:

> i.     Merrill's growing losses in the fourth quarter of 2008, causing BOA to consider scrapping the Merger prior to the Shareholder Vote;
>
> ii.    BOA's December 8, 2008 approval of the payment of $3.6 billion (out of the $5.8 billion agreed upon) in bonuses to Merrill employees prior to the Closing Date; and
>
> iii.   BOA's meeting with federal regulators to discuss BOA's potential termination of the Merger based upon the devastating impact of Merrill's still-undisclosed fourth quarter losses, which resulted in a $138 billion taxpayer bailout to prevent the Merger from imploding.

28.     In fact, the Oversight Committee Investigation has confirmed that by November 12, 2008, Defendants were consulting internally with BOA's attorneys to determine

935174.3                              - 10 -

COMPLAINT

whether they were required to disclose Merrill's then-known fourth quarter 2008 losses. The New York Attorney General's investigation has also confirmed that Defendants knew of Merrill's mounting losses in November 2008—prior to the Shareholder Vote. Specifically, on September 8, 2009, the New York Attorney General wrote a letter to BOA's outside counsel stating, in part:

> In November 2008, [BOA] became aware of at least $9 billion in previously undisclosed forecasted losses at [Merrill]. [BOA's] Chief Financial Officer, [Defendant] Price, has testified that his decision not to disclose those losses came after receiving legal advice from [BOA's] then General Counsel, Timothy Mayopoulos, as well as from outside counsel. [Defendant] Price further testified that [BOA] decided not to disclose Merrill's expected fourth quarter losses following a call on November 20, 2008 with outside counsel.

29.     These huge losses sparked a debate among Defendants as to whether to terminate the Merger before the Shareholder Vote. As the New York Attorney General noted in his September 8, 2009 letter, Merrill's fourth quarter 2008 losses "were so great that [BOA] officers sought guidance—***before [BOA] shareholders approved the merger***—about the applicability of the [Material Adverse Effect] clause in its merger agreement with [Merrill], the very same provision relied upon eight business days after the merger was approved, when [BOA] told regulators it had a legal basis to terminate the merger." (emphasis in original.)

30.     Despite filing amendments to the Proxy Statement with the SEC on November 21 and November 26, 2008, Defendants failed to disclose these material facts bearing upon the fairness of the Merger. Instead, BOA shareholders were deprived of information that was material to their vote, and an overwhelming 82% of votes, including those based upon the BOA shares that Plaintiffs voted, were cast in favor of the Merger on December 5, 2008.

31.     Even after the Shareholder Vote, the Defendants were required to update the Proxy Statement and related solicitation materials before consummating the Merger on the Closing Date. They failed to meet this obligation as well.

32.     In addition to permitting Merrill to pay billions of dollars in bonuses to its employees prior to the Closing Date, Defendants also failed to disclose that Merrill's known pre-tax losses ballooned to $21 billion by the end of the fourth quarter of 2008, sending Defendant Lewis on an emergency trip to meet with Bernanke and Paulson in Washington, D.C. on

December 17, 2008 to discuss walking away from the Merger. Defendants then failed to disclose the $138 billion government bailout that BOA obtained to salvage the Merger as a result of Defendant Lewis' hat-in-hand meeting with federal regulators.

33.     The facts above, as discussed more fully herein, demonstrate that Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by depriving BOA shareholders, including Plaintiffs, of information that was clearly material to their vote on the Merger. The approval of the Merger was instead based upon a materially false and misleading Proxy Statement and related solicitation materials that were essential links in obtaining the necessary BOA shareholder votes. Plaintiffs have suffered damages directly caused by Defendants' violations.

**B.      Defendants Also Knowingly And/Or Recklessly Made Materially False And Misleading Statements And Omitted Material Facts Concerning BOA's Acquisition Of Merrill Lynch During The Relevant Period.**

34.     Plaintiffs' allegations of Defendants' negligence are all that is required to plead Defendants' violations of Section 14(a) and Rule 14a-9 of the Exchange Act. Scienter is not, and cannot be construed as, an element of such claims. Nevertheless, Defendants also knowingly and/or recklessly made materially false and misleading statements and omissions of material fact concerning BOA's prospects in connection with the Merger which artificially inflated the price of BOA securities during the Relevant Period. Certain of these materially false and misleading statements give rise to separate and distinct claims under Section 10(b) and Rule 10b-5 of the Exchange Act.

35.     For example, on or about September 15, 2008, BOA agreed to permit Merrill to pay up to $5.8 billion in bonuses to its employees before the scheduled Closing Date on January 1, 2009. These bonuses were clearly material, equaling 11.6% of the total value of the Merger at the time. Ultimately, on December 8, 2008, BOA authorized Merrill to pay $3.6 billion in bonuses prior to the Closing Date, representing 62% of the total potential bonus payments agreed to on September 15, 2008. BOA was also aware that Merrill historically paid year-end discretionary bonuses in January, and the agreement allowed Merrill to accelerate the payment of these bonuses prior to the January 1, 2009 Closing Date. Executives at BOA, including Defendant

1   Lewis, expressly approved the Merrill bonuses. At no point during the Relevant Period did

2   Defendants disclose to the investing public the existence of BOA's agreement with Merrill or the

3   eventual payment of the Merrill bonuses.

4           36.     Defendants also failed to disclose to investors Merrill's massive fourth quarter

5   losses in late November 2008 when they knew that Merrill had already lost at least $13.3 billion

6   for the quarter. Executives at BOA, including Defendants Lewis, Price, and Cotty, were kept fully

7   informed about Merrill's deteriorating financial condition from the time the Merger was

8   announced. As Defendant Thain testified under oath, "Bank of America had daily access to the

9   exact same financial information that I had," and "was totally up to speed as to what was

10  happening."  Defendant Lewis also admitted before Congress that BOA received "detailed

11  financial reports every week" from Merrill and that Merrill's losses were "clear" before the

12  Shareholder Vote.

13          37.     By the morning of the Shareholder Vote, Defendants knew that Merrill's losses

14  had increased to $15.3 billion, but failed to disclose this material information.  In fact, as further

15  described herein, internal BOA documents and sworn testimony establish that, in order to ensure

16  that no disclosure was made, BOA's most senior officers – who knew two days before the vote

17  that Merrill had suffered losses in October and November of at least $15 billion – affirmatively

18  misled BOA's General Counsel regarding the magnitude of the losses.

19          38.     Following the shareholder vote, Defendants continued to conceal highly material

20  information from investors.  Within days of the shareholder vote, Defendant Lewis internally

21  acknowledged that Merrill's losses were so significant that BOA could not proceed with the

22  Merger.  On or about December 17, 2008, Defendant Lewis called Secretary Paulson to inform

23  him that Merrill's losses were so severe that BOA was going to terminate the merger by invoking

24  the MAC.  Summoned almost immediately to a meeting in Washington, D.C., Lewis falsely

25  claimed to Secretary Paulson and Chairman Bernanke that Merrill's losses only recently

26  materialized in mid-December, and that he had been unaware of them until then.

27          39.     After reviewing Merrill's and BOA's financial data, senior officials of the U.S.

28  Federal Reserve concluded that Lewis's claims of surprise were "***not credible***," and that Merrill's

935174.3                          - 13 -
                                                      CASE NO. _____
                                                                        COMPLAINT

1   financial deterioration had been "**observably under way over the entire quarter**."  Indeed,

2   documents and other evidence establish that Merrill's losses were far greater in October and

3   November 2008 than in December 2008, and that BOA, which had appointed Cotty to be

4   Merrill's acting CFO when the Merger was announced, knew of these losses as they occurred.

5   Accordingly, Secretary Paulson and Chairman Bernanke told Lewis that invoking the "Material

6   Adverse Effect" clause in the Merger Agreement (commonly referred to as the "material adverse

7   change" clause or "MAC") "after three months of review, preparation and public remarks by the

8   management of Bank of America about the benefits of the acquisition" would reveal the falsity of

9   those statements, and "cast doubt in the minds of financial market participants . . . about the due

10  diligence and analysis done by the company, its capability to consummate significant

11  acquisitions, its overall risk management processes, and the judgment of it management."  As

12  Secretary Paulson later testified to Congress, he also told Lewis that, if Lewis invoked the MAC,

13  Lewis, BOA's senior management, and the BOA Board would be terminated.

14          40.     After this threat, and despite the fact that Merrill's losses were projected to be

15  more than $21 billion for the quarter, Defendant Lewis agreed not to invoke the MAC.  Instead,

16  he agreed to proceed with the Merger on the condition that the U.S. Government provide BOA

17  with a $138 billion taxpayer bailout, consisting of a highly dilutive $20 billion capital infusion

18  and an asset guarantee of $118 billion.  Recognizing that disclosure of these facts would lead to a

19  shareholder revolt, cause rating agency downgrades, and almost certainly prevent the Merger

20  from closing – and thus cost him his job – Defendant Lewis actively concealed the Government's

21  commitment from BOA's shareholders and investors.  In a December 22, 2008 email to the BOA

22  Board after the deal with the Government was reached, Lewis expressed his personal desire not to

23  disclose the bailout prior to the close of the Merger, writing, "I just talked with Hank Paulson.  He

24  said there is no way the Federal Reserve and the Treasury could send us a letter of any substance

25  [documenting the bailout] without public disclosure **which, of course, we do not want**."

26          41.     Significantly, internal BOA documents and sworn testimony establish that, at the

27  time BOA's senior officers made the decision not to disclose the bailout or Merrill's losses prior

28  to the close of the Merger, they knew that (i) this information was highly material; (ii) the market

1     had no idea that Merrill had suffered these losses, and in fact believed that BOA was in better

2     shape than its competitors precisely because it did not need "government assistance";

3     (iii) disclosure of the bailout prior to the Merger close would cause the deal to crater; and (iv) the

4     failure to disclose this information had created a "fundamental issue of lack of credibility" with

5     investors. Indeed, according to notes taken in December 2008 by a senior partner of BOA's

6     outside counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell"), BOA's senior officers knew

7     before the Merger closed that investors "do not have an inkling this [Merrill's losses] is coming,"

8     and that if BOA "disclosed the ever increasing losses for the fourth quarter," it would have an

9     "adverse impact" on BOA's credit ratings, cause the deal to "fall apart," and "presumably

10     confirm materiality of the fourth quarter losses." *See* paragraphs 380-386, *infra*.

11          42.     The Merger closed on January 1, 2009, with BOA shareholders and investors still

12     unaware that (i) Merrill had lost more than $21 billion in the fourth quarter of 2008 and was

13     insolvent; (ii) as a result of these massive losses, Lewis had advised the Treasury Department and

14     the Federal Reserve that BOA had determined that a MAC had occurred and that BOA should not

15     proceed with the Merger; (iii) BOA had agreed to proceed with the Merger only after Secretary

16     Paulson told Lewis that he would be fired if BOA refused to proceed; (iv) as a result of that

17     ultimatum, BOA's officers and directors faced a clear, irreconcilable conflict of interest in

18     agreeing to proceed with the Merger; (v) BOA could not absorb Merrill's losses, and had agreed

19     to proceed with the Merger only after obtaining a $138 billion taxpayer bailout; and

20     (vi) notwithstanding Merrill's losses, Merrill had paid its executives and employees $3.6 billion

21     in bonuses prior to the close of the Merger, further depleting Merrill's resources.

22         **C.**     **Defendants Gradually Disclosed Previously Withheld And/Or Misrepresented Material Facts.**

23

24          43.     In celebrating the closing of the Merger on January 1, 2009, Defendants made

25     materially false and misleading statements and omissions of material fact by claiming, among

26     other things, that the transaction "uniquely positioned [BOA] to win market share and expand

27     [BOA's] leadership position in markets around the world." On January 12, 2009, however, news

28     began to emerge indicating that BOA would report disappointing financial results. On this day, a

1   Citigroup analyst advised that BOA would report massive losses and cuts its dividend. In

2   response, BOA's share price declined from its opening price of $12.86 to close at $11.43.

3          44.     After the close of trading on January 14, 2009, BOA's December 2008 discussions

4   with federal regulators and its need for additional federal funding based upon Merrill's still

5   undisclosed fourth quarter 2008 losses became public in an article appearing in *The Wall Street

6   Journal*. The next day, BOA's common stock lost 18% of its value, dropping from $10.20 per

7   share on January 14, 2009 to close at $8.32 per share on January 15, 2009.

8          45.     On January 16, 2009, BOA issued its preliminary financial results for the fourth

9   quarter and full year of 2008, disclosing, among other things, BOA's loss of $1.79 billion for the

10  fourth quarter of 2008 and, at last, Merrill's $15.31 billion fourth quarter net loss (more than

11  $21 billion before taxes). On this news, BOA's stock price dove again, from $8.32 per share on

12  January 15, 2009 to $7.18 per share at the close of trading on January 16, 2009.

13         46.     During BOA's fourth quarter 2008 conference call on January 16, 2009, Defendant

14  Lewis admitted, among other things, that Defendants knew of Merrill's extreme losses prior to

15  completing the Merger, and that negotiations with federal regulators to salvage the transaction

16  had also taken place before the Merger closed:

17                 ***We went to our regulators and told them that we would not - that
                   we could not close the deal without their assistance***. As a result,
18                 we have agreed to the issuance of $20 billion in Tier-1 qualifying
                   TARP preferred [stock] as well as the issuance of an additional
19                 preferred of $4 billion in exchange for an asset guarantee that is
                   essentially insurance protection on approval of capital markets
20                 related assets.

21         47.     During the call, Defendant Lewis also acknowledged that BOA evaluated its rights

22  to terminate the Merger under the Merger Agreement and decided to move forward only with the

23  assistance of regulators. Defendant Lewis stated that he intentionally sought to avoid taking any

24  action that would result in re-pricing the Merger because doing so would have necessitated a new

25  shareholder vote on the transaction, perhaps defeating the Merger.

26         48.     After the market closed on January 21, 2009, *The Financial Times* issued a story

27  reporting that Merrill had made accelerated bonus payments, estimated at between $3-$4 billion,

28  before the Closing Date.

935174.3                              - 16 -
                                                              CASE NO. _____

COMPLAINT

49.     Upon these disclosures of previously omitted material facts, the price of BOA shares closed at $5.71 on January 22, 2009, down approximately 50% from the first partial disclosure of the truth on January 14, 2009, marking a $28.03 per share decrease from its closing price on September 12, 2008 – the last trading day before Defendants announced the Merger.

## II.     JURISDICTION AND VENUE

50.     This action arises under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder. This action also asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

51.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

52.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C.A. § 78aa, and 28 U.S.C. § 1391(b). Defendants conducted substantial business within this District and used the instrumentalities of the mails and other interstate facilities within this District throughout the course of the underlying fraud.  Defendants disseminated false and misleading statements in this District about the securities at issue in this litigation.   Plaintiffs received Defendants' material misrepresentations, voted on the Merger, and were damaged in this District.

53.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, internet communications and the facilities of the New York Stock Exchange ("NYSE").

## III.     THE PARTIES

### A.     Plaintiffs

54.     Plaintiff Schwab Investments is a no-load, open-end management investment company organized as a Massachusetts business trust and as a series investment company registered under the Investment Company Act as of October 26, 1990.  Schwab Investments' present principal place of business is located at 211 Main Street, San Francisco, California 94105.

55.     Plaintiff Schwab Capital Trust is an open-end management investment company organized as a Massachusetts business trust, registered under the Investment Company Act as of May 7, 1993, with its present principal place of business located in 211 Main Street, San Francisco, California 94105.

56.     Plaintiff Schwab S&P 500 Index Fund is a series of funds of Schwab Capital Trust.  Plaintiff Schwab S&P 500 Index Fund owned more than 2.5 million shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased approximately 130,000 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period, and has been damaged thereby.  As described below, Plaintiff Schwab S&P 500 Index Fund is also successor-in-interest to Plaintiff Schwab Institutional Select S&P 500 Fund.

57.     Plaintiff Schwab 1000 Index Fund is among a series of funds of Schwab Investments.  Plaintiff Schwab 1000 Index Fund owned more than 2 million shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased approximately 120,000 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period, and has been damaged thereby.

58.     Plaintiff Schwab Institutional Select S&P 500 Fund, prior to September 9, 2009, was a series of funds of Schwab Capital Trust.  Plaintiff Schwab Institutional Select S&P 500 Fund owned more than 1 million shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased approximately 235,800 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period, and was damaged thereby.  On September 9, 2009, several months after the close of the Relevant Period, Schwab Institutional Select S&P 500 Fund was merged into Plaintiff Schwab S&P 500 Index Fund.

935174.3

- 18 -

COMPLAINT

59.     Plaintiff Schwab Dividend Equity Fund is a series of funds of Schwab Capital Trust.  Plaintiff Schwab Dividend Equity Fund owned approximately 775,400 shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased approximately 100,000 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period, and has been damaged thereby.

60.     Plaintiff Schwab Core Equity Fund is a series of funds of Schwab Capital Trust.  Plaintiff Schwab Core Equity Fund owned approximately 350,000 shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased approximately 417,550 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period, and has been damaged thereby.

61.     Plaintiff Schwab Premier Equity Fund is a series of funds of Schwab Capital Trust.  Plaintiff Schwab Premier Equity Fund owned approximately 375,000 shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased approximately 150,000 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period, and has been damaged thereby.

62.     Plaintiff Schwab Fundamental US Large Company Index Fund is a series of funds of Schwab Capital Trust.  Plaintiff Schwab Fundamental US Large Company Index Fund owned more than 330,000 shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased approximately 55,000 shares of BOA common stock on the open market at artificially inflated prices during the Relevant Period, and has been damaged thereby.

63.     Plaintiff Schwab Total Stock Market Index Fund is a series of funds of Schwab Capital Trust.  Plaintiff Schwab Total Stock Market Index Fund owned approximately 270,000 shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger

1   and continued to hold these shares through the Shareholder Vote, voted its shares in favor of the

2   Merger, purchased approximately 69,000 shares of BOA common stock on the open market at

3   artificially inflated prices during the Relevant Period, and has been damaged thereby.

4        64.    Plaintiff Schwab Financial Services Fund is a series of funds of Schwab Capital

5   Trust.  Plaintiff Schwab Financial Services Fund owned approximately 122,800 shares of BOA

6   common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to

7   hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased

8   approximately 45,600 shares of BOA common stock on the open market at artificially inflated

9   prices during the Relevant Period, and has been damaged thereby.

10        65.    Plaintiff Schwab S&P 500 Index Portfolio is a series of funds of Schwab Capital

11   Trust.  Plaintiff Schwab S&P 500 Index Portfolio owned approximately 58,000 shares of BOA

12   common stock as of the October 10, 2008 Record Date for voting on the Merger and continued to

13   hold these shares through the Shareholder Vote, voted its shares in favor of the Merger, purchased

14   approximately 10,000 shares of BOA common stock on the open market at artificially inflated

15   prices during the Relevant Period, and has been damaged thereby.

16        66.    Plaintiff Schwab MarketTrack Growth Portfolio is a series of funds of Schwab

17   Capital Trust.  Plaintiff Schwab MarketTrack Growth Portfolio owned approximately 46,575

18   shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger

19   and continued to hold these shares through the Shareholder Vote, and voted its shares in favor of

20   the Merger.

21        67.    Plaintiff Schwab MarketTrack Balanced Portfolio is a series of funds of Schwab

22   Capital Trust.  Plaintiff Schwab MarketTrack Balanced Portfolio owned approximately 31,000

23   shares of BOA common stock as of the October 10, 2008 Record Date for voting on the Merger

24   and continued to hold these shares through the Shareholder Vote, and voted its shares in favor of

25   the Merger.

26

27

28

**B.**     **Defendants**

**1.**     **Corporate Defendants**

68.     Defendant BOA is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices located at 100 North Tryon Street, Charlotte, North Carolina. BOA is traded on the NYSE under the symbol "BAC." BOA is duly registered as a bank holding company and financial holding company under the Bank Holding Company Act of 1956, as amended. The Company provides various financial services to both retail and commercial customers in the United States and internationally.

69.     Defendant Merrill is a Delaware corporation headquartered at 4 World Financial Center, New York, New York 10080.  Merrill is a global financial services company, providing investment banking, wealth management, and research services.  From the start of the Relevant Period through December 31, 2008, Merrill stock was actively traded on the NYSE under the ticker symbol MER.  As of January 1, 2009, Merrill became a direct subsidiary of BOA.

**2.**     **Officer Defendants**

70.     Defendant Kenneth D. Lewis was, at all times relevant to this action, BOA's Chief Executive Officer, President, and Chairman of its Board of Directors.  Defendant Lewis signed the materially false and misleading Proxy Statement on BOA's behalf and was responsible for the accuracy and completeness of the information contained and incorporated by reference within it. Moreover, Defendant Lewis voted in favor of the Merger and recommended the Merger to BOA shareholders in the Proxy Statement.  As set forth herein, Defendant Lewis made materially false and misleading public statements and/or omitted material facts regarding the Merger in at least the following:

        i.      an analyst conference call on September 15, 2008;

        ii.     an analyst conference call on October 6, 2008 regarding BOA's third quarter 2008 earnings;

        iii.    an amendment to the Proxy Statement filed with the SEC on November 26, 2008 on Form 425/8-K;

        iv.    a BOA press release on December 5, 2008 announcing shareholder approval of the Merger;

v.   a BOA press release on January 1, 2009 announcing the closing of the Merger;

vi.   a BOA press release on January 16, 2009 announcing BOA's fourth quarter and year-end financial results; and

vii.   an analyst conference call on January 16, 2009 regarding BOA's fourth quarter and year-end financial results.

71.   Defendant Joseph L. Price was, at all times relevant to this action, BOA's Chief Financial Officer.  On January 12, 2010, Defendant Price was named as President of BOA's Consumer & Small Business Banking division, a position he held until September 6, 2011. Defendant Price signed the Proxy Registration Statement and was responsible for the accuracy and completeness of the information contained in the Proxy and incorporated by reference within it. Defendant Price made or caused to be made materially false and misleading public statements on behalf of BOA during the Relevant Period in Company press releases, conference calls with analysts, and in relevant BOA public filings with the SEC in favor of the Merger. As set forth herein, Defendant Price also made materially false and misleading public statements regarding the Merger in at least the following: (i) an analyst conference call on September 15, 2008; and (ii) an analyst conference call on October 6, 2008 regarding BOA's third quarter 2008 earnings.

72.   Defendant Neil A. Cotty was, at all times relevant to this action, BOA's Chief Accounting Officer. Defendant Cotty signed the Proxy Registration Statement and was responsible for the accuracy and completeness of the information contained in the Proxy and incorporated by reference within it. After the Merger Announcement on September 15, 2008, Defendant Cotty was appointed as Merrill's interim Chief Financial Officer ("CFO"), and acted as a direct liaison between BOA and Merrill, reporting to Defendants Lewis and Price. As Merrill's interim CFO, Cotty had daily access to and knew of Merrill's fourth quarter 2008 financial losses, as confirmed by Merrill's then Chief Executive Officer, Thain, on January 26, 2009. On January 12, 2010, Defendant Cotty was named as BOA's interim CFO, a position he held until May 11, 2010. Defendant Cotty is BOA's current Chief Accounting Officer.

73.   Defendant John A. Thain was Merrill's CEO and Chairman of the Board from the beginning of the Relevant Period through December 31, 2008.  From January 1, 2009 through the

935174.3
- 22 -

CASE NO. _____

COMPLAINT

1    end of the Relevant Period, Defendant Thain was the President of Global Banking, Securities and

2    Wealth Management at BOA.  Thain signed the Merger Agreement on behalf of Merrill.  Thain

3    also personally signed a cover letter for the materially false and misleading Proxy.  Because of his

4    senior position with Merrill, Thain possessed the power and authority to control the contents of

5    the Merger Agreement, Proxy and Merrill's press releases, investor and media presentations, and

6    other SEC filings.  Defendant Lewis terminated Thain's employment with BOA on January 22,

7    2009.

8             74.    Lewis, Price, Cotty and Thain are collectively referred to herein as the "Officer

9    Defendants."  The Officer Defendants had the duty to make full, candid, and timely disclosures of

10   all material facts relating to the business, operations, performance, and prospects of BOA, as well

11   as all material facts pertaining to the Merger. These duties included updating representations in

12   the Proxy Statement and related documents to correct the statements therein that were materially

13   misleading and/or omitted material facts. Among other things, the Officer Defendants were

14   required to:

15        •    conduct and supervise the business of BOA in accordance with all
16             applicable laws and regulations; and

17        •    supervise the preparation of the Company's SEC filings, including but not
             limited to, the Proxy Statement and any and all amendments thereto, and
18             approve any reports concerning the financial reporting and results of BOA.

19             75.    As controlling persons of a publicly-held company whose common stock was, at

20   all relevant times, registered with the SEC pursuant to the Exchange Act and governed by the

21   provisions of the federal securities laws, the Officer Defendants each had a duty to promptly

22   disseminate accurate and truthful information with respect to the Company's performance,

23   operations, business, and prospects. Each of the Officer Defendants also had a duty to correct any

24   previously issued statements that were or had become materially misleading or untrue. The

25   performance of such duties by the Officer Defendants was required so that shareholders eligible

26   to vote on the Merger would have all relevant information prior to the Shareholder Vote and prior

27   to the consummation of the Merger, and so that the market price of the Company's publicly-

28   traded securities would be based upon truthful and accurate information.

935174.3                          - 23 -
                                                        CASE NO. _____

COMPLAINT

1
2
3
4
5
6

76.     As a result of the Officer Defendants' failure to fulfill the foregoing obligations, BOA shareholders voted to approve the Merger without information material to their vote. Such information, which was available to the Company and the Officer Defendants, concerned, among other things, the negative impact of Merrill's dire financial condition on the value of the Merger and BOA's undisclosed agreement to permit billions of dollars in bonus payments to be made to Merrill employees.

7
8
9

77.     Additionally, as a result of the Officer Defendants' failures, BOA's common stock was artificially inflated during the Relevant Period. As a direct and proximate result of the Officer Defendants' wrongdoing, Plaintiffs, in purchasing BOA's common stock, were damaged.

10

## IV.    FACTUAL BACKGROUND

11

### A.    Pre-Merger BOA

12
13
14
15
16
17
18
19
20
21

78.     Beginning in 1992, BankAmerica Corporation, founded in California in 1904, purchased leading regional retail banks in California, Washington, Arizona, Idaho and Oregon. By 1994, BankAmerica Corporation had become the largest commercial bank in the U. S. in terms of deposits. In 1997, NationsBank Corporation, founded in North Carolina in 1874, surpassed BankAmerica Corporation to become the largest commercial bank in the U.S. in terms of deposits through its own acquisitions of regional banks in Florida and Georgia. In 1998, NationsBank Corporation completed the then-largest bank acquisition in history when it acquired BankAmerica Corporation to create BOA, which became the largest commercial bank in the U.S. in terms of deposits and the only true coast-to-coast bank franchise, with more than 4,800 branches in 22 states.

22
23
24
25
26
27

79.     In 2001, Defendant Lewis, a NationsBank Corporation employee during that company's era of acquisitions and the chief lieutenant of its former-CEO, became Chairman and CEO of BOA. Unlike his predecessor, Defendant Lewis stated an intention to institute an era of entrenchment at BOA and grow the Company organically by increasing the customer base in the Company's traditional core businesses: commercial and retail banking, mortgage lending, and credit cards.

28

CASE NO. _____

COMPLAINT

80.     Defendant Lewis' intended discipline did not last long. Beginning in 2004, he steered BOA through a campaign to acquire banks and financial institutions in a massive spending spree that eventually totaled more than $120 billion. For example, in 2004, BOA purchased FleetBank Financial, the largest bank in New England, for $47.2 billion. In 2005, BOA purchased MBNA Corporation, the largest independent issuer of credit cards in the U.S., for $34.6 billion. In 2007, BOA purchased United States Trust Company, the largest trust company in the U.S., for $3.3 billion and LaSalle Bank Corporation, an Illinois-based regional bank, for $21 billion.

81.     By November 2006, BOA had $1.45 trillion in assets, second only to Citigroup Inc., and its common stock was trading at an all-time high of more than $54 per share. On November 29, 2006, BOA's market capitalization reached $243.7 billion, finally surpassing Citigroup Inc. as the most valuable bank in the world in terms of market capitalization.

82.     On January 11, 2008, BOA announced that it was acquiring troubled Countrywide Financial Corporation ("Countrywide"), the largest mortgage lender in the U.S., for approximately $4 billion, and on September 15, 2008 BOA announced the Merger with Merrill, Defendant Lewis' most ambitious acquisition to date. BOA's common shares closed at $33.74 on September 12, 2008, the last trading day before the Merger Announcement.

**B.      Pre-Merger Merrill**

83.     Founded in 1914, Merrill grew to become one of the world's leading providers of wealth management, brokerage, corporate finance, and investment banking services, with offices in 40 countries and territories around the world. In particular, Merrill was a preeminent provider of retail brokerage and wealth-management services, with more than 20,000 advisors and more than $1.7 trillion in client assets.

84.     Like many of its peer financial institutions, beginning no later than 2003, Merrill expanded from its core businesses (brokerage services, corporate finance and investment banking) to become a central participant in the subprime mortgage industry. From 2004 through 2006, Merrill was the biggest underwriter of mortgage-backed collateralized debt obligations ("CDOs") in the world and, by 2006, was also one of the leading originators of subprime

1    mortgages through its subsidiaries, including First Franklin Financial Corporation. CDOs are a

2    type of structured security collateralized by pools of underlying assets, such as asset-backed

3    securities, mortgage loans, auto loans, and/or credit card receivables. Many of Merrill's CDOs

4    were comprised of risky subprime mortgages.

5         85.    Merrill's massive bets on the subprime industry appeared to pay huge dividends.

6    Merrill reported record profits in 2006 of $7.5 billion, making it the second most profitable firm

7    on Wall Street after Goldman Sachs & Co. Merrill's common stock price hit an all-time high of

8    $97.53 per share in January 2007.

9         86.    However, Merrill's purported profits derived from subprime activities were short-

10   lived. On October 24, 2007, less than ten months after it reported record profits, Merrill

11   announced a net loss in the third quarter of 2007 of $2.3 billion, attributed to $7.9 billion in write-

12   downs on CDOs and subprime mortgages. The losses were not only Merrill's first quarterly losses

13   in more than six years, but were also – at least up to that point – the largest losses in the

14   company's history.

15        **C.     The Lehman Meetings**

16        87.    In early September 2008, Lehman, a competitor of Merrill and BOA, faced

17   significant declines in its stock price from its exposure to subprime-related assets. As a result of

18   the severity of Lehman's stock decline, Merrill and BOA became involved in a series of meetings

19   with federal regulators, Lehman, and other investment banks designed to save Lehman from

20   bankruptcy. It was in connection with these emergency meetings from September 12-14, 2008

21   that the Merger between BOA and Merrill was proposed, negotiated, and finalized.

22        88.    During the week of September 8, 2008, following Lehman's announcement that it

23   had not secured an anticipated merger deal with Korean Development Bank, the value of Lehman

24   common stock declined by approximately 80%.

25        89.    The prevailing wisdom among market analysts heading into the weekend of

26   September 13-14, 2008 was that Lehman was likely to file for bankruptcy in the next several days

27   given its inability to find new sources of credit or another company willing to merge with it. If

28

COMPLAINT
CASE NO. _____

1   Lehman filed for bankruptcy, Merrill's financial condition would also be negatively affected

2   given Merrill's substantial counterparty transactions with Lehman.

3          90.    In an effort to stave off Lehman's bankruptcy, an emergency meeting among high

4   level officials from the United States Treasury Department, the Federal Reserve Bank, the SEC,

5   and senior executives at the largest U. S. financial institutions was held on the evening of Friday,

6   September 12, 2008 at the offices of the Federal Reserve Bank of New York. In attendance from

7   the government were then Treasury Secretary Paulson, then President of the Federal Reserve

8   Bank of New York Timothy Geithner, and then SEC Chairman Christopher Cox. The bank

9   executives at the meeting included Morgan Stanley CEO John Mack, JPMorgan Chase CEO

10  James Dimon, Goldman Sachs CEO Lloyd Blankfein, Citigroup CEO Vikram Pandit, then

11  Merrill CEO Thain, and representatives from BOA, the Royal Bank of Scotland Group Plc, and

12  Bank of New York Mellon Corporation.

13         91.    Earlier that day, Secretary Paulson instructed his policy director Michele Davis

14  and legislative affairs chief Kevin Fromer to inform U. S. financial institutions through media

15  communications that the federal government would not supply taxpayer money to subsidize a

16  bailout of Lehman.

17         92.    On Saturday, September 13, 2008, Lehman's president, Herbert H. McDade III,

18  gave a presentation on Lehman's financial condition to the same group of government officials

19  and financial institutions present at the prior night's meeting. Mr. McDade outlined the significant

20  asset write-downs and losses suffered by Lehman. The dire news concerning Lehman's assets and

21  liabilities was reinforced by certain financial institutions that had reviewed their respective

22  Lehman exposures.

23         93.    BOA, Barclays, and HSBC had each previously expressed interest in merging with

24  Lehman, but only on the condition that the federal government provide financial assistance to

25  support the transaction as it did earlier in the year in transactions involving Bear Stearns, Freddie

26  Mac, and Fannie Mae, respectively. Now, in the absence of direct government support, the

27  prospects for a viable merger to save Lehman from bankruptcy became increasingly remote as the

28  Saturday meetings progressed.

**D.      Merrill Initiates Merger Discussions With BOA**

94.      Merrill had conducted a telephone conference the morning of September 12, 2008, during which senior management made a presentation to the company's Board of Directors on general market conditions, Lehman's financial situation, Merrill's capital and overall liquidity, Merrill's recent stock performance, and potential ratings agency downgrades of Merrill's stock. At the conclusion of the presentation, Merrill's Board of Directors instructed senior management to explore alternatives to protect Merrill's interests.

95.      During the course of the Lehman meetings on September 13, Thain telephoned Defendant Lewis to discuss a possible transaction between Merrill and BOA. Defendant Lewis was immediately receptive to Thain's call, and by 2:30 p.m. that same day the two men met in person in New York City to discuss a possible business combination.

96.      At this Saturday afternoon meeting, Thain initially proposed to sell BOA a 9.9% equity stake in Merrill. BOA would also provide Merrill with a credit facility as part of the contemplated transaction. In response, Defendant Lewis stated that BOA was not interested in acquiring a minority stake in Merrill, but rather in negotiating a business combination between the two companies.

97.      Defendant Lewis believed there was a strategic fit between BOA and Merrill, and was eager to acquire Merrill's industry-leading retail brokerage and wealth management businesses. By the end of the afternoon, Thain agreed to sell Merrill to BOA on the condition that Merrill shareholders receive a substantial control premium above Merrill's September 12, 2008 closing price of $17.05 per share.

**E.      Defendants' Purported Due Diligence On The Merger**

98.      Throughout the remainder of the day on September 13, 2008, management of both BOA and Merrill met internally and with their respective advisors to discuss the terms of the possible Merger in greater detail. These parties began to undertake their due diligence investigations of BOA and Merrill.

99.      BOA retained J.C. Flowers and Fox-Pitt as Financial Advisors on the Merger negotiations. By this point, the parties were contemplating an all-stock transaction and, as part of

1     their engagement, the Financial Advisors were to issue fairness opinions on the Merger's

2     Exchange Ratio for converting Merrill stock into BOA stock.

3          100.    Merrill's due diligence was handled internally by its affiliated entity Merrill

4     Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"). MLPFS was also engaged to issue a

5     fairness opinion on the agreed Exchange Ratio for the Merger.

6          101.    The companies' respective due diligence investigations continued throughout the

7     remainder of Saturday, September 13, and into the following morning.

8          **F.**      **The Merger Valuation And Pricing Negotiations**

9          102.    Early on Sunday, September 14, 2008, less than 24 hours after their initial

10    conversation, Thain and Defendant Lewis met again to discuss the results of their due diligence

11    investigations and the perceived benefits of a merger between the companies. At this meeting,

12    Defendant Lewis and Thain agreed to have representatives of their companies and their legal

13    advisors begin negotiating the terms of the Merger Agreement between BOA and Merrill. This

14    included negotiations on the valuation and pricing of the potential acquisition.

15         103.    BOA retained the law firm of Wachtell, Lipton, Rosen & Katz ("Wachtell

16    Lipton") to work on the documentation of the Merger Agreement. Merrill's legal counsel on the

17    transaction was the law firm of Shearman & Sterling LLP.

18         104.    Merrill representatives again indicated that under the Merger terms, the company

19    would be seeking a significant premium on its September 12, 2008 common stock closing price

20    of $17.05 per share, plus an appropriate multiple of book value.

21         105.    BOA and Merrill ultimately agreed to present their respective Boards with a

22    proposed transaction price of $29.00 for each share of Merrill common stock – a 70% premium

23    over Merrill's September 12 closing price. This equaled an Exchange Ratio of 0.8595 based on

24    the $33.74 closing price for a share of BOA common stock on September 12, 2008.

25         **G.**      **BOA Secretly Agrees To Permit Merrill To Pay Up To $5.8 Billion In Bonuses**

26                   **To Merrill Employees Prior To The Merger Closing Date.**

27         106.    According to statements that Thain made on September 17, 2009, fiscal year 2008

28    bonuses for Merrill employees were one of the "main things" discussed during the Merger

1   negotiations. Thain further stated that the other major components of the transaction discussed at

2   this time were the price of the deal and the MAC. The planned bonus payments to Merrill

3   employees were not disclosed before the Shareholder Vote or the Closing Date.

4          107.   The secret bonus provisions of the Merger were negotiated by Greg Curl, BOA's

5   Global Corporate Strategic Development and Planning Executive, and Greg Fleming, Merrill's

6   President and Chief Operating Officer.

7          108.   Historically, Merrill paid its employees bonuses in January based upon their

8   performance for Merrill's prior fiscal year. Merrill described its compensation policy in its 2008

9   Definitive Proxy which was filed with the SEC on March 14, 2008 (and later incorporated by

10  reference into the Proxy Statement). The Definitive Proxy stated that "[t]he goal of [Merrill's]

11  compensation program is to provide an integral link between pay and performance and to fully

12  align the interests of employees with those of shareholders," and that "the financial performance

13  of [Merrill] as a whole had to be the dominant consideration in formulating its compensation

14  determinations." As detailed herein, Merrill's payment of astronomical and undisclosed

15  "performance" bonuses in light of the company's crippling losses at the time was inconsistent

16  with the objectives of Merrill's compensation policy.

17         109.   During the bonus negotiations prior to the September 15, 2008 Merger

18  Announcement, in which Lewis and Thain were intimately involved, Merrill not only sought the

19  right to pay up to $5.8 billion in discretionary year-end bonuses to its executives and employees,

20  but it also insisted that it be allowed to accelerate these bonuses so that they could be paid in

21  December 2008. Thus, the bonuses would be paid before the Merger was scheduled to close on

22  January 1, 2009 and before Merrill's financial results for the fourth quarter of 2008 became

23  public. These material facts were not disclosed.

24         110.   According to a February 7, 2009 *New York Times* article, during the bonus

25  negotiations "[a] page was ripped from a notebook, and someone on Merrill's team scribbled

26  eight-digit figures for each of Merrill's top five executives, including $40 million for Thain

27  alone." The *New York Times* article further stated that the bonuses were not in consideration for

28  performance, but rather "were fees for getting the merger done, akin to what investment bankers

1    receive for blockbuster deals. Thain in particular felt he deserved a hefty payout for his deal-

2    making heroics, according to five individuals with detailed knowledge of the situation. . . ."

3    Ultimately, after hours of bonus negotiations, BOA agreed to permit Merrill to pay up to

4    $5.8 billion in discretionary bonuses to its executives and employees.

5          111.   Significantly, BOA agreed to Merrill's acceleration of the bonus payments to

6    December 31, 2008, a day before the Closing Date. As Thain testified in his February 19, 2009

7    deposition taken by the New York Attorney General's Office: "***The timing . . . was determined***

8    ***when we signed the merger agreement***. The timing was contemplated then, in September, to be

9    prior to the close, and the expectation was always that the close would be on or around December

10   31."

11         112.   The relevant provision governing payment of Merrill's bonuses was included in a

12   "Disclosure Schedule" that was appended to the Merger Agreement, ***but was omitted from the***

13   ***publicly filed version of the Merger Agreement***. This provision stated:

14            5.2(b)(iii), 5.2(c)(i), and 5.2(c)(ii) – Variable Incentive
             Compensation Program ("VICP") in respect of 2008 (including
15           without limitation guaranteed VICP awards for 2008 or any other
             pro rata or other 2008 VICP awards payable, paid or provided to
16           terminating or former employees) may be awarded at levels that (i)
             do not exceed $5.8 billion in aggregate value (inclusive of cash
17           bonuses and the grant date value of long-term incentive awards) . . .
             and (ii) do not result in 2008 VICP-related expense exceeding $4.5
18           billion . . . . Sixty percent of the overall 2008 VICP shall be
             awarded as a long-term incentive award either in the form of equity
19           or long-term cash awards. The form (i.e., equity v. long-term cash)
             and terms and conditions of the long-term incentive awards shall be
20           determined by [Merrill] in consultation with [BOA] . . . . The
             allocation of the 2008 VICP among eligible employees shall be
21           determined by [Merrill] in consultation with [BOA].

22         113.   The "Disclosure Schedule" was never publicly disclosed, and the contents of the

23   Schedule were not provided in the Merger Agreement, the Proxy Statement, or any of the

24   Defendants' public statements made prior to the Closing Date. Accordingly, the Disclosure

25   Schedule was never seen by BOA shareholders, including Plaintiffs, prior to either the

26   Shareholder Vote or the Closing Date. In direct contrast to the Disclosure Schedule, a provision in

27   the Merger Agreement entitled "Company Forbearances" stated that Merrill would not "pay any

28   amounts to [directors, officers, or employees] not required by any current plan or agreement

1    (other than base salary in the ordinary course of business)." Significantly, this provision was *the*

2    *only* provision shareholders, including Plaintiffs, saw prior to the Shareholder Vote and Closing

3    Date regarding Merrill's bonuses. This disclosure, which purported to limit compensation to

4    "required" payments, failed to provide Plaintiffs with the material information that BOA had

5    *already* authorized payment of up to $5.8 billion in bonus payments to Merrill employees.

6         114.    As the New York Attorney General highlighted in his complaint, Merrill continued

7    to falsely represent in letters to the New York Attorney General on November 5, 2008 and to the

8    Oversight Committee on November 24, 2008 that it planned to make incentive compensation

9    decisions at year-end, from which it logically followed that Merrill would wait until after year-

10   end to actually pay bonuses. For example, Merrill stated to the Oversight Committee:

11                 Merrill Lynch operates on a calendar-year basis. The Management
                   Development and Compensation Committee of the Board of
12                 Directors makes incentive compensation decisions at year-end.
                   Consistent with this calendar year-end process, incentive
13                 compensation decisions for 2008 have not yet been made.

14        115.    According to the New York Attorney General, these representations were false and

15   misleading because Merrill's Compensation Committee had agreed to an accelerated timetable on

16   November 11, 2008, nearly two weeks before the letter to the Oversight Committee was written,

17   which involved setting a date of December 8, 2008 to allocate up to $5.8 billion in bonus

18   payments. Additionally, BOA "sat back" and "tacitly approved" Merrill's payout of these

19   bonuses in "its worst year of financial performance on record, one in which its losses exceeded

20   $27 billion after taxes."

21        116.    While $3.6 billion in bonuses were eventually paid out prior to the Closing Date,

22   the $5.8 billion in total bonuses that BOA agreed to permit Merrill to pay on September 15, 2008

23   constituted approximately:

24              ●    11.6% of the Merger's $50 billion total value;

25              ●    26% more than BOA earned during the first two quarters of 2008;

26              ●    30% of Merrill's total stockholder equity; and

27              ●    8% of Merrill's total cash and cash equivalents as of December 31, 2008.

28

117.     Plaintiffs and other BOA shareholders voted on the Merger only after receiving inaccurate and incomplete material facts from the Defendants regarding Merrill's bonus payments. The accurate and complete facts that should have been shared with BOA shareholders, including Plaintiffs, were in Defendants' possession but were not disclosed until well after the Closing Date.

**H.     The Merger Presentation To The BOA Board**

118.     Late in the afternoon on Sunday, September 14, 2008, less than 36 hours after Thain first contacted Defendant Lewis to discuss a possible transaction, BOA's senior management and the Financial Advisors presented the results of their abbreviated due diligence of Merrill to the BOA Board. The presentation included, among other things, a truncated analysis of the two companies' financial information.

119.     Following a review of these presentations on September 14, 2008, the BOA Board determined that the Merger was in the best interests of BOA and its stockholders and voted unanimously to approve the contemplated Merger Agreement, which was still being finalized. Merrill's Board of Directors held a separate meeting at approximately the same time and also voted unanimously to approve the transaction.

120.     Both companies and their respective advisors continued to finalize the definitive agreements for the transaction following approval of the Merger by the Boards of BOA and Merrill.

121.     In the early morning of September 15, 2008, approximately 48 hours after Thain had initially contacted Defendant Lewis, both BOA and Merrill executed the Merger Agreement, which set forth the terms of the Merger.

122.     Under the Merger Agreement, the purchase price for Merrill was approximately $50 billion, comprised of $44 billion for Merrill's common shares and $6 billion for stock options, convertible securities, and restricted stock units. BOA anticipated issuing approximately 1.71 billion shares of common stock and 359,100 shares of preferred stock in the Merger.

## V. SUMMARY OF CLAIMS

123. Plaintiffs state a claim in Count I for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder against all Defendants. Count I is not based upon any allegations of fraudulent or knowing misconduct by any Defendant, and Plaintiffs disclaim any reference to or reliance upon allegations of fraud for its claim under Count I, which is based solely upon Defendants' negligence. Count II states a claim for control person liability under Section 20(a) of the Exchange Act against the Officer Defendants in connection with the primary violation of Section 14(a).

124. Separately, in Counts III through VI, Plaintiffs assert claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against BOA, Merrill, and Defendants Lewis, Price and Thain, and Section 20(a) against the Officer Defendants. These claims are independent of the other claims alleged herein.

## VI. DEFENDANTS' VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND RULE 14a-9 PROMULGATED THEREUNDER

### A. Materially False And Misleading Statements And Omissions Of Material Fact In The Proxy Statement And Related Solicitation Materials

#### 1. Defendants Announce the Merger

125. On September 15, 2008, BOA issued a press release entitled "Bank of America Buys Merrill Lynch Creating Unique Financial Services Firm" (the "September 15, 2008 Press Release"), announcing the Merger and describing Merrill as a "leading global wealth management, capital markets and advisory company." In the September 15, 2008 Press Release, Defendant Lewis described the Merger as "a great opportunity for our shareholders" and claimed that "[t]ogether, [the] companies are more valuable because of the synergies in our businesses."

126. The September 15, 2008 Press Release also stated that through the Merger, BOA "expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012," and that "[t]he acquisition is expected to be accretive to earnings by 2010." Merrill was described as adding "strengths in global debt underwriting, global equities and global merger and acquisition advice." The only specific information in the September 15, 2008 Press Release regarding Merrill's financial condition was the assertion that the company had total client assets of approximately

1    $1.4 trillion and owned half of BlackRock, Inc., a leading investment management company. The

2    September 15, 2008 Press Release made no reference to Merrill's trading and investment assets,

3    which were largely illiquid and susceptible to significant future write-downs.

4         127.    The September 15, 2008 Press Release also explained that in connection with the

5    Merger, BOA would file a Registration Statement with the SEC on Form S-4. This SEC filing

6    would include the Proxy Statement issued by BOA and Merrill containing important information

7    about the Merger. The September 15, 2008 Press Release was incorporated by reference into the

8    Proxy Statement.

9         128.    Immediately following the September 15, 2008 Press Release, there was

10   speculation among market analysts that BOA had paid too much for Merrill. Moreover, there

11   were concerns that BOA could not possibly have conducted sufficient due diligence to adequately

12   evaluate Merrill's financial condition in the 36 hours preceding the Merger. As alleged below,

13   Defendants made materially misleading and incomplete statements in the Proxy Statement

14   refuting each of these concerns.

15                          **2.    The Merger Presentation to Investors**

16        129.    The mechanics of the Merger and the considerations behind it were summarized in

17   a slideshow presentation to BOA and Merrill investors on September 15, 2008 (the "Merger

18   Presentation"). The Merger Presentation was entitled "Creating the Premier Financial Services

19   Company in the World," and listed both Thain and Lewis on the front cover. BOA filed the

20   Merger Presentation with the SEC on Form 425.

21        130.    The Merger Presentation, designed to encourage BOA shareholders to approve the

22   Merger, described Merrill as a "premium franchise," a "[l]eading global wealth manager," a

23   "leading global investment bank," and a company with an "[e]xperienced management team." On

24   a slide entitled "Strategic Rationale" for the Merger, the presentation listed the following: (i)

25   "Diversify business mix"; (ii) "Significant enhancement to [BOA's] investment banking

26   capabilities"; (iii) "Leadership position in retail brokerage and wealth management"; and (iv)

27   "Brings global scale in investment management."

28

131.    The Merger Presentation also included a slide entitled "Stable Merrill Lynch Core Franchise Despite Market Challenges" which graphically depicted Merrill's quarterly net revenues from 2005 through the first half of 2008. While the graph indicated that Merrill's net revenues for the first half of 2008 were approximately $14.9 billion, it omitted any information regarding the significant company losses in such asset categories as investment securities, private equity investments, and loans during this same time period. Merrill's losses in these asset categories would ultimately prove to be enormous.

132.    In addition to the positive depiction of Merrill's net revenues, the presentation contained a slide entitled "Other Considerations" which purported to address the "Risk" associated with the Merger. This slide represented the following with respect to the Merger "Risk":

- Due diligence complete
- Significant progress by Merrill Lynch in reducing risk
- Asset valuations carefully reviewed

133.    Taken together, the slides gave every assurance that the Merger was in the best interests of BOA and its shareholders. Among other things, the Merger Presentation omitted material facts indicating the continuing deterioration of Merrill's assets and the billions of dollars in bonus payments that BOA had agreed to permit Merrill to pay its employees prior to the Closing Date.

**3.    The September 15, 2008 Analyst Conference Call**

134.    In connection with the Merger Announcement, Lewis, Price and Thain conducted an analyst conference call on September 15, 2008 (the "September 15, 2008 Analyst Call").

135.    Addressing the issue of the Merger price, Matthew O'Connor, a UBS analyst, stated that "there's a lot of near-term uncertainty and I think a lot of people would view Merrill's stock as selling off today and this week if the deal hadn't been announced. I guess the question is why pay $29 at this point?"

COMPLAINT

CASE NO. _____

136.     Among other considerations, Defendant Lewis stated that BOA agreed to the Merger price given that "the long-term benefits were so overwhelming, it was such a strategic opportunity that we elected . . . to go ahead and do it at this time."

137.     In addressing concerns regarding the adequacy of due diligence performed by and on behalf of BOA, Defendant Lewis described J.C. Flowers as follows:

> J.C. Flowers or Chris Flowers is someone we've known for quite some time. We've done several deals with him. We know his firm very well, and it was fortunate that we did because his firm – he and his *firm had done quite an amount of due diligence on Merrill Lynch fairly recently, and it was very, very extensive*. They had looked at the marks very comprehensively, so this allowed us to have him and [his] team as an adviser, and just update the information they already had. *So that was one of the key ingredients to being able to do this as quickly as we did. . . .*

138.     The foregoing statement, made in connection with soliciting proxies for the Merger, was materially misleading because J.C. Flowers' "recent and extensive" work on Merrill did not provide an adequate basis to determine the fairness of the Merger or the Exchange Ratio. As the New York Attorney General stated in his complaint, "'fairly recently' was a misleading description" as BOA was relying on diligence J.C. Flowers "had done on Merrill in late 2007 in connection with another potential investment [that was] never completed."

139.     Defendant Price reiterated the assertion that J.C. Flowers' prior knowledge of Merrill had allowed J. C. Flowers to conduct adequate due diligence in an extremely abbreviated time period, and added that: "the progress that Merrill Lynch had made in reducing risk exposures and analyzing them and having all that laid out given the efforts that the management team has made over the last period made it possible for us."

140.     Defendant Price's statements during the September 15, 2008 Analyst Call were made on behalf of BOA and in connection with soliciting proxies for the Merger. The statements were materially misleading because neither BOA's nor J.C. Flowers' prior experience with Merrill provided an adequate basis to determine the fairness of the Merger or the Exchange Ratio. Nor did Merrill's purported efforts to reduce risk provide a basis for the due diligence performed in connection with the Merger to be as abbreviated as it was.

141.    Defendant Lewis also provided further reassurance that Merrill's assets were sound and had been examined carefully by BOA. Like Price, he indicated that Thain "and his team had made incredible progress" in reducing the risk exposures in Merrill's asset portfolios. Defendant Lewis also assured investors that "Merrill had the liquidity and capacity to see [the Merger] through." When questioned on whether BOA had considered Merrill's CDO portfolio for purposes of taking marks in connection with the Merger, Defendant Lewis again stated:

> [t]he numbers that we presented today, we had considered marks on the assets. . . . I will tell you that again going back to the point on things such as CDOs, we have very similar methodology valuations and we have very similar marks to structures. We're dealing with the same counterparties on things. . . . *we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself[in terms of risk reduction]*."

142.    Given the inquiries regarding the severe risks associated with Merrill's illiquid CDO asset classes, Defendants were acutely aware that investors and BOA shareholders wanted detailed information concerning Merrill's asset valuations and write-downs prior to voting on the Merger. Defendants had an obligation to ensure that the Proxy Statement, and the documents incorporated by reference therein, contained accurate and complete information concerning Merrill's assets in order for BOA shareholders, including Plaintiffs, to make a fully informed decision regarding the Merger.

143.    Rather than meeting this obligation, Defendants failed to include details about Merrill's rapidly deteriorating financial condition in the Proxy Statement and failed to correct these statements as Merrill's losses grew. Instead, Defendants gave materially misleading assurances that adequate due diligence on Merrill's assets had been conducted in connection with negotiating and pricing the Merger.

**4.    The Undisclosed Agreement to Permit Billions of Dollars in Bonuses to Merrill Employees**

144.    As noted above, Defendants failed to disclose that at the time the Merger Agreement was executed, BOA had secretly agreed to permit Merrill to pay its employees up to $5.8 billion in bonuses before the Merger's scheduled Closing Date.

145.    Remarkably, the agreement, which permitted Merrill to pay bonuses equaling approximately 11.6% of the total Merger consideration, was not documented in the public Merger Agreement that was later incorporated into the Proxy Statement distributed to BOA shareholders, including Plaintiffs. Instead, the agreement on the Merrill bonuses was hidden in a non-public "Disclosure Schedule" appended to the Merger Agreement.

146.    The existence and terms of the bonus agreement were material to BOA shareholders, including Plaintiffs, and Defendants should have known that the bonuses would be viewed unfavorably, particularly in light of the fact that BOA received at least $15 billion from the Treasury Department under the Troubled Asset Relief Program ("TARP") in October 2008. Indeed, as Thain stated, Merrill's bonuses were one of the three "main things" focused on in the merger negotiations. As such, it would be expected that the bonuses would be part of the information disseminated to BOA shareholders, including Plaintiffs, prior to the Shareholder Vote.

### 5.    The Proxy Statement

147.    On November 3, 2008, the Schedule 14A Definitive Joint Proxy Statement, dated October 31, 2008, was filed with the SEC. The Proxy Statement contained the statements discussed below, which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, stated material facts requiring correction based upon subsequent facts and events, and/or omitted material facts necessary to prevent such statements from being false or misleading.

148.    The Proxy Statement began with a letter signed by Defendant Lewis (the "Shareholder Letter") setting forth the basic terms of the Merger, including the 0.8595 Exchange Ratio by which each Merrill share would be converted into shares of BOA. In bold letters at the bottom of the Shareholder Letter, it stated that "*[t]he Bank of America board of directors unanimously recommends that Bank of America stockholders vote FOR the proposal to issue shares of Bank of America common stock in the merger and FOR the other related proposals*." (emphasis in original.) The letter indicated the same recommendation by the Merrill Board of Directors to Merrill shareholders.

COMPLAINT

CASE NO. _____

149.    The opposite page of the Shareholder Letter contained a "Notice of Special Meeting of Stockholders" addressed to BOA shareholders by order of the BOA Board. This notice indicated that a special meeting of BOA shareholders would be held on December 5, 2008 to consider and vote on, among others, the proposal to: (i) issue new BOA shares as contemplated by the Merger Agreement; and (ii) adopt an amendment to BOA's certificate of incorporation to increase the number of authorized shares of BOA common stock from 7.5 billion to 10 billion. The notice indicated that the BOA Board had set the close of business on October 10, 2008 as the Record Date for shareholder eligibility to vote on the Merger. Finally, the notice stated that only holders of BOA common stock and Series B Preferred stock as of the Record Date would be entitled to vote on the Merger.

150.    The Proxy Statement enumerated the following bases (among others) upon which BOA and the BOA Board purportedly concluded that the Merger was in the best interests of the Company and its shareholders:

> In reaching its conclusion to approve the merger agreement, the Bank of America board considered a number of factors, including the following material factors:
>
> - its understanding of Bank of America's business, operations, financial condition, earnings and prospects and of Merrill Lynch's business, operations, financial condition, earnings and prospects;
>
> - its understanding of the current and prospective environment in which Bank of America and Merrill Lynch operate, including economic and market conditions, the competitive environment and the likely impact of these factors on Bank of America and Merrill Lynch;
>
> - the review by the Bank of America board of directors with its legal advisors of the structure of the merger and the financial and other terms of the merger and stock option agreement, including the review by the Bank of America board of directors with its financial advisors of the exchange ratio, and the expectation of Bank of America's legal advisors that the merger will qualify as a transaction of a type that is generally tax-free for U. S. federal income tax purposes;
>
> *    *    *
>
> - the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK [Fox-Pitt] to Bank of America's board of directors concerning the operations, financial condition and prospects of

Merrill Lynch and the expected financial impact of the merger on the combined company;

- the likelihood that the regulatory and stockholder approvals needed to complete the transaction will be obtained in a timely manner and that the regulatory approvals will be obtained without the imposition of adverse conditions;

- the historical and current market prices of Bank of America common stock and Merrill Lynch common stock, as well as the financial analyses prepared by J.C. Flowers and FPK;

- the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America;

- the potential impact of the transaction on the capital levels and credit rating of Bank of America; and

- the need and ability to retain key Merrill Lynch personnel.

151.   The factors considered by the BOA Board, as enumerated in the Proxy Statement, omitted any consideration of the realistic and foreseeable risk that Merrill's CDO portfolio, in particular, would continue to decline in value and force further write-downs at Merrill. In fact, at the time the Proxy Statement was filed on November 3, 2008, Merrill had already sustained more than $7.5 billion in losses as of October 2008 alone. Merrill's pre-tax losses had climbed to $15.3 billion by the morning of December 5, 2008—the day of the Shareholder Vote.  Defendants' failure to adequately consider these issues or to disclose that they had not considered these issues rendered the Proxy Statement materially false and misleading.

152.   Defendants' failure to disclose this material information concerning Merrill's then known fourth quarter 2008 losses, which were over $7.5 billion and escalating at the time the Proxy Statement was filed on November 3, 2008, violated Defendants' duty to comply with SEC Schedule 14A governing what information is required in a proxy statement. Specifically, Schedule 14A requires that the issuer disclose information required by Item 303 of Regulation

1    S-K. Item 303 of Regulation S-K requires, among other things, disclosure of known material

2    trends, demands, commitments, events and/or uncertainties that have had, or that the registrant

3    reasonably expects will have, a material favorable or unfavorable impact on its liquidity, capital

4    resources, or net sales, revenues and/or income from continuing operations.

5         153.    Defendants failed to comply with Item 303 of Regulation S-K when the Proxy

6    Statement was filed on November 3, 2008. By that time, Defendants were well aware of the

7    billions of dollars in losses Merrill had already sustained for the fourth quarter of 2008 and the

8    continuing acceleration of Merrill's losses, which would materially impact both BOA's and

9    Merrill's liquidity, capital resources, and income from continuing operations. Prior to the

10   Shareholder Vote, Defendants failed to correct the Proxy Statement to comply with Item 303 of

11   Regulation S-K to inform BOA shareholders of Merrill's $13.3 billion in losses for October and

12   November 2008, not including Merrill's $2.3 billion goodwill impairment, which significantly

13   reduced the overall value of the Merger.

14        154.    The continued risk of loss in Merrill's CDO asset portfolio was a material factor

15   that should have been carefully considered by Defendants prior to their approval and

16   recommendation of the Merger to BOA shareholders. Defendants' failure to do so demonstrates

17   that, contrary to their assertions in the Proxy Statement and the September 2008 Merger

18   Announcements, adequate due diligence of Merrill was not, in fact, performed.

19        155.    The Proxy Statement also contained a section entitled "Risk Factors" which

20   purported to set forth a list of important considerations for BOA shareholders to weigh prior to

21   voting on the proposed Merger. Of the twelve enumerated "Risk Factors" identified in the Proxy

22   Statement, *none* addressed the significant risk of loss or decline in the overall value of the Merger

23   given the untenable state of Merrill's illiquid assets, particularly its CDO portfolio. Instead, the

24   "Risk Factors" section of the Proxy Statement only made general reference to the companies'

25   potential inability to "successfully combine the business of Bank of America and Merrill Lynch"

26   as a possible factor which might result in a failure to realize the full benefits of the Merger.

27        156.    Despite what was known, or should have been known, by Defendants concerning

28   Merrill's growing losses in the fourth quarter of 2008, Defendants failed to disclose the

substantial risk that such losses could very well exceed the total value of the Merger itself. As alleged below, Defendants also failed to update or correct these material omissions and misstatements prior to either the Shareholder Vote or the Closing Date.

### 6.     The Fairness Opinions

157.    The Proxy Statement also materially misstated the adequacy of Defendants' due diligence of Merrill prior to the approval of the Merger by the BOA Board. In support of BOA's due diligence efforts, the Proxy Statement cited the fairness opinions provided by J.C. Flowers and Fox-Pitt, each dated September 14, 2008 (the "Fairness Opinions"). Both Fairness Opinions were incorporated by reference into the Proxy Statement. As noted above, the Fairness Opinions concluded that the Exchange Ratio to be paid by BOA under the Merger was fair to BOA from a financial standpoint.

158.    The Proxy Statement indicated that in reaching their conclusions, the Financial Advisors had reviewed and analyzed, among other things:

- the proposed financial terms of the Merger as of September 14, 2008;
- publicly available information concerning BOA that each firm believed to be relevant to its analysis;
- publicly available information concerning Merrill that each firm believed to be relevant to its analysis;
- financial and operating information with respect to the business, operations and prospects of BOA furnished to J.C. Flowers and Fox-Pitt;
- financial and operating information with respect to the business, operations and prospects of Merrill furnished to J.C. Flowers and Fox-Pitt;
- a comparison of historical financial results and then current financial condition of BOA and Merrill with each other and with those of other companies that each firm believed to be relevant to its analysis;
- a comparison of the financial terms of the Merger with the financial terms of certain other transactions that each firm believed to be relevant to its analysis;
- the trading histories of BOA common stock and Merrill common stock from September 2003 to September 2008; and

- the potential pro forma impact of the Merger on the future financial condition and performance of BOA, including estimated synergies arising from the combination of the two companies, goodwill created as a result of the Merger, and increases in BOA's earnings per share.

159. The Proxy Statement and J.C. Flowers' Fairness Opinion also indicated that J.C. Flowers had "participated in discussions with members of senior management of Merrill Lynch with respect to the businesses and prospects of Merrill Lynch."

160. Despite the lengthy list of informational sources purportedly considered, it is undisputed that Defendants provided the Financial Advisors with less than 36 hours to conduct due diligence concerning BOA's proposed purchase of a complex company that had approximately $26 billion in market capitalization and $1.7 trillion in client assets. Defendants neglected to recognize that 36 hours was not enough time for the Financial Advisors to have an adequate basis to issue their Fairness Opinions.

161. The Proxy Statement attempted to overcome this clear deficiency in Defendants' due diligence efforts by asserting that both of the Financial Advisors were chosen to render the Fairness Opinions "because of their respective expertise, reputation, and familiarity with Bank of America and Merrill Lynch, and because their senior professionals have substantial experience in transactions comparable to the merger." As noted above, statements to this effect had also been made by Defendants Lewis and Price during the September 15, 2008 Analyst Call addressing the Merger. Contrary to these statements, Defendants were negligent in not knowing that the Financial Advisors' purported knowledge of BOA and Merrill could not overcome such an abbreviated due diligence review, which did not permit the Financial Advisors to conduct independent valuations.

162. The purported adequacy of the Financial Advisors' prior knowledge and previous review of Merrill as a substitute for complete and current due diligence in connection with the Merger was false and misleading given the significant losses at Merrill already underway during the third quarter of 2008. These losses continued to escalate in the fourth quarter of 2008, as BOA eventually disclosed on January 16, 2009. Defendants were, at a minimum, negligent in failing to

935174.3            - 44 -

COMPLAINT

1    incorporate these facts into their due diligence and solicitation of BOA shareholder votes in favor

2    of the Merger.

3              **7.**       **The Proxy Statement's Disclosure of Government Financing**

4              163.     The Proxy Statement also included a section entitled "Recent Developments,"

5    containing a detailed description of the participation of both BOA and Merrill in federal

6    government financing programs.

7              164.     Specifically, BOA disclosed in the Proxy Statement and in its October 30, 2008

8    Form 8-K, incorporated by reference therein, that on October 26, 2008, BOA had entered into an

9    agreement with the U.S. Treasury under the $250 billion Capital Purchase Program ("CPP"). The

10   CPP was a component of TARP implemented under the Emergency Economic Stabilization Act

11   of 2008, signed into law on October 3, 2008. The Proxy Statement provided details of BOA's

12   agreement under the CPP, pursuant to which:

13                    [BOA] will issue to the U. S. Treasury $15 billion of a new series
                      of preferred stock of Bank of America. In connection with this
14                    investment, Bank of America has also agreed to issue to the U.S.
                      Treasury warrants to purchase approximately 73 million shares of
15                    Bank of America common stock at an exercise price of $30.79 per
                      share. . . . If the merger is completed prior to Treasury making an
16                    investment in Merrill Lynch . . . Treasury will purchase from Bank
                      of America an additional $10 billion of a new series of preferred
17                    stock of Bank of America and receive warrants to purchase
                      approximately 49 million shares, all on the same terms applicable to
18                    the $15 billion investment.

19             165.    Thus, the Proxy Statement only informed Plaintiffs of the specific terms of BOA's

20   initial participation in the CPP. As discussed below in Section VI.C.7, Defendants failed to

21   update the Proxy Statement to disclose that Defendants negotiated an additional $20 billion

22   capital infusion under the TARP program in mid-December 2008 to prevent the Merger from

23   imploding.

24             166.    The foregoing statements in the September 15, 2008 Press Release, the Merger

25   Presentation, the September 15, 2008 Analyst Call, and the Proxy Statement (including the

26   Fairness Opinions) were false and misleading with respect to material facts, or omitted material

27   facts necessary in order to make the statements therein not false and misleading, because

28   Defendants had reason to know and/or were negligent in not knowing that, among other things:

935174.3                                   - 45 -
                                                              CASE NO. _____

                                                                        COMPLAINT

i. The BOA Board did not have an adequate basis upon which to recommend the Merger;

ii. BOA did not perform due diligence adequate to evaluate Merrill's true financial condition;

iii. BOA did not adequately evaluate Merrill's troubled asset classes;

iv. BOA did not effectively evaluate Merrill's efforts to offload troubled assets and reduce its risk of exposure to potential future losses;

v. The Financial Advisors did not have an adequate and reasonable basis to issue the Fairness Opinions included in the Proxy Statement; and

vi. Given the foregoing, the Proxy Statement misled BOA shareholders into believing that BOA, its Board of Directors, and the Financial Advisors had an adequate basis to evaluate the substantial risk of loss associated with Merrill's assets and the benefits of the Merger, including the value of the assets to be acquired from Merrill.

167. As a result of the materially false and misleading statements in the Proxy Statement and related solicitation materials, and the omitted material facts necessary to correct the certain statements and to prevent other statements from being materially misleading, BOA shareholders as of the Record Date, including Plaintiffs, were deprived of material information in connection with their vote on the Merger, and thereby suffered damages.

**B.** **The Merger Agreement Provided Defendants With The Means To Protect BOA Shareholders, Which Defendants Neglected to Do.**

168. The Merger Agreement—excluding the undisclosed schedule regarding Merrill's bonuses—was attached as Appendix A to the Proxy Statement. Certain provisions of the Merger Agreement provided Defendants with important access to Merrill's financial statements, as well as termination rights which could be exercised to protect the interests of BOA and its shareholders. These access and termination rights gave Defendants the necessary means to know of Merrill's true financial condition prior to the Shareholder Vote and the Closing Date, as well as the means to renegotiate a Merger price that would have been more favorable to Plaintiffs and to BOA's other shareholders.

**1.** **Defendants' Continuous Access to Merrill's Financial Information**

169. The Merger Agreement required BOA and Merrill to cooperate with each other in providing necessary company information to be used for preparing and filing the Proxy

1    Statement. Specifically, under Article 6.1 entitled "Regulatory Matters," BOA and Merrill agreed

2    that they:

3              shall promptly prepare and file with the SEC the Form S-4, in
               which the Joint Proxy Statement will be included as a prospectus.
4              Each of [BOA and Merrill] shall use its reasonable best efforts to
               have the Form S-4 declared effective under the Securities Act as
5              promptly as practicable after such filing, and [Merrill] shall
               thereafter mail or deliver the Joint Proxy Statement to its
6              stockholders. . . . *[Merrill] shall furnish all information
               concerning [Merrill] and the holders of [Merrill] Common Stock
7              as may be reasonably requested in connection with any such
               action*.
8
                                    *    *    *
9
               [Merrill and BOA] shall have the right to review in advance, and, to
10             the extent practicable, each will consult the other on, in each case
               subject to applicable laws relating to the confidentiality of
11             information, all the information relating to [Merrill] or [BOA], as
               the case may be, and any of their respective Subsidiaries, that
12             appear in any filing made with, or written materials submitted to,
               any third party or any Governmental Entity in connection with the
13             transactions contemplated by this Agreement.

14             *(c) Each of [BOA] and [Merrill] shall, upon request, furnish to
               the other all information concerning itself, its Subsidiaries,
15             directors, officers and stockholders and such other matters as may
               be reasonably necessary or advisable in connection with the Joint
16             Proxy Statement . . . .*

17        170.    The Merger Agreement also explicitly provided BOA and its representatives with

18    unfettered access to all of Merrill's books and records to the extent not otherwise protected by

19    applicable confidentiality laws:

20             Access to Information. (a) Upon reasonable notice and subject to
               applicable laws relating to the confidentiality of information, each
21             of [Merrill] and [BOA] shall, and shall cause each of its
               Subsidiaries to, afford to the officers, employees, accountants,
22             counsel, advisors, agents and other representatives of the other
               party, reasonable access, during normal business hours during the
23             period prior to the [effective date of the merger], *to all its
               properties, books, contracts, commitments and records, and,
24             during such period, such party shall, and shall cause its
               Subsidiaries to, make available to the other party . . . (ii) all other
25             information concerning its business, properties and personnel as
               the other party may reasonably request. . . .*
26
          171.    Under these express provisions of the Merger Agreement, *Defendants had a right*
27
      *of complete access to all of Merrill's financial information*, including information on the
28

935174.3                              - 47 -                              COMPLAINT

                                                          CASE NO. _____

1   valuations and performance of Merrill's CDO asset portfolio and its other subprime mortgage-

2   exposed assets, at least as early as September 15, 2008 when the Merger Agreement was

3   executed. Merrill complied with its obligation under the Merger Agreement to provide

4   Defendants with full access to Merrill's financial information.

5           172.    In fact, on January 25, 2009, in a farewell memorandum to former Merrill

6   colleagues, Thain confirmed exactly what the Merger Agreement provided:

> [T]he losses in the fourth quarter . . . were very large and
> unfortunate. However, they were incurred almost entirely on legacy
> positions and were due to market movements. ***We were completely
> transparent with Bank of America. They learned about these
> losses when we did***. The acting CFO of my businesses [Defendant
> Cotty] was Bank of America's former Chief Accounting Officer.
> ***They had daily access to our p&l, our positions and our marks.
> Our year end balance sheet target (which we more than met) was
> given to us by Bank of America's CFO***.

12          173.    On January 25, 2009, Thain gave an interview where he again rejected speculation

13  and suggestions (this time by Defendant Lewis and others at BOA) that Merrill withheld

14  information from BOA concerning Merrill's fourth quarter losses. Thain emphasized that, as was

15  required by the Merger Agreement, Merrill provided BOA with access to all of Merrill's books

16  and records on a daily basis in the months preceding the Closing Date:

> ***They were seeing exactly the same information that we saw. We
> gave them complete access to everything that we had***. . . . Well, let
> me say it this way. The—the acting chief financial officer
> [Defendant Cotty] had come from Bank of America. He was their
> formal—former chief accounting officer. He and his team, which
> were—for all practical purposes, our day-to-day CFOs, they had
> direct access to our daily P&Ls, to our positions, to our marks.

21          174.    BOA's representations in the Proxy Statement concerning, among other things,

22  Defendants' purported due diligence of Merrill and the "fairness" of the Exchange Ratio were

23  materially false and misleading in light of Defendants' clear access to the information necessary

24  to carefully investigate and analyze Merrill's asset portfolios and financial statements between

25  September 15, 2008 and the Closing Date. Defendants' representations concerning the Merger

26  should have been based upon Defendants' continuing assessment of Merrill's financial condition

27  and not solely upon the Financial Advisors' hasty 36-hour due diligence of Merrill.

28

935174.3                        - 48 -                        COMPLAINT
                                                    CASE NO. _____

175.     Defendants were negligent in failing to exercise their right to review Merrill's financial statements prior to the Closing Date given what they knew, or had reason to know, of Merrill's deteriorating financial condition during this period – a condition which, in fact, necessitated the Merger. To the extent Defendants exercised their right of access to Merrill's books and records, they were negligent, at a minimum, in failing to detect and/or to disclose Merrill's deteriorating financial condition to BOA shareholders to prevent statements made in the Proxy Statement from being materially misleading and/or to correct statements which had become false and misleading based upon Merrill's deteriorating financial condition.

## 2.     The Companies' Representations and Warranties

176.     In describing the terms of the Merger Agreement, the Proxy Statement included a section entitled "Representations and Warranties." This section summarized the "Representations and Warranties" made by both BOA and Merrill to each other in the Merger Agreement. Among others, these included representations concerning both companies':

      i.      proper corporate organization;

      ii.     capitalization;

      iii.    authority to execute the Merger Agreement;

      iv.     filing of required government forms and consents;

      v.      accurate financial statements, internal controls, and accounting/auditing practices;

      vi.     compliance with applicable laws; and

      vii     ***the absence of material adverse changes***.

177.     Article 9.2 of the Merger Agreement provided, among other things, that:

> No representation or warranty of [Merrill] contained in Article III . . . shall be deemed untrue, inaccurate or incorrect for any purpose under this Agreement, and no party hereto shall be deemed to have breached a representation or warranty for any purpose under this Agreement, in any case as a consequence of the existence or absence of any fact, circumstance or event unless such fact, circumstance or event, individually or taken together with all other facts, circumstances or events . . . has had or would reasonably be expected to have a Material Adverse Effect with respect to [Merrill or BOA].

1    178.    The Merger Agreement contained the companies' representations that no "Material

2    Adverse Effect" had occurred between a date certain and the closing of the Merger. With respect

3    to Merrill's representation and warranty to this effect, Section 3.8 of the Merger Agreement,

4    entitled "Absence of Certain Changes or Events," stated that:

5                 (a) Since June 27, 2008, no event or events have occurred that have
                 had or would reasonably be expected to have, either individually or
6                 in the aggregate, a Material Adverse Effect on [Merrill]. As used in
                 this Agreement, the term "Material Adverse Effect" means, with
7                 respect to [BOA or Merrill], as the case may be, a material adverse
                 effect on (i) *the financial condition, results of operations or*
8                 *business of such party and its Subsidiaries taken as a whole* . . .

9    Accordingly, prior to the Closing Date, Merrill represented that it had not experienced any

10   material adverse effects on its financial condition and business results.

11   179.    However, as described in more detail below, Defendants had reason to know that

12   these statements were materially false and misleading as of at least the end of November 2008.

13   By then, Defendants were aware that Merrill was experiencing massive fourth quarter losses of at

14   least $13.3 billion. The Oversight Committee Investigation has confirmed that by November 12,

15   2008, Defendants were consulting internally with BOA's attorneys to ascertain whether they

16   needed to disclose Merrill's then-known fourth quarter 2008 losses. Former BOA General

17   Counsel Timothy Mayopoulos' ("Mayopoulos") November 17, 2009 testimony before the

18   Oversight Committee also confirms that Defendants consulted both Mayopoulos and BOA's

19   outside counsel at Wachtell Lipton on whether these losses should be disclosed. Although there

20   was an initial agreement that Merrill's known fourth quarter 2008 losses should be disclosed prior

21   to the Shareholder Vote, Defendants failed to do so.

22   180.    The New York Attorney General's complaint reveals that between November 12

23   and December 3, 2008, Mayopoulos advised Defendants that BOA was not required to make

24   additional disclosures concerning Merrill's forecasted fourth quarter 2008 losses based, in part,

25   on his discussions with BOA's outside counsel at Wachtell Lipton. However, during the

26   December 3 final discussion Defendant Price had with Mayopoulos concerning whether BOA

27   should disclose Merrill's losses, Defendant Price provided Mayopoulos with a $7 billion

28   "forecasted" after-tax loss. At this time, Defendant Price knew—based upon his conversation

935174.3                                    - 50 -
                                                              CASE NO. _____

COMPLAINT

1  with Defendants Lewis and Cotty that same day—that Merrill's losses were already over

2  $10 billion after taxes. According to Mayopoulos' testimony to the New York Attorney General:

3  "[T]he closer you got to $10 billion . . . the case for making disclosure became more compelling"

4  as $10 billion was the most Merrill lost in the preceding five quarters. To the detriment of BOA

5  shareholders, Defendants never disclosed Merrill's enormous fourth quarter losses until after the

6  Closing Date.

7        181.    Indeed, Merrill's losses were so severe that on December 17, 2008, Defendant

8  Lewis arranged an emergency meeting with federal regulators to obtain additional financing for

9  the Merger. Consequently, given Merrill's known but undisclosed fourth quarter 2008 losses,

10  Defendants were required to correct representations in the Proxy Statement concerning, among

11  other things, the "fairness" of the Exchange Ratio and the Merger being in the best interests of

12  BOA shareholders to prevent the Proxy Statement from being materially false, misleading, and

13  incomplete.

14        182.    Similarly, Defendants were also aware that BOA was itself experiencing

15  significant fourth quarter losses of at least $1.4 billion – the first quarterly loss in 17 years –

16  which further compromised the Company's ability to withstand Merrill's losses. Defendants were

17  also required to disclose this material fact, but failed to do so.

18        183.    Defendants also failed to correct previous positive statements about the Merger by

19  failing to disclose that, by no later than early December 2008, Defendants were evaluating

20  whether to exercise BOA's right to terminate the Merger under the MAC. For example, on

21  December 1, 2008—*four days prior to the Shareholder Vote*—Defendant Price and Greg Curl

22  sought advice from Mayopoulos regarding the MAC clause and whether BOA could terminate the

23  Merger based upon Merrill's known fourth quarter losses.

24        184.    In this regard, under Article 7.2 of the Merger Agreement, BOA was only required

25  to enter into the Merger subject to Merrill's satisfaction of its "Representations and Warranties,"

26  including the representation that no changes or events constituting a "Material Adverse Effect"

27  had occurred prior to the Closing Date. Article 8.1 of the Merger Agreement further provided

28  BOA with the right to terminate the Agreement prior to the Closing Date if there had been a

1    breach in any of the "Representations and Warranties" by Merrill. Defendants' failure to disclose

2    that they were considering terminating the Merger in early December 2008 constituted a material

3    failure to correct false and misleading statements in the Proxy Statement, and further

4    demonstrates the materiality of Merrill's growing losses which Defendants failed to disclose.

**C.   Defendants Fail To Correct The Material Misstatements And Omissions In The Proxy Statement.**

7    185.    Defendants had a continuing obligation, from the date the Proxy Statement was

8    filed and distributed through the consummation of the Merger, to update and correct it to prevent

9    any statement therein from being materially misleading or incomplete. In particular, Defendants

10   had a duty to provide BOA shareholders, including Plaintiffs, with corrected information to

11   reflect what they knew, or should have known, about, among other things: (i) Merrill's significant

12   losses for the fourth quarter of 2008, which were known to be at least $13.3 billion by the end of

13   November 2008 and $15.3 billion prior to the Shareholder Vote; (ii) BOA's September 2008

14   agreement to permit Merrill to pay up to $5.8 billion in bonuses to Merrill employees, of which

15   Merrill paid $3.6 billion prior to the Closing Date; and (iii) the necessity for BOA to obtain

16   emergency government financing to complete the transaction — ultimately a $138 billion bailout,

17   consisting of a $20 billion capital infusion and $118 billion in asset guarantees.  Defendants failed

18   to fulfill this duty.

**1.    The November 21, 2008 Amendment to the Proxy Statement**

20   186.    On November 21, 2008, BOA filed a Form 425/8-K updating information

21   contained in the Proxy Statement on pending Merger-related litigation involving Merrill (the

22   "First Proxy Amendment"). This amendment also supplemented certain sections of the Proxy

23   Statement pertaining to Merrill resulting from the settlement of these lawsuits.

24   187.    Under a section entitled "Litigation Relating to the Merger," the Proxy Statement

25   described a series of class action lawsuits brought on behalf of Merrill shareholders in the

26   Supreme Court of the State of New York and the Court of Chancery of the State of Delaware.

27   These lawsuits challenged the Merger on state law breach of fiduciary duty grounds. The status of

28   several derivative lawsuits brought on Merrill's behalf in federal and state courts in New York

1    and Delaware was also outlined in this section of the Proxy Statement (collectively, the "Merrill

2    Actions").

3          188.    The First Proxy Amendment announced that certain of the Merrill Actions had

4    been settled as follows:

> On November 21, 2008, the defendants entered into a memorandum
> of understanding with the plaintiffs in the Court of Chancery and in
> the Southern District of New York actions regarding settlement of
> the Court of Chancery action and the merger-related claims in the
> Southern District of New York action. In connection with the
> settlement contemplated by the memorandum of understanding,
> Merrill Lynch and Bank of America agreed to make certain
> additional disclosures related to the proposed merger, which are
> contained in this Form 8-K. . . .

189.    These additional disclosures in the First Proxy Amendment were limited to

Merrill's: (i) Board of Directors' information call on September 14, 2008; (ii) potential credit

ratings downgrade; (iii) discussions regarding potential transactions with other financial

institutions; (iv) due diligence of BOA; (v) financial advisor MLFPS; (vi) executive positions in

the merged company; and (vii) consideration of certain derivative lawsuits against current and

former Merrill directors. The First Proxy Amendment failed to provide any additional or specific

detail concerning Merrill's deteriorating financial condition despite Defendants' daily access to

Merrill's financial information and knowledge that Merrill had already amassed billions of dollars

in losses for the ongoing fourth quarter of 2008. Nor did the First Proxy Amendment disclose that

BOA had agreed to permit Merrill to pay up to $5.8 billion in bonuses prior to the Closing Date.

**2.      The November 26, 2008 Amendment to the Proxy Statement**

190.    On November 26, 2008, BOA filed another Form 425/8-K amendment to the

Proxy Statement (the "Second Proxy Amendment"). This amendment consisted of a letter from

Defendant Lewis touting BOA's purported liquidity and financial strength despite declining

financial markets at that time.

191.    In the letter, Defendant Lewis sought to reassure BOA shareholders that the

Company was well-positioned to survive the financial crisis and was, in fact, continuing to grow:

> Bank of America continues to be a strong, active player in the
> financial markets. We are generating strong deposit growth and

935174.3                                    - 53 -

COMPLAINT

attracting new customer and client relationships throughout our company. We continue to make loans to consumers and businesses to boost shareholder value and to do what we can to support economic activity.

*We are one of the most liquid banks in the world*. We successfully raised capital in October and now have Tier 1 capital that exceeds both regulatory requirements and our own target. *In short, we believe we are one of the strongest and most stable major banks in the world*.

192.  As evidence of BOA's purported economic strength, Defendant Lewis explicitly stated in his letter that BOA had no need for the $25 billion in taxpayer money it received on or about October 28, 2008 under the TARP/CPP program:

*Regarding the federal capital injection, these were funds that we did not need and did not seek*. At the time the government asked the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, *had more than adequate capital*. We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally, and will pay interest to the government on the funds until the investment is paid back.

Thus, Defendant Lewis represented to BOA shareholders that BOA was accepting approximately $25 billion in TARP/CPP financing merely to lend its support to the Treasury Department's overall efforts to bolster the financial markets.

193.  The Second Proxy Amendment made no mention of the Merger or Merrill and did not address Merrill's financial condition, even though, as of late November 2008, Defendants knew that Merrill's mounting fourth quarter losses were approaching $13 billion. While Defendants did amend the Proxy Statement twice, neither amendment provided any additional information regarding Merrill's rapidly deteriorating financial condition or the agreed upon Merrill bonuses, which bore directly upon the fairness of the Merger to BOA shareholders. To the contrary, both amendments gave the impression that BOA's financial footing was secure and that the Merger was proceeding apace.

194.  No other amendment or supplement to the Proxy Statement was ever filed.

- 54 -

### 3.     The November 26, 2008 Press Release

195.     On November 26, 2008, BOA issued a press release announcing that it had received the required approval from the Board of Governors of the Federal Reserve System to proceed with the Merger (the "November 26, 2008 Press Release"). In celebrating this approval, Defendants again positively characterized the Merger without disclosing the ballooning losses within Merrill that were threatening the viability of the transaction:

> *Merrill Lynch is expected to enhance Bank of America's current strengths* by creating a company with the leading position in wealth management as well as in global debt underwriting, global equities and global merger and acquisition advice. Once the purchase is complete, Bank of America will have the largest wealth management business in the world with nearly 20,000 financial advisors and approximately $2.5 trillion in client assets.
>
> 'Combining the leading global wealth management, capital markets and advisory firm with the largest consumer and corporate bank in the U.S. creates the world's premier financial services company with unrivaled breadth and global reach,' said [Defendant Lewis]. '*This presents a compelling opportunity for our customers and shareholders*.'

196.     Again, Defendants failed to provide any additional information relating to Merrill's financial condition or its potential effect on the Merger despite the fact that the "compelling opportunity" that Defendant Lewis proclaimed the Merger represented to BOA shareholders had dramatically changed based upon Merrill's staggering fourth quarter 2008 losses.

### 4.     BOA Shareholders Vote to Approve the Merger

197.     On December 5, 2008, at a special meeting of all BOA shareholders as of the Record Date, approximately 82% of BOA shareholders voted to approve the Merger based upon the materially misleading and incomplete Proxy Statement and related solicitation materials. Plaintiffs voted those of their BOA shares eligible to be voted in favor of the Merger.

198.     In a press release issued after the Shareholder Vote (the "December 5, 2008 Press Release"), Defendants celebrated the shareholders' approval and asserted that the Merger would make BOA a stronger company. Specifically, Defendant Lewis stated in the press release that "Bank of America will have the premier financial services franchise" as a result of the Merger.

199. Despite Defendants' numerous positive statements concerning the Merger, the December 5, 2008 Press Release misrepresented and omitted material facts. The true but concealed and/or misrepresented facts known to and/or recklessly disregarded by Defendants included, but were not limited to:

    i.    as of late November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $9 billion;

    ii.    as of the end of November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $13.3 billion;

    iii.    according to the New York Attorney General's complaint, on the morning of December 5, 2008, prior to the Shareholder Vote, Defendants knew Merrill's losses were approximately $15.3 billion. By the evening of December 5, Merrill's known losses had increased to approximately $16.2 billion;

    iv.    as the New York Attorney General's investigation has revealed, BOA officers privately sought guidance from BOA's attorneys "before [BOA] shareholders approved the merger" about terminating the Merger pursuant to the MAC clause of the Merger Agreement due to Merrill's historic losses; and

    v.    BOA had negotiated and entered into an undisclosed agreement with Merrill that permitted Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date, diminishing resources available to the Company going forward.

**5.    <u>Defendant Lewis Abruptly Fires Timothy Mayopoulos as BOA's General Counsel After He Sought Information on Merrill's Growing Losses.</u>**

200. According to the New York Attorney General's complaint, at a BOA Board meeting held on December 9, 2008, Mayopoulos first learned that Defendant Price had misrepresented to him Merrill's actual known after-tax fourth quarter losses. On that day, Mayopoulos learned that Merrill's then-forecasted after-tax losses were approximately $9 billion, not $7 billion as Defendant Price had stated. Mayopoulos was surprised by the discrepancy in the two numbers and sought to speak with Defendant Price "to understand what had happened."

201. Mayopoulos tried to get in contact with Defendant Price, but Defendant Price's assistant informed Mayopoulos that Price was in a meeting with Defendant Lewis and other senior business executives for the rest of the afternoon on December 9. Mayopoulos decided that he would contact Defendant Price the next day, December 10, "to talk to him about what's

COMPLAINT
CASE NO. _____

changed; why it's changed; what does it mean with respect to whether we should make a disclosure or not."

202.    On December 10, however, Mayopoulos was abruptly fired as BOA's General Counsel and was immediately escorted from the premises by an HR executive. Mayopoulos was replaced by Brian Moynihan, a former FleetBoston Financial executive who started at BOA when it acquired Fleet in 2003. At the time that Moynihan replaced Mayopoulos as BOA's General Counsel, Moynihan was not practicing law and had not done so for fifteen years. Moreover, Moynihan's bar membership was inactive.

203.    According to the New York Attorney General's complaint, Moynihan acted as BOA's General Counsel for approximately six weeks, "a key portion of which period was taken up with [BOA's] efforts to secure government assistance by threatening to invoke the MAC." After that time, on January 20, 2009, Moynihan became the head of BOA's Global Banking and Global Wealth Management group and is the current Chief Executive Officer of BOA.

204.    Mayopoulos stated in his congressional testimony that he was "stunned" when he was fired as BOA's General Counsel and that he "had never been fired from any job . . . never heard of the general counsel of a major company being summarily dismissed for no apparent reason and with no explanation." Mayopoulos has never received an explanation from BOA or any related party as to why he was summarily terminated even after consistently receiving great performance reviews and being promised by Defendant Lewis that he would be the General Counsel of the combined company after the Merger was completed.

### 6.    BOA Consults with Merrill on Paying Undisclosed Bonuses to Merrill Employees.

205.    As is now clear from facts uncovered by the New York Attorney General's investigation into the circumstances surrounding the secret bonuses paid by Merrill, on or about December 8, 2008, Andrea Smith, BOA's head of human resources, met with Thain to discuss bonus payments to Merrill employees. Rather than eliminating the bonuses based upon Merrill's mounting fourth quarter losses, which at this time were known by both parties to be well over $16 billion, Smith and Thain only discussed reducing certain of the Merrill bonuses to correspond

more closely to the compensation typically received by BOA employees in similar positions. Further, J. Steele Alphin ("Alphin"), Chief Administrative Officer of BOA and a top aide and close confidant to Defendant Lewis, had at least one discussion in November 2008 with Thain regarding reducing the bonuses to "under $4.0 billion." However, at no point did Defendants update the Proxy Statement or disclose to BOA shareholders that such enormous bonuses would be paid to Merrill employees.

206.    By early December 2008, Defendants were aware that Merrill would lose at least $15.3 billion in the fourth quarter of 2008. Merrill's losses escalated to over $21 billion prior to the Closing Date. In light of these known catastrophic losses, the fact that Merrill intended to use $3.6 billion of its increasingly scarce cash on hand to pay accelerated bonuses to employees, many of whom would not be retained by BOA, was clearly material to BOA shareholders and investors, including Plaintiffs, yet Defendants did not update the Proxy Statement or otherwise disclose these facts.

**7.    Defendant Lewis' Undisclosed December 17, 2008 Meeting with Federal Regulators and Subsequent Undisclosed Negotiations to Prevent Merrill's Losses from Derailing the Merger**

207.    On December 17, 2008, only twelve days after BOA shareholders voted in favor of the Merger, Defendant Lewis requested an emergency meeting with then Treasury Secretary Paulson and Federal Reserve Chairman Bernanke to discuss grave concerns with the Merger stemming from Merrill's fourth quarter losses. This meeting followed an earlier telephone call between Defendant Lewis and Paulson during which Defendant Lewis explained that BOA would not be able to cover Merrill's huge losses for the quarter and was considering terminating the Merger under the "MAC" clause.

208.    During Defendant Lewis' February 26, 2009 deposition taken as part of the New York Attorney General's investigation, Defendant Lewis testified that he reported on the dismal financial condition of the combined company at the December 17, 2008 meeting. He stated that BOA was projected to lose $1.4 billion in the fourth quarter – BOA's first quarterly loss in 17 years. Defendant Lewis then reported that Merrill's fourth quarter 2008 losses were so large that they threatened BOA's solvency.

COMPLAINT
CASE NO. _____

209. Handwritten notes from the December 17, 2008 meeting, released by Congress, reveal that Defendant Price, who was also present, told the regulators that Merrill had recently suffered "unusual" losses and was now projecting losses of approximately $18 billion on a pre-tax basis, or a $12.5 billion net loss after taxes, for the entire fourth quarter of 2008. Accordingly, Defendants concluded that a "material adverse change" had likely occurred in Merrill's financial condition and that BOA could terminate the Merger pursuant to the MAC clause. Defendant Lewis falsely claimed that BOA only learned of Merrill's losses in mid-December when such losses allegedly accelerated.

210. According to Defendant Price's notes, both Bernanke and Paulson urged Defendant Lewis not to terminate the Merger pursuant to the MAC clause. Defendant Lewis responded by proposing that BOA receive a taxpayer bailout, and offered as an example a "Citi" guarantee of $50 billion of assets to proceed with the Merger. Ultimately, Defendant Lewis supplied the Treasury and the Federal Reserve with Merrill's and BOA's fourth quarter 2008 financial information so the regulators could further analyze the situation.

211. During the federal regulators' examination, it became clear that Defendant Lewis had falsely claimed that BOA only recently learned of Merrill's fourth quarter 2008 losses. Kevin M. Warsh, a member of the Board of Governors of the Federal Reserve that was examining Merrill's fourth quarter 2008 financial information, stated in an e-mail: "***This claim is not credible***." On December 19, 2008, Tim Clark, a Senior Advisor in the Federal Reserve's Division of Banking Supervision and Regulation, e-mailed other Federal Reserve officials and noted:

> General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that ***the deterioration at [Merrill] has been observably under way over the entire quarter . . . Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect. At a minimum, it calls into question the adequacy of the due diligence process [BOA] has been doing in preparation for the takeover***.

212. Other senior Federal Reserve officials echoed Clark's sentiments. For example, as set forth in an internal Federal Reserve memorandum entitled "Analysis of Bank of America & Merrill Lynch Merger":

> While the extent of the market disruptions that have occurred since mid-September were not necessarily predictable, ***[BOA] management's contention that the severity of Merrill's losses only came to light in recent days is problematic and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition***.
>
> <p style="text-align:center">*   *   *</p>
>
> [The] single largest area of risk exposure and driver of recent losses that have been identified by management [was Merrill's] large losses stemming from exposures to financial guarantors. . . . [These exposures and losses] were clearly shown in Merrill Lynch's internal risk management report that [BOA] reviewed during their due diligence. . . . [R]isk exposures cited by management . . . should also have been reasonably well understood, particularly as [BOA] itself is also active in these products."

213.    Additionally, Defendant Lewis' claim that BOA only learned of Merrill's fourth quarter 2008 losses in mid-December is flatly refuted by internal documents that BOA produced to the New York Attorney General, the SEC, and to Congress as part of their ongoing investigations into the facts and circumstances surrounding the Merger. For example, Defendant Cotty's November 5, 2008 e-mail to Defendant Price included Merrill's October 2008 financial report which estimated markdowns and "other large items" of $5.3 billion, and included Defendant Cotty's comment: "***Read and weep***." Two days after the Shareholder Vote, on December 7, 2008, Gary Carlin, Merrill's then Chief Accounting Officer, e-mailed Defendant Cotty with Merrill's updated financials through December 5 and stated: "***What a disaster!***"

214.    The New York Attorney General's complaint also alleges that Defendants' representations that they just became aware of Merrill's "unusual" losses were "simply false and misleading." While Defendants claimed that Merrill's losses after the Shareholder Vote accelerated by $7 billion, Merrill's actual losses only increased by $1.4 billion after the Shareholder Vote.

215.    Defendant Lewis' meetings with regulators at the Federal Reserve led certain of those officials to conclude that Defendant Lewis was concerned that the inadequacy of the abbreviated due diligence conducted in connection with the Merger would be exposed. In this regard, on December 23, 2008, Federal Reserve Senior Vice President, Mac Alfriend, stated in an e-mail that Defendant Lewis "is worried about stockholder lawsuits; ***knows they did not do a***

1  *good job of due diligence* and the issues facing the company are finally hitting home and *[Lewis]*

2  *is worried about his own job* after cutting loose lots of very good people."

3  216.  Defendant Price's December 17, 2008 handwritten notes from the meeting with

4  Paulson and Bernanke also revealed that Federal Reserve officials informed Defendant Lewis that

5  a decision by BOA to invoke the MAC clause would lead to the market questioning BOA's prior

6  statements about the Merger and show that statements concerning BOA's due diligence were

7  false. Additionally, if BOA terminated the Merger, the market would undoubtedly question

8  BOA's financial condition and its judgment. In fact, on June 25, 2009, Bernanke testified before

9  the Oversight Committee that he told Defendant Lewis that:

10
11  > an attempt [by BOA] to invoke the MAC after three months of review, preparation and public remarks by the management of Bank of America about the benefits of the acquisition would cast doubt in the minds of financial market participants, including the investors, creditors and customers of Bank of America about the due diligence and analysis done by the company, its capability to consummate significant acquisitions, its overall risk management processes and the judgment of its management.

12
13
14  217.  Defendant Lewis called Paulson on December 21, 2008 to continue discussions

15  about how to salvage the Merger. During this conversation, Paulson informed Defendant Lewis

16  that if BOA terminated the Merger, the Federal Reserve could remove the BOA Board and

17  management. In this regard, Paulson stated in testimony given on July 16, 2009 before the

18  Oversight Committee:

19
20  > It was . . . appropriate for me to remind [Lewis] under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the board of Bank of America. I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

21
22
23
24  218.  Paulson's message was clearly understood by Defendant Lewis. According to

25  Defendant Lewis' deposition taken by the New York Attorney General, before his conversation

26  with Paulson, Defendant Lewis stated that "we [BOA] were going to call the MAC."

27  Subsequently, Defendant Lewis changed his mind and decided not to terminate the Merger.

28

935174.3 — - 61 - —  CASE NO. ___  COMPLAINT

219.     It was ultimately agreed that BOA would issue an additional $20 billion in Tier-1 qualifying preferred stock under the TARP program. Part of this $20 billion included an issuance of $4 billion in BOA preferred securities in exchange for $118 billion in asset guarantees to protect against a further deterioration in BOA's illiquid assets mostly attributable to Merrill. Under this guarantee, BOA would be responsible for the first $10 billion in losses on the pool of $118 billion in illiquid assets. The Treasury Department and the Federal Deposit Insurance Corporation would take on the next $10 billion in losses. Finally, the Federal Reserve Bank would be responsible for 90% of any additional losses in the asset pool, and BOA would cover the rest. BOA agreed to proceed with the Merger based on this promise of additional government assistance, but did not inform BOA shareholders of the new financial details of the Merger.

220.     None of the Defendants ever updated or corrected the Proxy Statement and related solicitation materials prior to the Closing Date to disclose the dire circumstances that required an unprecedented government bailout to prevent the Merger from imploding. Indeed, Defendants' negotiation for an additional $20 billion cash infusion twelve days after the Shareholder Vote, and fourteen days before the Merger closed, contrasts directly with Defendant Lewis' assertion in the Second Proxy Amendment that BOA had "more than adequate capital."

221.     Defendants should have known that information regarding the Company's receipt of federal financing under the TARP/CPP program to salvage the Merger was material information requiring an update to the Proxy Statement. Their failure to update the Proxy Statement to provide information concerning the additional $20 billion needed to consummate the Merger rendered the Proxy Statement materially false and misleading.

222.     As alleged below in Section VI.D., details regarding this additional federal financing and Merrill's calamitous fourth quarter losses were not disclosed to Plaintiffs or other BOA shareholders until weeks *after* the Merger had closed.

223.     In this regard, the New York Attorney General sent a letter to Congressional officials on April 23, 2009 in connection with his investigation which stated, among other things, that:

> Despite the fact that Bank of America had determined that Merrill Lynch's financial condition was so grave that it justified termination of the deal pursuant to the MAC clause, Bank of America did not publicly disclose Merrill Lynch's devastating losses or the impact it would have on the merger. Nor did Bank of America disclose that it had been prepared to invoke the MAC clause and would have done so but for the intervention of the Treasury Department and the Federal Reserve.

224.    Defendants also failed to disclose their awareness of potential liability for misinforming shareholders about the Merger. On December 22, 2008, Bernanke e-mailed the General Counsel of the Federal Reserve, Scott Alvarez, stating that Defendant Lewis had just "confirm[ed] his willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the MAC, given the deterioration at [Merrill]." (emphasis in original.)

225.    Bernanke then asked Alvarez whether the Federal Reserve could provide a formal letter advising Defendant Lewis that invoking the MAC clause was not in the best interests of BOA, and whether Defendant Lewis could use such a letter as a defense from potential lawsuits. Alvarez responded that such a letter was not "appropriate."

226.    On December 22, 2008, Defendant Lewis e-mailed members of the BOA Board, among others, to inform them that neither the Federal Reserve nor the Treasury could send a letter without unwanted public disclosure. Specifically, Defendant Lewis stated: "I just talked with Hank Paulson. He said that there was no way the Federal Reserve and the Treasury could send us a letter of any substance without public disclosure which, of course, *we do not want*."

227.    Defendant Lewis and the BOA Board held a meeting on December 22, 2008. According to the minutes of this meeting, Defendant Lewis informed the BOA Board of the $138 billion government bailout to salvage the Merger and that "the Treasury and Fed would [have] remove[d] the Board and management of [BOA]" had BOA invoked the MAC clause. Defendant Lewis' statements reflected in the December 22, 2008 Board meeting minutes reveal that the $138 billion government bailout was a material definitive agreement by December 22, 2008. Nevertheless, Defendants failed to disclose this agreement or the circumstances necessitating the government bailout until well after the Closing Date.

228.   In a December 23, 2008 e-mail to Bernanke, Alvarez stated the following concerning potential liability for BOA's failure to disclose Merrill's fourth quarter losses prior to the Shareholder Vote:

> Management may be exposed if it doesn't properly disclose information that is material to investors. There are also Sarbanes-Oxley requirements that the management certify the accuracy of various financial reports. . . . **His [Lewis'] potential liability here will be whether he knew (or reasonably should have known) the magnitude of the [Merrill] losses when [BOA] made its disclosures to get the shareholder vote on the [Merrill] deal in early December**.
>
> First, we didn't order [Lewis] to go forward – we simply explained our views on what the market reaction would be and left the decision to him. Second, making hard decisions is what he gets paid for and only he has the full information needed to make the decision – so we shouldn't take [Lewis] off the hook by appearing to take the decision out of his hands.

Notably, Alvarez's account contradicted Defendant Lewis' contention that federal regulators forced the Merger to proceed by prohibiting BOA's invocation of the MAC clause.

229.   In a subsequent e-mail to Bernanke, Alvarez noted that Federal Reserve officials concluded that Defendant Lewis' knowledge of Merrill's fourth quarter losses prior to the Shareholder Vote may cause "problems," *i.e.*, potential liability for his failure to disclose these losses. Specifically, Alvarez stated:

> [O]nce we're in litigation, all our documents become subject to discovery and, as you'll remember from Deborah's presentation, some of our analysis suggests that Lewis should have been aware of the problems at [Merrill] earlier (perhaps as early as mid-November) and not caught by surprise. That could cause other problems for him around the disclosures [BOA] made for the shareholder vote.

230.   Despite the necessity of a massive taxpayer bailout to salvage the Merger, Defendants again determined to withhold this information from BOA shareholders, including Plaintiffs. According to the minutes of a special meeting of the BOA Board held on December 30, 2008: "[Defendant] Lewis explained that written assurances would not be received before January 1, 2009, because any written assurances would require formal action by the Fed and Treasury, *which formal action would require public disclosure*." However, because Defendants knew that

935174.3

- 64 -

1   the government's $138 billion bailout was firmly in place as of December 22, 2008, they decided

2   to proceed with the Merger. Instead of disclosing this information before the Closing Date,

3   Defendants determined to announce it "in conjunction with [BOA's] earnings release on January

4   20, 2009." Once again, as discussed herein, Defendants at all times were required to update the

5   Proxies, even after the Shareholder Vote.

6          231.    On June 25, 2009, pursuant to the Oversight Committee Investigation, Bernanke

7   provided sworn testimony confirming that BOA's failure to disclose material facts concerning the

8   Merger lay solely with the Company. Specifically, Bernanke testified:

9               Neither I nor any member of the Federal Reserve ever directed,
                instructed, or advised Bank of America to withhold from public
10              disclosure any information relating to Merrill Lynch, including its
                losses, compensation packages or bonuses, or any other related
11              matter. These disclosure obligations belong squarely with the
                company, and the Federal Reserve did not interfere in the
12              company's disclosure decisions.

13

14         232.    On July 16, 2009, after Paulson testified as part of the Oversight Committee

15   Investigation, Representative Dennis J. Kucinich, Chairman of the Oversight Committee

     Investigation, stated:
16

17              [N]othing in Mr. Paulson's testimony today justifies the
                Government's decision to ignore evidence that [BOA] withheld
18              information from its shareholders about mounting losses at
                [Merrill] before the crucial shareholder vote on December 5—a
19              potentially illegal act.

                                        *      *      *
20

21              Top staff at the Fed and Treasury had determined that Mr. Lewis
                knew about accelerating losses at [Merrill] before the shareholder
22              vote to ratify the merger, but he did not provide that information to
                shareholders.

23

24         233.    While Paulson reminded Defendant Lewis of his power to remove Lewis and BOA

25   Board members if they decided to terminate the Merger, Paulson *did not, and could not*, alter

26   Defendants' obligation to disclose material information to Plaintiffs and other BOA shareholders

27   concerning the Merger. In particular, Defendants had a duty under SEC Form 8-K to disclose the

28

1    material definitive agreement with the government to receive a $138 billion taxpayer bailout, but

2    failed to do so.

3    234.    In his testimony before the Oversight Committee, Defendant Lewis himself

4    acknowledged this disclosure duty and denied that Paulson or Bernanke had interfered with any

5    BOA disclosures. Specifically, Defendant Lewis testified that "[n]either Secretary Paulson nor the

6    chairman of the Federal Reserve, Mr. Bernanke, ever told me not to disclose something that we

7    publicly — that we felt should be publicly disclosed." In response to questioning from the

8    Oversight Committee on this subject, Defendant Lewis elaborated that "[Bernanke] never said we

9    should not disclose anything that was disclosable. ***That would be our decision*** and I never heard

10   from him on the issue of us not disclosing anything."

11   235.    As made clear by the internal documents cited above, Defendants–at a minimum—

12   negligently failed in their duty to update the Proxy Statement and the documents incorporated

13   therein, including, among others, the September 15, 2008 public statements, the First and Second

14   Proxy Amendments, and the press releases concerning the Shareholder Vote. Moreover, the

15   Proxy Statement and the documents incorporated therein were either false and misleading with

16   respect to material facts and/or omitted material facts necessary to make such statements not false

17   and misleading, because Defendants knew, among other things:

        i.    No later than mid-November 2008 that BOA could not support
18            Merrill's massive losses, jeopardizing consummation of the
19            Merger;

20      ii.   No later than the end of November 2008, *at least 5 days before the*
21            *Shareholder Vote*, that Merrill's actual fourth quarter 2008 losses
              would be at least $13.3 billion;
22
        iii.  The morning of the Shareholder Vote, Merrill's actual fourth
23            quarter 2008 losses were at least $15.3 billion;

24      iv.   BOA had agreed in an undisclosed schedule to the Merger
25            Agreement to permit Merrill to distribute up to $5.8 billion in
              bonuses to its employees before the Merger closed, of which $3.6
26            billion was actually distributed by Merrill on December 31, 2008;

27      v.    Defendant Lewis was meeting with federal regulators in search of
              (further dilutive) federal funding necessary to complete the Merger;
28            and

vi.     BOA's senior management was evaluating BOA's rights to
        terminate the Merger and that BOA consummated the Merger only
        upon receipt of billions of dollars in undisclosed federal funding.

236.    As a result of Defendants' failure to correct the Proxy Statement, BOA shareholders as of the Record Date were prevented from exercising their voting rights based upon available, but undisclosed, material facts. Plaintiffs suffered damages by voting their BOA shares in favor of the Merger based upon materially misrepresented and incomplete facts. Defendants failed to correct the materially misleading Proxy, which formed an essential link in obtaining BOA shareholder approval, and the Merger was completed on the Closing Date based upon materially false and misleading information.

**D.     BOA Finally Discloses Merrill's Fourth Quarter Losses And BOA's Request For, And Receipt Of, Additional Federal Financing.**

237.    On January 12, 2009, news began to emerge indicating that BOA would report a substantial loss for the fourth quarter of 2008. Specifically, *Bloomberg* issued a story detailing a Citigroup analyst's client note advising that BOA would report fourth quarter losses and a substantial dividend reduction. On this news, BOA's stock price declined from its $12.86 January 12, 2009 opening price to close at $11.43 that day.

238.    Late in the day on January 14, 2009, *The Wall Street Journal* reported that certain BOA senior executives had met with federal regulators in December 2008 to discuss financial assistance for the Merger based upon Merrill's fourth quarter 2008 losses. This was the first time BOA shareholders, including Plaintiffs, learned of the extent of Merrill's losses for the fourth quarter of 2008 and BOA's need for additional government capital to consummate the Merger. Defendants had no comment on the January 14, 2009 *Wall Street Journal* article.

239.    On January 15, 2009, articles in both *The Wall Street Journal* and *The New York Times* reported in greater detail that BOA was finalizing a deal with the federal government to obtain additional financial aid to support the Merger. Both articles also confirmed that this additional financing under the TARP/CPP program was sought by and promised to Defendant Lewis in mid-December 2008.

240.  As reported in the January 15th *Wall Street Journal* article:

> The U. S. government is close to finalizing a deal that would give
> billions in additional aid to Bank of America Corp. to help it close
> its acquisition of Merrill Lynch & Co., according to people familiar
> with the situation.
>
> ***Discussions over these funds began in mid-December*** when Bank
> of America approached the Treasury Department. The bank,
> already the recipient of $25 billion in committed federal rescue
> funds, said that it was unlikely to complete its Jan. 1 purchase of the
> ailing Wall Street securities firm because of Merrill's larger-than-
> expected losses in the fourth quarter, according to a person familiar
> with the talks.

241.  The January 15, 2009 *New York Times* article also confirmed that Defendant Lewis
learned of Merrill's fourth quarter losses and negotiated with Messrs. Paulson and Bernanke to
obtain additional financing to consummate the Merger at least two weeks before the Merger
closed:

> The preparations for further support come after ***Bank of America's***
> ***chief executive, Kenneth D. Lewis, told regulators in mid-***
> ***December that the shotgun deal it signed just two months earlier***
> ***with Merrill Lynch was in jeopardy***.
>
> ***Billions of dollars in write-downs on mortgages, commercial real***
> ***estate and other credit assets at the brokerage firm climbed into***
> ***double-digit territory in the fourth quarter, pushing Merrill into a***
> ***substantial loss***. . . .

242.  At the end of trading on January 15, 2009, BOA's common stock lost 18% of its
value, closing at $8.32 per share on heavy trading volume. This was a $1.88 drop from the $10.20
per share closing price on January 14, 2009, leaving BOA's common stock price at an 18-year
low.

### 1.  Defendant Lewis' Memorandum to BOA Employees

243.  Defendant Lewis responded to the growing media coverage surrounding BOA's
negotiations with the government and Merrill's fourth quarter losses with a memorandum to BOA
employees on January 15, 2009 entitled, "Bank of America Remains Strong."

244.  The memorandum acknowledged the press coverage "reporting that Bank of
America is in discussions with the Treasury Department regarding financial assistance with the
Merrill Lynch transaction." However, the memorandum provided no further elaboration on this

935174.3

- 68 -

CASE NO. _____

COMPLAINT

subject, and simply stated that "we expect to talk about this when we report fourth-quarter financial results."

245.    The remainder of the memorandum provided assurance to BOA employees that the Company's financial condition was sound and continued to grow:

> The core of the company, Bank of America, remains strong.
>
> We are one of the world's leading financial institutions with broad earnings diversity and a large growing deposit base.
>
> In fact, we have experienced significant growth in both retail and commercial deposits. We continue to serve one out of every two American households, helping them navigate these challenging times.
>
>             \*    \*    \*
>
> The financial services industry as a whole is being affected, as demonstrated by competitors' recent earnings reports.
>
> This extraordinary period has called for extraordinary measures. . . .
>
> And we remain focused on delivering strong results, as we have in past decades and will in the future.

246.    The full text of Defendant Lewis' memorandum to BOA employees was posted on the *Deal Journal* page of *The Wall Street Journal*, and in the Associated Press on or about January 15, 2009.

### 2.    BOA's Fourth Quarter 2008 Press Release

247.    In a January 16, 2009 press release, BOA reported its financial results for fiscal year 2008 and the fourth quarter of 2008 (the "January 16, 2009 Press Release"). For the fourth quarter of 2008, BOA had a significant net loss of $1.79 billion compared with net income of $268 million a year earlier.

248.    Although BOA's fourth quarter results did not account for, and were not based on, Merrill's fourth quarter 2008 results, the press release that accompanied BOA's earnings report revealed the shocking depth of Merrill's losses. Specifically, the "Transition Update" section of the press release indicated that "Merrill Lynch preliminary results indicate *a fourth-quarter net loss of $15.31 billion*, or $9.62 per diluted share, driven by severe capital market dislocations." *Merrill's fourth quarter 2008 pre-tax losses were over $21 billion*.

249.    As part of this tremendous fourth quarter loss, the January 16, 2009 Press Release identified the following "[s]ignificant negative fourth-quarter items for Merrill Lynch":

- Credit valuation adjustments related to monoline financial guarantor exposures of $3.22 billion.

- Goodwill impairments of $2.31 billion. Leveraged loan write-downs of $1.92 billion.

- $1.16 billion in the U.S. Bank Investment Securities Portfolio write-downs.

- Commercial real estate write-downs of $1.13 billion.

250.    BOA's "Supplemental Information for Fourth Quarter 2008" was incorporated by reference into the January 16, 2009 Press Release. In turn, BOA's "Supplemental Information" attached "Selected Fourth Quarter 2008 Merrill Lynch Results," reflecting net negative revenue of $13.109 billion from "principal transactions" in the fourth quarter. Merrill had previously defined "principal transactions" revenue to include "both realized and unrealized gains and losses on trading assets and trading liabilities, investment securities classified as trading investments and fair value changes associated with structured debt." The Merrill results incorporated by reference into the BOA press release also indicated that Merrill had a net loss of $3.39 billion in the "Other" revenue category. The financial results defined "Other" to include "investment securities, private equity investments, loans and other miscellaneous items."

251.    BOA also announced for the first time in the January 16, 2009 Press Release that it had entered into an agreement with federal regulators for additional financing to absorb Merrill's losses and to salvage the Merger. The agreement was described as follows:

> In view of the continuing severe conditions in the markets and economy, ***the U.S. government agreed to assist in the Merrill acquisition by making a further investment in Bank of America of $20 billion in preferred stock carrying an 8 percent dividend rate***.
>
> ***In addition, the government has agreed to provide protection against further losses on $118 billion in selected capital markets exposure***, primarily from the former Merrill Lynch portfolio. Under the agreement, Bank of America would cover the first $10 billion in losses and the government would cover 90 percent of any subsequent losses. Bank of America would pay a premium of 3.4 percent of those assets for this program.

1       252.    Following the issuance of the January 16, 2009 Press Release, BOA's common

2 stock price dropped 14% from $8.32 per share on January 15, 2009, to $7.18 per share at the

3 close of trading on January 16, 2009.

4           **3.**      **BOA's Fourth Quarter Earnings Conference Call**

5       253.    On January 16, 2009, BOA held its fourth quarter 2008 earnings conference call.

6 During the call, Defendant Lewis elaborated on the recently announced Merrill losses and

7 confirmed the new funding arrangements with the federal government.

8       254.    Defendant Lewis also confirmed that Defendants were aware of Merrill's losses

9 prior to the completion of the Merger and that negotiations with federal regulators to salvage the

10 transaction had taken place before the Merger closed:

> We went to our regulators and told them that ***we could not close the deal without their assistance***. As a result, we have agreed to the issuance of $20 billion in tier-1 qualifying TARP preferred [stock] as well as the issuance of an additional preferred of $4 billion in exchange for an asset guarantee that is essentially insurance protection on approval of capital markets related assets.

15      255.    When asked by an analyst on the call whether anything was missed during BOA's

16 due diligence, Defendant Lewis attributed the losses to a much greater deterioration in Merrill's

17 assets than BOA's management had anticipated:

> In a nutshell, much, much higher deterioration of the assets we had identified than we had expected going into the fourth quarter. . . . So it wasn't an issue of not identifying the assets. ***It was that we did not expect the significant deterioration, which happened in mid to late December that we saw***.

21      256.    As noted above, the New York Attorney General's investigation confirmed that by

22 the end of November 2008, Merrill's fourth quarter losses were $13.3. billion, which Defendants

23 knew or should have known before the Shareholder Vote and the Closing Date. Specifically, the

24 New York Attorney General's September 8, 2009 letter revealed that Defendants knew at the end

25 of November 2008 that Merrill had sustained more than $13 billion in fourth quarter 2008 losses

26 and that Merrill would need to take a goodwill charge of more than $2 billion associated with

27 subprime related losses. The September 8, 2009 letter also revealed that Defendants determined

28

1   on December 17, 2008, that BOA likely had a legal basis to terminate the Merger because of

2   Merrill's enormous fourth quarter 2008 losses.

3          257.    Finally, Defendant Lewis acknowledged the materiality of Merrill's losses to BOA

4   shareholders when he attempted to justify Defendants' decision to proceed with the Merger

5   without disclosing the losses and the government support. In response to an analyst's inquiry

6   during the January 16, 2009 conference call on why Defendants did not seek to renegotiate a

7   better price with Merrill once it learned of Merrill's losses, Defendant Lewis did not assert that

8   the losses were immaterial, but rather stated that a "re-pricing, assuming it could be agreed,

9   ***would have required a new stockholder vote*** both at Bank of America and at Merrill Lynch and

10  therefore the Merger would have been delayed by at least a couple of months."

11         258.    Upon these disclosures, BOA shares dropped from $7.18 to close at $5.10 per

12  share on January 20, 2009, the next trading day following the earnings conference call.

13         259.    On January 21, 2009, BOA's common stock price rebounded from its $5.10 per

14  share close on January 20, 2009 to close at $6.68. As reported by *Bloomberg* that same day,

15  BOA's share price gain was based upon Lewis's and five BOA directors' purchase of more than

16  500,000 shares to shore up BOA's ailing stock price.

17         260.    After the market closed on January 21, 2009, *The Financial Times* reported that

18  Merrill made accelerated bonus payments estimated to be between $3-$4 billion at the same time

19  that Merrill was recording unprecedented losses and BOA was seeking additional capital from

20  government regulators. The fall-out was swift. In response to this disclosure of Merrill's

21  accelerated bonus payments, BOA's common stock price lost a substantial portion of its director-

22  driven price recovery—dropping from a close of $6.68 per share on January 21, 2009 to close at

23  $5.71 per share on January 22, 2009. That same day, January 22, 2009, Thain met with the BOA

24  Board and was forced to resign from his position at BOA.

25         261.    The foregoing statements demonstrate that Defendants understood that the omitted

26  information concerning Merrill's losses and BOA's requirement of further federal funding was

27  material to the integrity of the Shareholder Vote. Rather than providing the Company's

28  shareholders with this material information, Defendants failed to update and/or correct the Proxy

935174.3                                    - 72 -
                                                              CASE NO. _____
                                                                        COMPLAINT

1    Statement and related solicitation materials as required under Section 14(a) and Rule 14a-9 of the

2    Exchange Act, causing BOA shareholders, including Plaintiffs, to suffer significant damages.

3    **E.      Ensuing Investigations**

4         **1.      The New York State Attorney General's Investigation of BOA's
              Failure to Disclose Either the Merrill Bonuses or Merrill's Fourth**
5             **Quarter 2008 Losses**

6         262.    On January 27, 2009, the New York Attorney General subpoenaed Thain to testify

7    on the timing and nature of the bonus payments authorized in the few days following the

8    Shareholder Vote. The subpoena was issued in connection with an investigation that the New

9    York Attorney General commenced in September 2008 concerning bonuses by investment banks

10   that had received TARP financing, including Merrill.

11        263.    On February 10, 2009, pursuant to a request from the United States House

12   Committee on Financial Services, the New York Attorney General sent a letter to Committee

13   Chairman Barney Frank addressing the Merrill bonuses. The letter set forth certain of the New

14   York Attorney General's findings to that date as follows:

15            Merrill Lynch secretly moved up the planned date to allocate
              bonuses and then richly reward their failed executives. Merrill
16            Lynch had never before awarded bonuses at such an early date and
              this timetable allowed Merrill to dole out huge bonuses ahead of
17            their awful fourth quarter earnings announcement and before the
              planned takeover of Merrill by Bank of America.
18

19   The New York Attorney General's letter to Congressman Frank also expressly highlighted

20   BOA's approval of Merrill's bonuses and the Company's failure to disclose these massive and

21   unconscionable pre-approved bonus payments, or Merrill's fourth quarter losses prior to the

22   Closing Date:

23            Merrill Lynch's decision to secretly and prematurely award
              approximately $3.6 billion in bonuses, *and Bank of America's*
24            *apparent complicity in it*, raises serious and disturbing questions.
              *By December 8, 2008, Merrill and presumably Bank of America*
25            *must have been aware that the fourth quarter and yearly earnings*
              *results were disastrous*. . . . In the face of these losses, federal
26            taxpayers were forced to help Bank of America acquire Merrill.

27        264.    On February 19, 2009, Thain testified in response to the New York Attorney

28   General's subpoena and confirmed that he had met with Andrea Smith on or about December 8,

935174.3                              - 73 -
                                                          CASE NO. _____
                                                                                 COMPLAINT

1   2008 to discuss Merrill's bonuses and that BOA was at all times made aware of and consulted on

2   the bonuses. However, purportedly at the direction of BOA, Thain refused to disclose the specific

3   amounts and recipients of the bonuses. On February 23, 2009, the New York Attorney General

4   moved to compel Thain's testimony in this regard and the next day Thain disclosed details of the

5   bonuses. On February 27, 2009, Defendant Lewis testified in response to a similar subpoena.

6          265.    On April 23, 2009, the New York Attorney General sent a letter to certain

7   Congressional and federal regulators who oversee TARP to inform them of the findings from his

8   ongoing investigation into the Merger. The New York Attorney General confirmed in the letter

9   that Merrill's fourth quarter losses were "known to Bank of America executives prior to the

10  [Shareholder Vote]" and that the December 30, 2008 BOA Board meeting minutes established

11  that BOA "was trying to time its disclosure of Merrill Lynch's losses to coincide with the

12  announcement of its earnings in January" after the Closing Date. The New York Attorney

13  General also noted that Defendant Lewis acknowledged that BOA's decision not to terminate the

14  Merger pursuant to the "MAC" clause would likely harm BOA shareholders for the next "three

15  year[s]."

16         266.    On September 8, 2009, the New York Attorney General sent a letter to BOA's

17  outside counsel, Lewis Liman, confirming, among other things, that BOA only went forward with

18  the Merger after receiving a verbal commitment from Paulson to support the Merger with

19  taxpayer funds. Specifically, the New York Attorney General's September 8, 2009 letter stated:

20        Bank of America failed to disclose that it had determined, eight
    business days after the merger was approved, that it had a legal
21        basis to terminate the merger because of Merrill's losses. . . . Yet, it
    took Bank of America more than a month to make public disclosure
22        of its dire financial condition – a month during which millions of
    shares of Bank of America stock were traded based on entirely
23        inaccurate and outdated financial information. Bank of America
    further failed to disclose . . . that it had received the government's
24        oral commitment to support the merger with taxpayer funds.

25         267.    The New York Attorney General's September 8, 2009 letter also summarized his

26  findings by stating that "[o]ur investigation has found at least four instances in the fourth quarter

27  of 2008 where Bank of America and its senior officers failed to disclose material non-public

28  information to its shareholders." These four instances included:

935174.3

CASE NO. _____

COMPLAINT

i.      BOA's knowledge as of November 2008 of Merrill's more than $14 billion fourth quarter 2008 losses;

ii.     Merrill's goodwill charge of more than $2 billion associated with subprime related losses prior to the Shareholder Vote;

iii.    BOA's determination eight days after the Shareholder Vote that it had a legal basis to terminate the Merger because of Merrill's enormous losses; and

iv.    the $3.6 billion in accelerated undisclosed bonus payments to Merrill employees that BOA approved on December 8, 2008.

268.    On February 4, 2010, the New York Attorney General filed a complaint against Defendants BOA, Lewis, and Price asserting causes of action under New York's Martin Act and New York Executive Law for securities fraud arising out of the same facts and circumstances alleged herein regarding the Merger.

### 2. The Oversight Committee Investigation and the SEC Action Further Confirm Defendants' Failure to Disclose Either the Merrill Bonuses or Merrill's Fourth Quarter 2008 Losses.

269.    The Oversight Committee Investigation and the SEC Action further confirm that Defendants knew of, but failed to disclose – prior to both the Shareholder Vote and the Closing Date – BOA's agreement to permit Merrill to pay billions of dollars in bonuses to Merrill's employees and Merrill's massive fourth quarter 2008 losses.

270.    As noted above, beginning in June 2009, the Oversight Committee Investigation commenced a series of hearings with people who had knowledge of and/or participated in the consummation of the Merger, including, among others, Paulson, Bernanke, and Defendant Lewis. The Oversight Committee obtained testimony from many people who were integral to the consummation of the Merger. The Investigation particularly focused on Defendants' failure to disclose:

i.      Merrill's mounting losses;

ii.     the agreement to pay up to $5.8 billion in bonuses, of which $3.6 billion was paid prior to the Closing Date; and

iii.    BOA's arrangement with federal regulators to receive a $138 billion taxpayer bailout to save the Merger.

271.    Based upon its investigation, the Oversight Committee determined that evidence existed demonstrating possible securities law violations resulting from Defendants' failure to disclose Merrill's mounting losses weeks before the Shareholder Vote. Among other things, the Committee concluded that BOA failed to perform an adequate forecast of continuing losses at Merrill for the fourth quarter of 2008 based upon the losses which Defendants were aware of in mid-November.

272.    The SEC also commenced an investigation of the Merger, which led to the filing of the SEC Action on August 3, 2009, as amended on February 4, 2010. The SEC Action asserted claims under Section 14(a) and Rule 14a-9 of the Exchange Act based on the same facts and circumstances alleged herein.

273.    On October 12, 2009, BOA agreed to waive the attorney-client privilege and produced certain documents to the Oversight Committee, the New York Attorney General, and the SEC in connection with their respective investigations regarding the Merger. These documents revealed that Defendants knew the full extent of Merrill's fourth quarter 2008 losses both before the Shareholder Vote and the Closing Date.

274.    For example, Defendant Cotty wrote an e-mail on November 5, 2008—one month before the Shareholder Vote—to Defendant Price that included Merrill's October 2008 financial report. The e-mail, which estimated markdowns and "other large items" of $5.3 billion, included Defendant Cotty's comment: "***Read and weep***." Two days after the Shareholder Vote, on December 7, 2008, Gary Carlin, Merrill's former Chief Accounting Officer, e-mailed Defendant Cotty with Merrill's updated financials through December 5 and stated: "***What a disaster!***"

275.    Similarly, on October 14, 2009, an article in *The New York Times* cited to a January 15, 2009 e-mail from Gifford to May, both BOA Board members, stating that the Merger "***screw[ed] the shareholders!***" May replied "no trail," suggesting that Gifford should not write messages that could later be produced in litigation.

276.    On November 17, 2009, Mayopoulos provided sworn testimony to the Oversight Committee, where he stated, among other things, that the issue of whether BOA should disclose Merrill's then-known fourth quarter 2008 losses "arose around November 12, 2008"—

1    approximately 3 weeks before the Shareholder Vote and almost two months prior to the Closing

2    Date.

3           277.    Such documents and sworn testimony establish that Defendants knew or should

4    have known the magnitude of Merrill's fourth quarter 2008 losses and the billions of dollars in

5    bonus payments prior to the Shareholder Vote. Nevertheless, Defendants failed to disclose this

6    material information to BOA shareholders, including Plaintiffs.

7           278.    On February 4, 2010, the SEC and BOA agreed to a settlement of the SEC Action.

8    Under the settlement, BOA is required to pay a $150 million fine and implement certain internal

9    control procedures. On February 22, 2010, Judge Rakoff "reluctantly" approved the settlement.

10   After reviewing hundreds of pages of deposition testimony and other evidentiary material

11   produced in the SEC Action, Judge Rakoff noted that: (i) the Proxy Statement "failed adequately

12   to disclose [BOA's] agreement to let Merrill pay . . . $5.8 billion in bonuses at a time when

13   Merrill was suffering huge losses"; and (ii) BOA "failed adequately to disclose [prior to the

14   Shareholder Vote or Closing Date BOA's] ever-increasing knowledge that Merrill was suffering

15   historically great losses during the fourth quarter of 2008."

16          279.    While characterizing the settlement as "half-baked justice at best" and "far from

17   ideal" given that the settlement amount was paltry in light of the alleged misconduct, Judge

18   Rakoff nevertheless approved the settlement. Judge Rakoff gave "substantial deference" to the

19   SEC "as the regulatory body having primary responsibility for policing the securities markets"

20   and exercised the Court's "judicial restraint" to not impose its "own preferences."

21   **VII.    TOLLING OF THE STATUTE OF LIMITATIONS**

22          280.    Any applicable statute(s) of limitations with respect to Plaintiffs' claims have been

23   tolled since no later than January 21, 2009 by the filing of the class action complaint in the action

24   captioned *Steven J. Sklar v. Bank of America Corp. et al.*, No. 09-cv-580 (S.D.N.Y.), pursuant to

25   the doctrine announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 552 (1974),

26   *In re WorldCom Securities Litigation*, 496 F.3d 245 (2d Cir. 2007), and *In re Hanford Nuclear*

27   *Reservation Litigation*, 534 F.3d 986, 1009 (9th Cir. 2008). The Sklar action was consolidated on

28   June 30, 2009 into the action captioned *In re Bank of America Corp. Securities, Derivative, and*

CASE NO. _____

COMPLAINT

*Employee Retirement Income Security Act (ERISA) Litigation*, No. 09 MD 2058 (PKC) (S.D.N.Y.).

## COUNT I

### For Violation of § 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants

281. Plaintiffs incorporate by reference and reallege all preceding paragraphs, other than paragraphs 8, 34 – 42, and 124, as if fully set forth herein.

282. The claim set forth below under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder against all Defendants is not based upon any allegations of knowing or reckless misconduct. Further, this claim does not allege fraud or sound in fraud. Plaintiffs explicitly disclaim reference to or reliance upon any allegations of fraud in connection with this claim, which sounds in negligence pursuant to the Exchange Act and case law interpreting it.

283. Plaintiffs assert this claim against all Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, which prohibit making material misstatements and/or omissions in proxy statements and require statements of material facts necessary to correct statements in proxy solicitation materials so that they are not materially false and misleading.

284. Defendants solicited proxies, permitted the use of their names to solicit proxies, signed proxy materials, and made other public statements to solicit proxies from Plaintiffs and other investors, by means of the Proxy Statement and other public representations, containing statements, as set forth in greater detail above, which at the time and in light of the circumstances under which they were made were false and misleading with respect to material facts regarding the Merger. Defendants also failed to disclose material facts regarding the Merger necessary to prevent statements in the Proxy Statement and related solicitation materials from being materially false and misleading or to correct the statements made in the Proxy Statement and other public representations such that they were not materially false and misleading.

285. BOA and Merrill were the issuers of the Proxy Statement and each permitted the use of its name in the Proxy Statement representing, among other things, that neither company

1   experienced any "Material Adverse Effect" as defined in the Merger Agreement and that the

2   Merger was in the best interests of each company's shareholders.

3          286.    Defendant Lewis signed the Proxy and the Second Proxy Amendment. Defendant

4   Lewis also permitted the use of his name in the Proxy Statement and solicited BOA shareholder

5   votes in the September 15, 2008 Press Release, the Merger Presentation, the September 15, 2008

6   Analyst Call, the Second Proxy Amendment, and the November 26, 2008 Press Release.

7   Defendant Lewis failed to disclose material facts in the Proxy Statement, all documents

8   incorporated by reference therein, and related solicitation materials concerning the Merger.

9          287.    Defendant Price signed the Proxy Registration Statement, solicited BOA

10  shareholder votes in the September 15, 2008 Analyst Call, and failed to disclose material facts in

11  the Proxy Statement, all documents incorporated by reference therein, and related solicitation

12  materials concerning the Merger.

13         288.    Defendant Cotty signed the Proxy Registration Statement, failed to disclose

14  material facts in the Proxy Statement, all documents incorporated by reference therein, and

15  related solicitation materials concerning the Merger.

16         289.    Defendant Thain signed the Proxy Registration Statement, failed to disclose

17  material facts in the Proxy Statement, all documents incorporated by reference therein, and

18  related solicitation materials concerning the Merger

19         290.    Each of the Defendants had a duty to update and/or correct statements made in the

20  Proxy Statement and related solicitation materials prior to the Closing Date regarding Merrill's

21  deteriorating financial condition, the undisclosed bonuses, and the need for a taxpayer bailout to

22  salvage the Merger. These Defendants failed to update and/or correct statements made in the

23  Proxy Statement and related solicitation materials, despite their knowledge of and access to

24  material nonpublic information that had a direct impact on the valuation of the Merger.

25         291.    The Proxy Statement, all documents incorporated therein, and related solicitation

26  materials were essential links in obtaining the BOA shareholder votes, including Plaintiffs',

27  required to complete the Merger on January 1, 2009. Defendants sat by idly and allowed BOA

28  shareholders to approve the Merger on December 5, 2008 on the basis of the materially false and

misleading Proxy Statement and related solicitation materials without disclosing material facts arising since the Proxy Statement's dissemination. Specifically, Defendants failed to disclose, among other things: (i) Merrill's billions of dollars in losses for the fourth quarter of 2008; (ii) the agreement to pay up to $5.8 billion in bonuses, of which $3.6 billion was paid prior to the Closing Date; and (iii) BOA's arrangement with federal regulators to receive a $138 billion taxpayer bailout to save the Merger.

292.    From the first partial disclosure of the material facts omitted from the Proxy Statement and related solicitation materials on January 12, 2009 to the close of trading on January 22, 2009, BOA's stock price dropped from its opening price of $12.86 on January 12, 2009 to close at $5.71 per share on January 22, 2009.

293.    Plaintiffs voted their BOA shares in favor of the Merger based upon the materially misleading and incomplete Proxy Statement and related solicitation materials. Plaintiffs were denied the opportunity to make a fully informed decision in voting on the Merger based upon Defendants' materially false and misleading statements.

294.    As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Plaintiffs have sustained and will continue to sustain injury based upon its votes in favor of the Merger based upon the materially misleading and incomplete Proxy Statement and related solicitation materials.

**COUNT II**

**For Violation of § 20(a) of the Exchange Act Against
Defendants Lewis, Price, Cotty and Thain**

295.    Plaintiffs incorporate by reference all preceding paragraphs, other than paragraphs 8, 34 – 42, and 124, as if fully set forth herein. This claim is asserted against Defendants Lewis, Price, Cotty and Thain.

296.    From the September 15, 2008 announcement of the Merger through the disclosure of previously omitted material facts beginning on January 12, 2009, Defendants Lewis, Price, Cotty and Thain were senior executive officers and/or directors of BOA or Merrill and were privy to confidential and proprietary information concerning BOA or Merrill and each company's

1    business, operations, performance and prospects, including its compliance with applicable

2    federal, state and local laws and regulations.

3         297.    Because of their high-level positions within BOA and/or Merrill, Defendants

4    Lewis, Price, Cotty and Thain exercised day-to-day control over BOA and/or Merrill and had

5    regular access to non-public information about each company's business, operations, performance

6    and prospects through access to internal corporate documents and information, conversations and

7    connections with other corporate officers and employees, attendance at management meetings

8    and each company's Board of Directors, and committees thereof, and reports and other

9    information provided to them in connection therewith.

10        298.    Defendants Lewis, Price, Cotty and Thain each acted as a controlling person of

11   BOA and/or Merrill within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

12   By virtue of their high-level positions, daily participation in and/or awareness of either

13   company's operations, and/or intimate knowledge of the statements made concerning the Merger

14   in the Proxy Statement and disseminated to the investing public, Defendants Lewis, Price, Cotty

15   and Thain had the power to influence and control and did influence and control, directly or

16   indirectly, the decision-making of BOA and/or Merrill, including the content and dissemination

17   of the materially false and misleading Proxy Statement and related solicitation materials.

18   Defendants Lewis, Price, Cotty and Thain were provided with or had unlimited access to copies

19   of BOA and/or Merrill's reports, press releases, public filings and other statements alleged by

20   Plaintiffs to have been misleading prior to and/or shortly after those statements were issued, and

21   had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

22        299.    In particular, Defendants Lewis, Price, Cotty and Thain had direct and supervisory

23   involvement in the day-to-day operations of BOA and/or Merrill in connection with the Merger

24   and, therefore, had the power and/or ability to control or influence the particular transactions

25   and/or statements giving rise to Plaintiffs' claims under Section 14(a) and Rule 14a-9 of the

26   Exchange Act alleged herein, and exercised the same. Defendants Lewis, Price, Cotty and Thain

27   had reason to know that BOA disseminated a materially false and misleading Proxy Statement,

28   failed to correct the statements therein and in related solicitation materials from being materially

1 | false and misleading, and were direct participants in these violations of Section 14(a) and

2 | Rule 14a-9.

3 |     300. BOA and Merrill violated Section 14(a) of the Exchange Act and Rule 14a-9

4 | promulgated thereunder through the statements and omissions set forth above. By virtue of their

5 | positions as controlling persons, Defendants Lewis, Price, Cotty and Thain are also liable

6 | pursuant to Section 20(a) of the Exchange Act for such violations. Plaintiffs suffered damages as

7 | a direct and proximate result of the wrongful conduct by Defendants Lewis, Price, Cotty and

8 | Thain.

9 | **VIII. DEFENDANTS' VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND RULE 10b-5 PROMULGATED THEREUNDER**

10 |

11 |     **A. Defendants Knowingly And/Or Recklessly Made Materially False And**
**Misleading Statements And Failed To Disclose Material Facts.**

12 |     301. During the Relevant Period from September 15, 2008 through January 21, 2009,

13 | Defendants made a series of materially false and misleading statements and failed to state

14 | material facts necessary to make the statements they made, in light of the circumstances in which

15 | they were made, not misleading. Defendants' material misstatements and omissions artificially

16 | inflated the price of BOA common stock trading on the open market during that time. In making

17 | such statements and/or omitting such facts, Defendants knew and/or recklessly disregarded

18 | numerous facts known to them before and throughout the Relevant Period concerning, among

19 | other things: (i) BOA's failure to conduct adequate due diligence on the Merger; (ii) BOA's

20 | agreement to permit Merrill to pay up to $5.8 billion in employee bonuses prior to the close of the

21 | Merger, out of which $3.6 billion in bonuses were paid prior to the Closing Date; and (iii)

22 | Merrill's significant fourth quarter 2008 losses.

23 |     302. In the September 15, 2008 Press Release announcing the Merger, Defendants

24 | stated, among other things:

25 |         Bank of America Corporation today announced it has agreed to
acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock

26 | transaction that creates a company unrivalled in its breadth of
financial services and global reach.

27 |

28 |         'Acquiring one of the premier wealth management, capital markets,
and advisory companies is a great opportunity for our

935174.3 | - 82 - |

1
2

shareholders,' Bank of America Chairman and Chief Executive
Officer Ken Lewis said. 'Together, our companies are more
valuable because of the synergies in our businesses.'

3

303.     Later on September 15, 2008, Defendants Lewis and Price participated in a press

4

conference with analysts to promote the Merger. During this telephone conference, Defendant

5

Lewis addressed concerns over the adequacy of due diligence conducted by, among others, J.C.

6

Flowers, in connection with the Merger by stating:

7
8
9
10

[H]e and his *firm had done quite an amount of due diligence on
Merrill Lynch fairly recently, and it was very, very extensive*. They
had looked at the marks very comprehensively, so this allowed us
to have him and [his] team as an adviser, and just update the
information they already had. *So that was one of the key
ingredients to being able to do this as quickly as we did*. . . .

11

304.     Addressing the same concerns over the adequacy of the due diligence, Defendant

12

Price stated:

13
14

*Clearly we've had a tremendous amount of historical knowledge
both as a competitor with Merrill Lynch but also have reviewed
and analyzed the company over the years*.

15

305.     During the September 15, 2008 Analyst Call, questions predictably arose

16

concerning BOA's assessment of Merrill's risk exposure. Defendant Price assured investors that

17

such risks were adequately considered prior to agreeing to the Merger and gauging its future

18

impact upon BOA's financial health:

19
20
21
22

*[I]t's not as if we don't have a very significant knowledge of the
markets around the asset classes that are most problematic*. . . .
and quite frankly the progress that Merrill Lynch had made in
reducing risk exposures and analyzing them and having all that laid
out given the efforts that the management team has made over the
last period made it possible for us.

23

306.     Echoing Defendant Price's statements, Defendant Lewis indicated that Merrill had

24

made "incredible progress" in reducing its risk exposure. In response to questions concerning

25

whether Merrill's CDO portfolio was evaluated in connection with the Merger, Defendant Lewis

26

stated:

27
28

The numbers that we presented today, we had considered marks on
the assets. . . . I would tell you that again going back to the point on
things such as CDOs, we have very similar methodology valuations

935174.3

- 83 -

CASE NO. _____

and we have very similar marks to structures. We're dealing with the same counterparties on things. . . . ***we're pretty familiar with the types of assets and feel pretty good about the progress that Merrill Lynch had made itself*** . . . in terms of 'risk reduction.'

307.    Significantly, Defendant Lewis went on to assert that "***we have asked for no relief, capital relief on this deal***" from the federal government and that "***there was no pressure from regulators . . . absolutely no pressure***" to finalize the Merger.

308.    The statements made by Defendants in the September 15, 2008 Press Release and Analyst Call concerning, among other things, the benefits of the Merger, the adequacy of due diligence, and the progress that Merrill had made in reducing its risk of further losses were materially false and misleading and omitted material facts. The true but concealed and/or misrepresented facts that Defendants knew and/or recklessly disregarded at the time the statements were made included, but were not limited to:

  i.  the abbreviated due diligence of Merrill conducted by Defendants and the Financial Advisors was woefully inadequate to determine the fairness of the Merger, and Defendants' reliance upon stale information purportedly known from prior work on behalf of Merrill could not serve as a reliable substitute for current due diligence of Merrill prior to agreeing to the material terms of the Merger;

  ii.  there was a risk of further material losses at Merrill in the very same business areas that suffered the losses precipitating the Merger, which would cause harm to BOA and its shareholders; and

  iii.  BOA had negotiated and entered into an agreement with Merrill that permitted Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date, diminishing resources available to the Company going forward.

309.    Moreover, despite their statements celebrating the Merger, Defendants failed to correct or update Defendant Lewis' assertion that BOA needed no government financing for the transaction. In fact, as alleged above and further described below, BOA required significant government funding to address Merrill's losses and consummate the Merger.

310.    On October 6, 2008, Defendants Lewis and Price conducted a conference call with analysts in conjunction with BOA's third quarter 2008 earnings announcement (the "October 6, 2008 Earnings Call"). During the call, Defendant Lewis announced that BOA was raising $10 billion in additional capital through a stock offering that would "ensure we can handle the

1  economic scenario we face, continue to be a source of liquidity to our customers and still take

2  advantage of opportunities to grow our market share."

3       311.  On the call, an analyst asked Defendants Lewis and Price whether BOA would

4  later raise additional capital to cover the Merger:

5       Just to be clear, I know when you announced the Merrill deal you
   alluded to raising capital and possibly cutting the dividends. The
6       $10 billion you're raising today, should we expect that to be that
   and then done or look for additional capital once the Merrill deal is
7       closed?

8  In response to this question, Defendant Price assured the analyst that BOA considered the Merger

9  when contemplating the $10 billion offering and that BOA would not need additional capital

10  because of the Merger:

11       We have considered the Merrill deal in our intentions here so the
    numbers we are talking about, as I mentioned in the prepared
12       remarks, covered [sic] our anticipated needs from a Merrill
    standpoint.
13

14       312.  Defendant Price's statements during the October 6, 2008 Earnings Call were made

15  on behalf of BOA and were materially false and misleading and omitted material facts required to

16  make them not misleading. To the extent that Defendants' statements were not false when made,

17  they were subject to Defendants' legal duty to update no later than December 17, 2008, when

18  Defendants knew that BOA needed additional financing to complete the Merger. BOA, in fact,

19  required at least $20 billion in additional government assistance to complete the Merger, which

20  Defendants did not disclose to BOA shareholders, including Plaintiffs, to correct Defendant

21  Price's statement above until January 16, 2009.

22       313.  On or about November 3, 2008, BOA filed its Schedule 14A Proxy Statement,

23  dated October 31, 2008, with the SEC in which Defendants promoted the Merger as accretive and

24  beneficial to its business going forward based putatively upon, among other things:

25       ●   Defendants' understanding of BOA's business, operations, financial
    condition, earnings and prospects and of Merrill's business, operations,
26          financial condition, earnings and prospects;

27       ●   Defendants' understanding of the current and prospective environment in
    which BOA and Merrill operate, including economic and market
28

conditions, the competitive environment and *the likely impact of these factors on BOA and Merrill*;

● the BOA Board's review with BOA's legal advisors of the structure of the Merger and the financial and other terms of the Merger and stock option agreement, including the review by the board of directors with the Financial Advisors of the Exchange Ratio;

● the reports of BOA's management and the financial presentation by the Financial Advisors to BOA's board of directors concerning the operations, financial condition and prospects of Merrill and the expected financial impact of the Merger on the combined company; and

● the potential impact of the transaction on the capital levels and credit rating of BOA.

314.    The Proxy Statement also included a discussion of BOA's October 2008 receipt of federal funding. In this regard, Defendants represented:

> [BOA] will issue to the U. S. Treasury $15 billion of a new series of preferred stock of Bank of America. In connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. . . . If the merger is completed prior to Treasury making an investment in Merrill Lynch . . . Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

Despite accepting government funds and anticipating potential additional financial aid in connection with the Merger, Defendants failed to disclose that BOA had agreed to permit Merrill to pay up to $5.8 billion in accelerated bonuses—equal to more than 30% of the government financial aid that BOA had already received—to Merrill employees prior to the Closing Date.

315.    The statements made by Defendants in the Proxy Statement concerning, among other things, the adequacy of the due diligence conducted in connection with the Merger, the benefits of the Merger to BOA, the financial health of Merrill in light of the current "market conditions," and BOA's receipt of federal financing were materially false and misleading for the same reasons stated in paragraph 308 above.

316.    On November 21, 2008, BOA filed the First Proxy Amendment with the SEC. This amendment purported to supplement the disclosures in certain sections of the Proxy Statement based upon a proposed settlement of certain shareholder lawsuits filed in Delaware and

935174.3

- 86 -

New York. These lawsuits challenged, among other things, the adequacy of the disclosures in the Proxy Statement concerning the potential impact of a Merrill credit rating downgrade.

317.    Despite filing the First Proxy Amendment with the SEC to disclose this information for the purported benefit of investors, including Plaintiffs, Defendants failed to provide investors with critical financial information needed to assess the continuing viability and financial condition of BOA following the Merger. Namely, Defendants said nothing about Merrill's billions of dollars in losses for the fourth quarter of 2008, which they knew of based upon their daily access to such information pursuant to the terms of the Merger Agreement. Moreover, Defendants failed to disclose the agreement to pay up to $5.8 billion in bonuses to Merrill employees prior to the Closing Date. Instead of disclosing this material information, Defendants merely referred investors, including Plaintiffs, to the materially false and misleading Proxy Statement for information concerning the impact of this transaction upon BOA.

318.    On November 26, 2008, BOA filed the Second Proxy Amendment with the SEC, consisting of a letter from Defendant Lewis to BOA investors purporting to address "***how Bank of America is positioned to ride out this severe economic storm***." Although Defendants already knew that Merrill had amassed approximately $13.3 billion in pre-tax losses for the fourth quarter of 2008 and that Merrill would expend billions of dollars in additional funds for Merrill employee bonuses prior to the Closing Date, Defendants failed to mention these material facts. Instead, Defendants, through Defendant Lewis, made the following statements to shore up investor confidence:

> ***Bank of America continues to be a strong, active player in the financial markets***.
>
> \*   \*   \*
>
> ***We are one of the most liquid banks in the world***. We successfully raised capital in October and now have Tier 1 capital that exceeds both regulatory requirements and our own target. ***In short, we believe we are one of the strongest and most stable major banks in the world***.
>
> \*   \*   \*
>
> ***Regarding the federal capital injection, these were funds that we did not need and did not seek***. At the time the government asked

COMPLAINT

CASE NO. _____

the major banks to accept the injections, we had just completed our own $10 billion capital raise in the market and, as I mentioned above, had more than adequate capital. **We accepted the funds from the government as part of a broad plan to stabilize the financial markets generally, and will pay interest to the government on the funds until the investment is paid back**.

\*     \*     \*

I am confident that after this storm passes, **investors will see the value in our franchise**, the power of our brand, and especially, our associates' ability to create broad, deep and long-lasting financial relationships.

319.    In addition to the Second Proxy Amendment, BOA issued the November 26, 2008 Press Release to announce approval of the Merger by the Board of Governors of the Federal Reserve System. In praising this approval, Defendants made the following materially false and misleading statements, which, among other things, failed to disclose Merrill's growing losses which threatened the Merger:

**Merrill Lynch is expected to enhance Bank of America's current strengths** by creating a company with the leading position in wealth management as well as in global debt underwriting, global equities and global merger and acquisition advice. Once the purchase is complete, Bank of America will have the largest wealth management business in the world with nearly 20,000 financial advisors and approximately $2.5 trillion in client assets.

'Combining the leading global wealth management, capital markets and advisory firm with the largest consumer and corporate bank in the U.S. creates the world's premier financial services company with unrivalled breadth and global reach,' said Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis. '**This presents a compelling opportunity for our customers and shareholders**.'

320.    The statements made and issued by Defendants in the First Proxy Amendment, the Second Proxy Amendment, and the November 26, 2008 Press Release concerning, among other things, the Company's liquidity, the financial position of BOA going forward, the adequacy of disclosures in the Proxy Statement, the purported shareholder opportunity that the Merger presented, BOA's ability to forego further financial assistance, and the Company's position to "ride out [the] severe economic storm" were materially false and misleading and omitted material

facts. The true but concealed and/or misrepresented facts known to and/or recklessly disregarded

by Defendants at the time the statements were made included, but were not limited to:

    i.     on or about November 12, 2008, Defendants were consulting internally with BOA's attorneys as to whether they needed to disclose Merrill's then-known fourth quarter 2008 losses to BOA's shareholders;

    ii.    as of late November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $9 billion;

    iii.   as of the end of November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $13.3 billion, which would cause BOA to suffer unprecedented losses;

    iv.   Merrill had suffered $15.3 billion in fourth quarter losses prior to the Shareholder Vote and, as the New York Attorney General and SEC's investigations have revealed, BOA officers sought guidance from BOA's attorneys "before [BOA] shareholders approved the merger" about terminating the Merger pursuant to the MAC clause of the Merger Agreement due to Merrill's astronomical losses;

    v.    there was a risk of further material losses at Merrill in the very same business areas that suffered the losses precipitating the Merger that also threatened BOA's financial position and ability to consummate the Merger; and

    vi.   BOA had negotiated and entered into an agreement with Merrill that permitted Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date, diminishing resources available to the Company going forward.

    321.    On December 5, 2008, BOA issued a press release celebrating shareholder

approval of the Merger at the special meeting convened in connection with the Shareholder Vote.

Defendants made the following statements in this press release, among others, which were

materially false and misleading and omitted material facts:

> Bank of America Corporation shareholders during a special meeting today approved the acquisition of Merrill Lynch & Co., Inc. by authorizing the shares of common stock to be issued in the merger.
>
> '***When this transaction closes***, Bank of America will have the premier financial services franchise anchored by the cornerstone relationship products and services of deposits, credit and debit cards, mortgages and wealth management,' said Bank of America Chairman and Chief Executive Officer Kenneth D. Lewis. '***With Merrill Lynch, we also will significantly add to our global footprint in several businesses***, including investment banking and sales and trading, enabling us to deepen existing client relationships and create greater opportunity to establish new ones.'

* * *

The combination also adds strengths in global debt underwriting, global equities and global merger and acquisition advice. After the acquisition, ***Bank of America would be the number one global debt underwriter, the top underwriter of global equity and the fourth-largest adviser on announced global mergers and acquisitions*** <u>***based on pro forma 2008 results through November 30***</u>.

322.   Defendants' statements in the December 5, 2008 Press Release, concerning, among other things, the positive impact that the Merger would have upon BOA's business and the post-Merger outlook for BOA based upon the Company's and Merrill's pro forma 2008 financial results through November 30, 2008 were materially false and misleading for the same reasons stated in paragraph 320 above.

323.   On the Closing Date, BOA issued a press release entitled "Bank of America Completes Merrill Lynch Purchase – Gains Strength in Wealth Management, International and Investment Banking Business" (the "January 1, 2009 Press Release"). Despite the fact that BOA almost terminated the Merger based upon Merrill's staggering fourth quarter 2008 losses and was only able to proceed with the Merger with additional financial aid from the government, Defendants did not disclose these material facts. Instead, Defendants claimed:

Bank of America Corporation today completed its purchase of Merrill Lynch & Co., Inc. creating a premier financial services franchise with significantly enhanced wealth management, investment banking and international capabilities.

'We created this new organization because we believe that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking,' said Bank of America Chairman and Chief Executive Officer Ken Lewis. '***We are now uniquely positioned to win market share and expand our leadership position in markets around the world***.'

* * *

The combination also adds strengths in debt and equity underwriting, sales and trading, and merger and acquisition advice, creating significant opportunities to deepen relationships with corporate and institutional clients around the globe.

* * *

935174.3

- 90 -

*As previously announced, Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012. Cost reductions will come from a range of sources, including the elimination of positions announced on December 11, and the reduction of overlapping technology, vendor and marketing expenses. In addition, the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Merrill Lynch customers*.

324.    Defendant Lewis also reiterated his earlier assertions about the benefits of the Merger for BOA shareholders:

> We created this organization because we believed that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking.

325.    Defendants' statements in the January 1, 2009 Press Release concerning, among other things, the positive impact of the Merger upon BOA's financial condition and competitiveness were materially false and misleading and omitted material facts. The true but concealed and/or misrepresented facts known to and/or recklessly disregarded by Defendants at the time the statements were made included, but were not limited to:

    i.    BOA had negotiated and entered into an agreement with Merrill that permitted Merrill to pay as much as $5.8 billion in bonuses to Merrill employees prior to the Closing Date, diminishing resources available to the Company going forward.

    ii.    on or about November 12, 2008, Defendants were consulting internally with BOA's attorneys as to whether they needed to disclose Merrill's then-known fourth quarter 2008 losses to BOA's shareholders;

    iii.    as of late November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $9 billion;

    iv.    as of the end of November 2008, Merrill's pre-tax loss for the fourth quarter of 2008 had grown to approximately $13.3 billion, which would cause BOA to suffer unprecedented losses;

    v.    Merrill had suffered $15.3 billion in fourth quarter losses prior to the Shareholder Vote and, as the New York Attorney General and SEC's investigations have revealed, BOA officers sought guidance from BOA's attorneys "before [BOA] shareholders approved the merger" about terminating the Merger pursuant to the MAC clause of the Merger Agreement due to Merrill's astronomical losses;

    vi.    on December 8, 2008—the first business day after the Shareholder Vote approving the Merger—BOA permitted Merrill to make $3.6 billion in bonus payments to Merrill employees prior to the Closing Date;

1       vii.      on December 8, 2008, Defendant Price gave a presentation to the BOA Board specifically laying out the perceived impact of Merrill's massive losses for the fourth quarter of 2008 upon BOA's future financial condition;

viii.     after consulting with the BOA Board and lawyers, Defendant Lewis met with Paulson and Bernanke in Washington, D.C. on December 17, 2008 to discuss BOA's contemplated termination of the Merger based upon Merrill's losses; and

ix.       as a result of Defendant Lewis' meetings with federal regulators, BOA obtained a $138 billion government bailout, consisting of more than $20 billion in additional federal funding and $118 billion in related financial guarantees, to salvage the Merger, without which the Merger would have unraveled.

### B.      Defendants Eventually Disclose The Truth

326.     On January 12, 2009, Bloomberg issued a story detailing a Citigroup analyst's client note advising that BOA would report substantial losses for the fourth quarter of 2008 and a correspondingly large dividend reduction. In response, BOA's stock price declined from its $12.86 January 12, 2009 opening price to close at $11.43 that day.

327.     Public disclosure of the previously misrepresented and omitted material facts concerning the Merger known to and/or recklessly disregarded by Defendants continued with an article published in *The Wall Street Journal* on January 14, 2009. Among other things, this article contained a discussion of BOA's need for additional federal financial aid based upon Merrill's still-undisclosed fourth quarter 2008 losses.

328.     The next day, both *The Wall Street Journal* and *The New York Times* published articles setting forth additional details on the undisclosed mad scramble at BOA to hold the Merger together after federal regulators discouraged BOA from abandoning the deal based upon Merrill's losses, as alleged above in paragraphs 239-241.

329.     In reaction to this previously undisclosed material information, BOA's common stock lost 18% of its value, closing at $8.32 per share on January 15, 2009 on heavy trading volume. This was a $1.88 drop from the $10.20 per share closing price on January 14, 2009.

330.     On January 16, 2009, BOA issued the January 16, 2009 Press Release setting forth the Company's putative financial results for fiscal year 2008 and the fourth quarter of 2008 and

1    disclosing, for the first time, the agreement that BOA entered into with federal regulators to

2    obtain additional financing to salvage the Merger, as alleged above in paragraphs 247-251.

3           331.    In reaction to the still-incomplete disclosures in BOA's January 16, 2009 Press

4    Release, BOA's common stock price declined another 14%, from $8.32 per share on January 15,

5    2009, to $7.18 per share at the close of trading on January 16, 2009.

6           332.    On January 16, 2009, BOA held its fourth quarter 2008 earnings conference call.

7    As alleged above in paragraphs 253-257, Defendant Lewis provided previously undisclosed

8    material facts during this call concerning Merrill's enormous fourth quarter 2008 losses and the

9    circumstances pursuant to which BOA obtained further federal financial aid to consummate the

10   Merger. On January 20, 2009, the first trading day after January 16, 2009, BOA shares closed at

11   $5.10.

12          333.    On January 21, 2008, BOA's common stock rebounded to close at $6.68 per share

13   based upon BOA insiders' large stock purchases, as alleged above in paragraph 259.

14          334.    In response to *The Financial Times* January 21, 2009 disclosure of Merrill's

15   accelerated bonus payments, as alleged above in paragraph 260, BOA's common stock price

16   closed at $5.71 per share. Upon disclosures of previously misrepresented and omitted material

17   facts, BOA's common stock declined by $28.03 per share from its $33.74 closing price on

18   September 12, 2008 (the last trading day before BOA announced the Merger) to its closing price

19   of $5.71 per share on January 22, 2009.

20          **C.    Additional Scienter Allegations For Claims Under Section 10(b) And Rule
                    10b-5 Of The Exchange Act**

21

22          335.    Defendants acted with scienter in that they knew or recklessly disregarded that the

23   public statements and documents issued and disseminated in BOA's name were materially false

24   and misleading, knew or recklessly disregarded that such statements and documents would be

25   issued and disseminated to the investing public, including Plaintiffs, and knowingly and

26   substantially participated and/or acquiesced in the issuance or dissemination of such statements

27   and documents as a primary violator of the federal securities laws.

28

935174.3                              - 93 -                          COMPLAINT

CASE NO. _____

336.     In addition to their conscious misbehavior, each of the Officer Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of BOA and/or Merrill and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and communications with analysts. This direct involvement was heightened in the context of the 36-hour negotiations precipitating the Merger, which closed only three-and-one-half months after being announced.

337.     Each of the Defendants was privy to confidential financial information concerning the Company's business, financial condition and future business outlook, and had access to material, nonpublic information concerning both BOA's and Merrill's true financial condition. As a result, each of the Defendants could falsify and/or conceal information disclosed to the public concerning the Merger and the Company's business and performance, and Defendants' public statements failed to accurately disclose material information known to Defendants. With respect to non-forward looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.

338.     As alleged herein, the Merger Agreement provided Defendants with complete daily access to Merrill's financial information. After the end of the Relevant Period, Thain, Merrill's former CEO, confirmed that these provisions of the Merger Agreement gave Defendants the ability to monitor and report upon Merrill's financial deterioration on a real-time basis.

**1.     BOA's Senior Officers Were Fully Aware Of Merrill's Staggering Losses Before The Shareholder Vote**

339.     Defendants Lewis, Thain, Price, and Cotty knew of Merrill's losses as they occurred.  Indeed, Cotty became acting CFO of Merrill immediately after the Merger was announced, and acted as a direct liaison between Merrill and Defendants Lewis and Price.  In addition, according to a February 8, 2009 *New York Times* article, "Bank of America, shortly after the deal was announced, quickly put 200 people at the investment bank, including a large

1    financial team," to continuously monitor Merrill's financial condition. As Thain wrote in a

2    January 26, 2009 memo to Merrill employees addressing Merrill's fourth quarter losses:

3              We were completely transparent with Bank of America. They
               learned about these losses when we did. The acting CFO of my
4              businesses was Bank of America's former Chief Accounting
               Officer. They had daily access to our p&l [profit and loss
5              statements], our positions and our marks.

6         340.   Moreover, Thain testified in his deposition taken by the New York Attorney

7    General that BOA executives not only had access to this detailed financial information, but

8    personally received regular updates as the fourth quarter progressed. Thain testified that Merrill

9    held meetings each Monday to discuss the prior week's financial results, and "[t]he acting chief

10   financial officer, Neil Cotty, sat in meetings and discussions and was totally up-to-speed on what

11   was happening" throughout the fourth quarter.

12        341.   During Thain's *PBS Frontline* interview, he explained in greater detail that both he

13   and Merrill's senior executives, as well as BOA and its senior executives, all received daily,

14   "step-by-step" updates on Merrill's financial condition:

15             Question:   And was Bank of America inside your books? . . .
                           Would they have known what was happening, what the
16                         projections were, how bad things actually were because
                           of the Lehman collapse and what else had happened in
17                         the market?

18             Thain:     *Yes, absolutely.* I believe in being totally transparent.
                          They had acquired us. *We were completely transparent*
19                        *with them.* They had inserted the person who had been
                          their chief accounting officer—he became the acting
20                        chief financial officer for the Merrill businesses. *We*
                          *generate a daily profit and loss statement. They were*
21                        *getting that daily profit and loss statement, so they*
                          *knew about the losses at the same time we did.*
22
               Question:   Which was when?
23
               Thain:     *We get an update every day.*
24
               Question:   *So they would have known all the way along?*
25
               Thain:     *All the way along.*
26
               Question:   *Step by step?*
27
               Thain:     *Yes.*
28

342. Indeed, BOA has admitted that it was aware of Merrill's financial condition. As reported in the February 8, 2009 *New York Times* article, "a Bank of America spokesman said that '*we have not disputed that we were kept informed about the financial condition of the company.*'"

343. As set forth below at paragraphs 382 – 385, although Lewis initially told Federal regulators that he was "surprised" by the size of Merrill's losses, he has since admitted in sworn testimony before Congress that he was aware of the losses that occurred during October and November 2008. Lewis was asked by one Representative whether BOA received "*detailed financial reports every week* from Merrill Lynch after signing the Merger agreement on September 15th?" Lewis replied, "*That is true.*" The Representative also asked Lewis, "Now Mr. Lewis, isn't it true that you understood the composition and performance of Merrill's portfolio because it was similar to your own . . .? Isn't that true?" Again, Lewis replied, "*It is true.*" At a later point in Lewis's testimony, another Representative asked whether any of the 200 financial analysts that BOA stationed at Merrill immediately after the Merger announcement reported Merrill's losses to Lewis before the shareholder vote. Lewis responded, "I apologize if I haven't been clear. The—*we did have people there, and we did know that there were losses. And that was clear both at our company and theirs.*"

344. Similarly, in a February 26, 2009 deposition taken by the New York Attorney General's office, Lewis stated that: "We were getting projections. I was getting a P and L at Bank of America, but we were getting projections [for Merrill]. I don't recall getting them every day, but I was either hearing about them and in some cases I saw them."

## 2. Internal BOA Documents And Sworn Testimony Establish That Defendants Recognized That Merrill's Losses Should Be Disclosed In Advance Of The Shareholder Vote

345. Internal BOA documents and the sworn testimony of BOA executives establish that BOA's most senior officers were not only aware of Merrill's losses as they occurred, but immediately recognized how devastating those losses would be to the combined company. For example, on November 5, 2008, Cotty sent an email concerning Merrill's October results to Defendant Price with the striking notation: "*Read and weep.*" Similarly, Merrill's Corporate

1    Controller acknowledged in a November 9, 2008 email to Defendant Cotty how poor Merrill's

2    results were, telling him that the "[n]umbers speak for themselves."

3        346.    On November 12, Defendants Price and Cotty received a forecast for Merrill's

4    fourth quarter.  In addition to setting forth Merrill's actual loss of $7.536 billion in October, the

5    report stated that Merrill's fourth quarter losses were expected to be more than $8.9 billion pretax,

6    or $5.4 billion after tax, assuming "no additional marks" or "other significant market dislocation

7    items."  These losses were so severe that they caused Defendant Price to immediately question

8    whether they should be disclosed.  "It prompted me to ask the disclosure question," Price testified

9    to the SEC.

10       347.    Thus, that same day, Defendant Price informed BOA's General Counsel, Timothy

11   Mayopoulos, that Merrill was forecasting a loss of approximately $5 billion after-tax for the

12   quarter.  Mayopoulos knew at once that BOA was likely required to disclose these losses to

13   shareholders voting on the Merger.  As Mayopoulos testified to the New York Attorney General,

14   he responded to this news by telling Price that "*$5 billion is a lot of money*," and "*a disclosure

15   was likely warranted.*"

16       348.    Similarly, BOA's outside counsel, Wachtell, concluded that Merrill's losses

17   should be disclosed to investors.  After meeting with Price on November 12, Mayopoulos

18   consulted Wachtell about disclosure of Merrill's losses.  According to the handwritten notes of

19   Wachtell senior partner Eric Roth, Wachtell was told that Merrill "had a terrible October," and

20   that "*ML lost $7B in October!*" (emphasis in original).  Roth's notes further show that Wachtell

21   was asked, "do we have to get the # out?"

22       349.    According to Roth's notes, Wachtell conducted research on whether disclosure of

23   Merrill's losses was required, and Roth reviewed a formal memo previously prepared by the firm

24   which concluded that, under Section 14(a), "there *was a duty*" to disclose material facts arising

25   after the issuance of a proxy (emphasis in original).  Significantly, as set forth in Roth's notes,

26   Wachtell's research had concluded that BOA had a "duty to bring to sh. all info material to vote"

27   "@ time of vote under federal proxy" law.

28

350.     The next day, November 13, Mayopoulos and other BOA in-house counsel met with Roth and other senior Wachtell partners to discuss disclosure of Merrill's losses.  At this meeting, as reflected in contemporaneous notes taken by Roth, BOA's in-house counsel and Wachtell agreed that Merrill's losses had to be disclosed prior to the shareholder vote.

351.     According to Roth's handwritten notes of this meeting, the lawyers discussed the fact that the consensus among analysts was for Merrill to report a profit for the fourth quarter, but that, unbeknownst to investors, Merrill would "be deep in the red."  In fact, according to BOA's own internal analysis of analysts' expectations at this time, the vast majority (9 out of 13) of analysts covering Merrill were forecasting the company to earn a profit for the fourth quarter of 2008.  For example, as BOA was aware, Credit Suisse was predicting that Merrill would earn a profit of $0.63 per share, Deutsche Bank was predicting that Merrill would report a profit of $0.54 cents per share, and Oppenheimer was predicting that Merrill would report a profit of $0.32 cents per share.  In fact, Deutsche Bank had raised its estimate for Merrill's fourth quarter results on October 16, 2008, after learning of Merrill's third quarter results, which reflected "a clean-up prior to its year-end Merger with Bank of America."

352.     Roth's notes further show that, at this meeting, Mayopoulos recommended that "given ML's #—rec. both co. report [their financial results] week or so before" the vote.  As Mayopoulos testified to the New York Attorney General, "I communicated to Wachtell that I believe my initial assessment was that a disclosure was warranted."

353.     Wachtell agreed that BOA was required to make a disclosure about Merrill's deteriorating financial condition.  Significantly, as Roth wrote, the lawyers "all agree must be *some* discl[osure]" of Merrill's losses beyond what was in the Proxy.  After discussing the contents of such a disclosure, the lawyers discussed the date for the disclosure and reached "*consensus—11/28!*" because it was a "week before sh. meeting."  (Emphases in original.)

354.     That same day, November 13, Defendants Price and Cotty were informed by Merrill's Chief Accounting Officer, David Moser, that Merrill would take an approximately $2 billion goodwill writedown during the fourth quarter.  That charge brought Merrill's actual

935174.3

COMPLAINT

CASE NO. _____

1    pretax losses for the quarter incurred to date to more than $10 billion—and the quarter was not

2    even half over.

3

            **3.**        **As Merrill's Losses Mount, Defendants Acknowledge That Disclosure**
                       **Of Merrill's Losses Would Cause Shareholders To Vote Against The**

4                        **Merger—And Abruptly Reverse Their Decision To Disclose The**
                       **Losses**

5

6         355.     On November 14, Defendant Price met with Defendant Thain.  Although it had

7    been agreed that Price would inform Thain of BOA's decision to disclose Merrill's financial

8    condition before the shareholder vote, Price did not inform Thain that BOA's in-house and

9    outside counsel had determined that a disclosure concerning Merrill's financial condition had to

10    be made.  Instead, according to the sworn testimony of Christopher Hayward, Merrill's Finance

11    Director, Price merely asked Thain "does Merrill plan to do any intra-quarter disclosure," to

12    which Thain responded "No."  Price did not discuss the issue further with Thain.

13         356.     By November 16, Defendants knew that Merrill's fourth quarter losses were

14    continuing to materially increase.  That day, Defendant Price emailed Cotty that Merrill "had a

15    pretax loss of $10.942 billion" for the fourth quarter, not including the approximately $2 billion

16    goodwill charge Merrill had decided it needed to take.  Thus, by November 16, Defendants Price

17    and Cotty knew that Merrill's losses for the fourth quarter would be at least $13 billion pre-tax,

18    and $8.5 billion after-tax.

19         357.     On November 18, Defendant Price met again with Mayopoulos to discuss

20    disclosure of Merrill's losses.  Significantly, Price did not tell Mayopoulos that Merrill's pre-tax

21    losses for the quarter had increased from $8.9 billion to $13 billion in the five days since they had

22    last met.  Instead, at the meeting, Price and Mayopoulos discussed the fact that disclosure of

23    Merrill's losses would impact shareholders' assessment of the transaction, and likely result in

24    shareholders voting the Merger down.  As Mayopoulos testified, if Merrill's losses were

25    disclosed, "I knew there was a possibility that shareholders would vote down the Merger."

26    Indeed, set forth prominently in the top right-hand corner of Mayopoulos's handwritten notes

27    from his meeting with Price was the question, underlined by Mayopoulos for emphasis: "*What*

28    *happens if neg. shh vote?*"

358.    Two days later, Price and Mayopoulos abruptly reversed course and decided that BOA did not have to disclose Merrill's losses.  On November 20, Mayopoulos and Price met in person, and spoke on the phone with senior Wachtell partners Ed Herlihy and Nicholas Demmo.  Once again, Defendant Price did not inform counsel that the losses were now in excess of $13 billion, including the $2.2 billion goodwill charge, leaving counsel with the impression that Merrill's losses were billions of dollars less than they truly were.  Indeed, as Herlihy and Mayopoulos testified, at this time they still understood that Merrill's losses would only be $8.9 billion pre-tax (or approximately $5 billion after-tax)—or more than $4 billion less than what they actually were.  They also had no idea that the losses had increased by nearly 50% in less than one week.

359.    At the meeting, Mayopoulos informed Herlihy and Demmo that no disclosure of these losses would be made.  A principal basis for this determination was that Merrill's fourth quarter losses were supposedly not material because Merrill had suffered between $2 billion and $9.8 billion of after-tax losses in the last five quarters, and the $5 billion of after-tax losses which Mayopoulos had been told Merrill would report were within that range.  Significantly, despite Price's knowledge of Merrill's true losses, he made no mention of the fact that Merrill's fourth quarter losses were more than $13 billion on a pretax basis, and $8.5 billion on an after-tax basis—or approximately 70% higher than Mayopoulos and Wachtell believed.

360.    Moreover, BOA's unsupported and arbitrary "materiality" analysis had no legal basis.  As Mayopoulos admitted in his sworn testimony before the New York Attorney General, in reversing the prior decision to disclose Merrill's losses, neither he nor anyone else at BOA performed any legal research regarding BOA's disclosure duties.  He did not read a single court decision or SEC rule, nor did he ask any in-house counsel at BOA to research the issue.

361.    In addition, upon changing their recommendation regarding disclosure, neither Mayopoulos nor Price asked Wachtell or any other counsel to opine as to BOA's disclosure responsibilities—notwithstanding the fact that, as of November 12, Mayopoulos, Price and Wachtell had already determined that some disclosure of the losses prior to the vote was necessary.  As Herlihy testified before the New York Attorney General, "we were not disclosure

CASE NO. _____

COMPLAINT

1  counsel.  We never worked on any of their filings or disclosures relating to the filings."  Herlihy

2  further testified that BOA did not request a legal opinion from Wachtell concerning BOA's

3  reversal of its decision to disclose Merrill's losses.

4        **4.    As The Vote Approaches, Senior Management Is Informed That**
           **Merrill's Quarterly Losses Will Exceed $16 Billion, And Ignores**
5          **Repeated Entreaties To Disclose The Losses**

6        362.    Although BOA had unilaterally determined that Merrill's losses were supposedly

7  immaterial so long as they were not the greatest quarterly loss in Merrill's history, by late

8  November, Merrill's mounting losses caused Defendant Price to ask Mayopoulos to review the

9  MAC clause in the Merger Agreement and advise him whether BOA had grounds to terminate the

10 Merger by invoking the MAC.  According to a February 5, 2009 article in *The Wall Street*

11 *Journal*, "shortly before Thanksgiving," BOA's senior "executives debated whether Merrill's

12 losses were so severe that the bank could walk away from the deal, citing the 'material adverse

13 effect' clause in its Merger agreement." The article further stated that the debate over whether to

14 invoke the MAC continued "up until a few days before shareholders of Merrill and Bank of

15 America were scheduled to vote."

16       363.    On December 1, Mayopoulos met with Defendant Price and Greg Curl (BOA's

17 Vice Chairman of Corporate Development) to discuss whether BOA had grounds to invoke the

18 MAC.  Mayopoulos informed Price and Curl that, based on the information that had been given to

19 him (which was that Merrill's fourth quarter after-tax losses were expected to be $5 billion), he

20 did not believe that BOA had grounds to invoke the MAC.

21       364.    Later that day, Defendant Cotty emailed updated loss figures to Defendant Price.

22 According to Cotty's email, Merrill's October and November losses now totaled approximately

23 $12.7 billion pre-tax, excluding the $2.2 billion goodwill writedown of which they both knew.

24 Including that writedown, Merrill's total pre-tax losses for October and November *were now*

25 *approximately $15 billion*.  Cotty's email also contained a forecast for Merrill to lose an

26 additional $1 billion in December, bringing Merrill's pre-tax losses for the quarter to at least $16

27 billion.

28

935174.3                          - 101 -                    COMPLAINT
                                                      CASE NO. _____

365.    Certain BOA executives insisted that if the Company was not going to terminate the Merger, shareholders should at least be told of Merrill's losses so that they could cast their vote with knowledge of the material facts.  According to the February 5, 2009 *Wall Street Journal* article quoted above, "*[t]here was disagreement inside the bank about whether to tell shareholders about Merrill's losses*," and this disagreement continued right up until "the night before the vote."  As *The Wall Street Journal* reporter, Dan Fitzpatrick, later explained on *PBS Frontline*, "there were people inside Bank of America who felt like this number was big enough to disclose, *that investors should know about this before they vote*."

366.    Indeed, as Merrill's losses mounted, both BOA senior officers and Merrill's auditor concluded that Merrill's losses should be disclosed to shareholders voting on the Merger so that they could cast an informed vote.  In late November, BOA Treasurer Jeffrey Brown told Defendant Price that "we should disclose" because "the losses were meaningful enough."  Price refused to do so.  In response, Brown warned him that he "didn't want to be talking through a glass wall over a telephone" if the losses were not disclosed—an admonition from one of BOA's own senior executives that the failure to disclose the losses could rise to the level of a criminal offense.

367.    Similarly, at approximately the same time, Merrill's auditor, Deloitte & Touche, recognized that Merrill's losses were sufficiently material that they warranted disclosure to shareholders.  According to the sworn testimony of Deloitte partner Thomas Graham, a "few days prior to the vote," Graham and Deloitte supervisor Ven Kocaj informed Merrill's Chief Accounting Officer David Moser and Corporate Controller Gary Carlin that Merrill's losses were "material subsequent events to what occurred at the end of September that would be relevant for parties that were voting on [the Merger]" and "sizable enough [to] probably warrant disclosure."  As Graham further testified, he told Moser and Carlin that, "given the losses through what it looks like will be November when it closes, given the fact you have another couple of billion dollars coming down the road in goodwill impairment, we believe it's prudent that you might want to consider filing an 8-K to let the shareholders, who are voting on this transaction, know about the size of the losses to date."

368.    On December 3, two days before the shareholder vote, Defendants Lewis, Price, Cotty and Thain met specifically to discuss Merrill's staggering fourth quarter losses.  At this meeting, Cotty informed Lewis, Price, and Thain that Merrill's losses for November would be billions of dollars more than reflected in current forecasts—news that, according to Defendant Cotty's sworn testimony, created a "very somber environment."  After reviewing Merrill's loss information, Defendants Lewis and Price decided to revise Merrill's loss report to include an additional $2 billion of losses for November.

369.    The revised loss report, entitled "2008 4Q Pacing & FY Forecast Scenario," was circulated shortly after the meeting concluded.  The report set forth Merrill's November losses at more than $4.9 billion—or more than $1 billion per week—and stated that Merrill's total fourth quarter losses would exceed $14 billion, or approximately $9 billion after taxes.

370.    However, as these officers knew, even that report materially understated Merrill's losses.  As the first page of the revised 2008 4Q Pacing & FY Forecast Scenario report emphasized, it did not include any "goodwill writeoff," even though BOA's senior officers, including Lewis and Price, knew that Merrill had decided in November to take a $2.2 billion goodwill writeoff.  With the writeoff included, Merrill's expected fourth quarter losses were now more than $16.2 billion dollars on a pre-tax basis, and more than $10.5 billion on an after-tax basis—*exceeding even the unsupported range* that BOA had set for disclosure of Merrill's losses on November 20.  Moreover, BOA's and Merrill's most senior officers now knew, two days before the shareholder vote, that Merrill's pre-tax losses for October and November alone would be at least $15 billion, and that the fourth quarter of 2008 was already by far the worst quarter in Merrill's history.

371.    After receiving this revised loss report on December 3, Price met with Mayopoulos concerning an unrelated litigation.  At the end of that meeting, Price casually mentioned to Mayopoulos that "there had been revisions to the $5 billion after-tax forecast for Merrill Lynch's fourth quarter results."  Although Price knew that Merrill's revised fourth quarter losses were now more than $10.5 billion after taxes and had exceeded even BOA's threshold for disclosure, Price misled Mayopoulos into believing that Merrill's losses were billions of dollars less.

Specifically, according to Mayopoulos's sworn testimony before the New York Attorney General, the SEC, and Congress, Price informed Mayopoulos that Merrill's losses were only "$7 billion after taxes." Based on the false and incomplete information provided to him by Defendant Price, Mayopoulos again concluded, without performing any legal analysis or consulting outside counsel, that no disclosure needed to be made to shareholders voting on the transaction on December 5.

372. As set forth more fully below at paragraphs 376 – 379, when Mayopoulos learned days after the shareholder vote that Merrill's expected fourth quarter losses were materially higher than Price had informed him and sought to confront Defendant Price about this discrepancy, Mayopoulos was immediately terminated without explanation, and escorted from BOA's premises.

373. At the same time that Merrill was collapsing, BOA's own financial condition was materially deteriorating to the point where, as Lewis acknowledged when he sought the taxpayer bailout, BOA would be unable to absorb the losses suffered by Merrill. As set forth in an internal Federal Reserve memorandum titled "Analysis of Bank of America & Merrill Lynch Merger" (the "Federal Reserve Merger Analysis"), before the Merger, BOA had incurred a loss of almost $800 million, and was projecting a total fourth quarter loss of $1.4 billion—the first quarterly loss in BOA's history. In a December 19, 2008 email, Tim Clark, a Senior Advisor at the Federal Reserve, highlighted BOA's own financial deterioration, writing that, "[a]s they [BOA senior executives] themselves noted the other night at our meeting, even on a standalone basis, the firm is very thinly capitalized," BOA had used "quite optimistic underlying assumptions for the economy and performance of assets," and was "clearly not [] well prepared for any further deterioration."

### 5. While Merrill Deteriorates, The Billions In Merrill Bonuses Are Finalized

374. While the financial condition of Merrill deteriorated, executives at both companies found the time to finalize the billions of dollars of bonuses that they had agreed would be paid in December 2008 to Merrill executives and employees. According to Thain's deposition

COMPLAINT

testimony, in early November 2008, he and Alphin (BOA's Chief Administrative Officer) jointly determined and approved the size and composition of the final bonus pool, which was $3.6 billion.  On November 11, 2008, Thain presented the final bonus numbers and accelerated payment schedule to Merrill's Compensation Committee for review.  Merrill's Compensation Committee approved the accelerated schedule as follows: final approval of the bonuses would occur on December 8, 2008, one business day after the shareholder vote; employees would be informed of their bonuses on December 22; and employees would receive their cash awards by December 31.  On November 12, Thain informed Alphin of the precise dates involved in the accelerated schedule.

375.    Throughout this process, BOA's senior executives knew of the size and timing of the bonus payments.  As Thain stated to *PBS Frontline*: "[T]here was complete transparency with them starting from September when they agreed to the bonuses, all through the period of time until they were ultimately paid."

**6.    Almost Immediately After Shareholders Approve The Merger, Mayopoulos Learns That Merrill's Pre-Vote Losses Are Materially Higher Than What He Has Been Told, Seeks To Confront Price About That Discrepancy, And Is Immediately Fired**

376.    On Tuesday, December 9, 2008, the second business day following the shareholder vote, Defendants Lewis and Price met with the BOA Board to discuss Merrill's deteriorating financial condition.  At the meeting, Defendant Price presented to the Board the $14 billion pre-tax loss figure ($9 billion after-tax) that Defendants Price, Lewis, Thain, and Cotty discussed on December 3, which still failed to include the $2.2 billion goodwill writedown.  At that meeting, Price acknowledged that Merrill's massive fourth quarter losses were material to investors, stating that the "magnitude" of the losses was "*quite significant*."

377.    Mayopoulos, who attended the December 9 Board meeting, testified that he was "surprised" by the size of the loss, as he had been told by Price on December 3 that Merrill's losses were only $7 billion.  As a result, after this meeting, Mayopoulos sought to confront Price about the fact that Merrill's pre-vote losses were materially greater than Price had represented to him.  According to Mayopoulos, he "want[ed] to talk to him [Price] about what's changed; why

1  it's changed; what does it mean with respect to whether we should make a disclosure or not."

2  However, Mayopoulos was told that Price was unavailable for the rest of the day. Mayopoulos

3  decided to meet with Price the next day.

4       378.   The next morning—before Mayopoulos could speak to Price—Mayopoulos, who

5  had served as BOA's General Counsel for five years, and who had been told by Defendant Lewis

6  on September 14, 2008 that he would be the General Counsel of the combined company, was

7  summarily terminated without explanation, instructed to leave his personal effects behind, and

8  immediately escorted from BOA's headquarters. Mayopoulos was replaced as General Counsel

9  by Brian Moynihan, who had not practiced law in 15 years, did not have an active license to

10  practice law, and was promoted to another executive position within weeks of replacing

11  Mayopoulos.

12       379.   Mayopoulos later testified to Congress:

13      I was stunned. I had never been fired from any job, and I had never

14      heard of the general counsel of a major company being summarily
    dismissed for no apparent reason and with no explanation.

15              *     *     *

16      I could not understand why I was dismissed so abruptly. I was

17      surprised that I was given no opportunity to say goodbye to my
    colleagues and staff, and why there was no orderly transition of my

18      work to Mr. Moynihan. No one, including Mr. Moynihan, ever
    contacted me to discuss what I had been working on. Nearly a year

19      later, I still do not know why I was terminated, who was involved
    in the decision to do so, or what their reasons or motivations were.

20      **7.**   **Lewis Secretly Decides to Invoke The MAC And Terminate The Deal,**

21      **But Agrees To Consummate The Transaction After Federal
Regulators Threaten To Fire Him**

22       380.   On December 12, 2008, one week after BOA shareholders voted to approve the

23  merger, Defendants Lewis and Price received a report showing that Merrill would report a pretax

24  loss for the quarter of at least $18 billion. As a result, according to a February 5, 2009 *Wall Street*

25  *Journal* article, Defendant "Lewis told Bank of America directors in a conference call that the

26  bank might abandon the acquisition, which was supposed to close in two weeks."

27       381.   Thereafter, on the morning of December 17, 2008, Lewis called Secretary Paulson

28  and told him that BOA had concluded that it had grounds to invoke the MAC and was "strongly

considering" doing so, according to Lewis's deposition testimony. Secretary Paulson immediately

ordered Lewis to fly up to Washington, D.C. for a meeting that evening at 6 p.m. at the Federal

Reserve.

382.    On the evening of December 17, 2008, Lewis and Price met with Secretary

Paulson, Chairman Bernanke, Federal Reserve General Counsel Scott Alvarez, and other

Treasury and Federal Reserve officials.  Lewis began the discussion by reporting the dire

financial condition of the combined company.  Lewis stated that BOA was projected to lose $1.4

billion in the fourth quarter – the Company's first quarterly loss in its history. Lewis then reported

that Merrill's massive fourth quarter losses were so large that they would materially impact

BOA's tangible common equity and Tier 1 capital ratios.  Defendant Price's handwritten notes

from the meeting, released by Congress, show that Lewis told the regulators that Merrill had

recently suffered "unusual" losses and was now projecting losses for the quarter of approximately

$18 billion on a pretax basis, which amounted to a $12.5 billion net loss after taxes.  Lewis stated

that BOA had concluded that a material adverse change had occurred in Merrill's financial

condition, and that it would terminate the merger pursuant to the MAC.  In an effort to explain his

failure to disclose these losses earlier, Lewis falsely claimed that he only learned of Merrill's

losses in mid-December, when they supposedly suddenly accelerated.

383.    Chairman Bernanke and Secretary Paulson both urged Lewis not to invoke the

MAC, opining that such an action would have serious repercussions for BOA and Merrill.  In

response, Lewis raised the idea of BOA receiving a taxpayer bailout – including a "Citi-type"

guarantee on $50 billion of assets – to proceed with the transaction, according to Price's

handwritten notes.  Secretary Paulson asked for time to allow the Treasury and Federal Reserve to

analyze the situation.  Lewis agreed to supply the Federal Reserve with information on Merrill's

and BOA's fourth quarter performance and risk exposures, and to wait to hear back from the

regulators before taking further action. Following this meeting, Lewis provided the regulators

with the current and prior loss forecasts that BOA executives had been receiving throughout the

fourth quarter.

CASE NO. _____

COMPLAINT

384.    After reviewing Merrill's internal data, senior Federal Reserve officials expressed their disbelief regarding Lewis's claims that he was recently surprised by the size of Merrill's losses. As Kevin Warsh, a member of the Board of Governors of the Federal Reserve, flatly stated in one email:  "***This claim is not credible.***"  On December 19, 2008, Tim Clark, a Senior Advisor in the Federal Reserve's Division of Banking Supervision and Regulation, emailed other Federal Reserve officials that Merrill's losses were clear from the beginning of the fourth quarter, and that any claim of "surprise[]" was dubious:

> ***General consensus forming among many of us working on this is that given market performance over past several months and the clear signs in the data we have that the deterioration at [Merrill] has been observably under way over the entire quarter*** – albeit picking up significant[ly] around mid-November and carrying into December – ***Ken Lewis' claim that they were surprised by the rapid growth of the losses seems somewhat suspect***.

385.    Senior Federal Reserve officials repeated this conclusion in the Federal Reserve Merger Analysis, which stated:

> While the extent of the market disruptions that have occurred since mid- September were not necessarily predictable, [BOA] ***management's contention that the severity of [Merrill's] losses only came to light in recent days is problematic*** and implies substantial deficiencies in the due diligence carried out in advance of and subsequent to the acquisition.

386.    According to the Federal Reserve Merger Analysis, BOA should not have been surprised by Merrill's losses because Merrill's largest risk exposures were well known to BOA. As that Analysis stated, the "single largest area of risk exposure and driver of recent losses that have been identified by management" was Merrill's "large losses stemming from exposures to financial guarantors."  These exposures and losses, Federal Reserve officials concluded, "were clearly shown in Merrill Lynch's internal risk management reports that [BOA] reviewed during their due diligence."  In addition, Federal Reserve officials concluded that the balance of Merrill's "risk exposures cited by management . . . should also have been reasonably well understood, particularly as [BOA] itself is also active in [] these products."

387.    The Federal Reserve Merger Analysis highlighted the "problematic" nature of Lewis's claim of surprise given the fact that the Proxy "explicitly assert[ed] that [BOA] has an

1   understanding of [Merrill's] business activities, financial condition and prospects as well as an

2   understanding of the outlook for the firm based on prospective economic and market conditions."

3        388.    As noted above, evidence emerging as a result of federal and state investigations

4   of the merger has confirmed that Lewis was aware of the losses at Merrill much earlier than mid-

5   December 2008. Among other things, before the shareholder vote, BOA's executives (i) were

6   fully aware that Merrill would report a loss for the fourth quarter of at least $16.2 billion;

7   (ii) were so concerned with the magnitude of these losses that they discussed invoking the MAC

8   or otherwise disclosing them to shareholders; and (iii) were found not to be credible by senior

9   government officials when they claimed that Merrill's losses and goodwill writedowns were

10  "surprising," and had not materialized until after the shareholder vote.

11       389.    On December 19, 2008, Lewis and Price again spoke with Secretary Paulson,

12  Chairman Bernanke, and other Treasury and Federal Reserve officials.  According to Defendant

13  Price's handwritten notes of the meeting, Lewis reported that Merrill was now projected to have

14  fourth quarter losses in excess of $21 billion pre-tax, and that BOA would likely invoke the

15  MAC.  Notably, the additional losses consisted principally of the $2.2 billion goodwill charge that

16  BOA's senior management had been aware of since mid-November.  Secretary Paulson asked

17  Lewis what needed to be done to have the deal proceed.  Lewis raised two possibilities: the

18  government could purchase Merrill's toxic assets directly, or provide an asset guarantee to BOA.

19       390.    Price's handwritten notes show that Federal Reserve officials unequivocally told

20  Lewis that a decision by BOA to invoke the MAC would reveal that BOA's prior statements

21  about the benefits of the merger were false, and would cause the market to seriously question

22  BOA's financial condition and the judgment of its management.  Chairman Bernanke testified

23  before Congress that he told Lewis that "an attempt [by BOA] to invoke the MAC after three

24  months of review, preparation and public remarks by the management of Bank of America about

25  the benefits of the acquisition would cast doubt in the minds of financial market participants,

26  including the investors, creditors and customers of Bank of America about the due diligence and

27  analysis done by the company, its capacity to consummate significant acquisitions, its overall risk

28  management processes and the judgment of its management."

391.     On December 21, 2008, Lewis called Secretary Paulson on his cell phone, reaching him at a ski cabin in Colorado, to discuss the situation further.  Secretary Paulson bluntly told Lewis that the Federal Reserve would remove BOA's senior management if it tried to terminate the transaction.  According to Secretary Paulson's testimony before Congress:

> It was . . . appropriate for me to remind him under such circumstances [that] the Federal Reserve could invoke its authority to remove management and the Board of Bank of America.  I intended my message to reinforce the strong view that had been expressed by the Fed and which was shared by the Treasury that it would be unthinkable that Bank of America take this destructive action.

392.     The threat to fire Lewis had its intended effect. Lewis testified in a deposition taken by the New York Attorney General's office that, before receiving this threat, "we [BOA] were going to call the MAC."  After receiving this threat, Lewis reversed course.  As the New York Attorney General wrote to Congress in a letter dated April 23, 2009, its investigation established that:

> Secretary Paulson's threat swayed Lewis.  According to Secretary Paulson, after he stated that the management and the Board could be removed, Lewis replied, "that makes it simple.  Let's de-escalate."  Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the deal.

393.     That day, Lewis told Secretary Paulson and Chairman Bernanke separately that BOA would proceed with the merger and would work with federal regulators on designing a bailout package. Lewis made the decision to proceed with the merger even though he knew that the impact of Merrill's losses would harm BOA shareholders.  Specifically, at his deposition, Lewis was asked whether BOA's shareholders were being forced to take "the hit of the Merrill losses," and if this "hit" would harm them.  He responded that BOA's investors were harmed over the "short term," which he defined as "[t]wo to three years."

394.     Recognizing that his conduct would likely result in legal liability for misleading shareholders, Lewis next took the extraordinary step of trying to obtain protection from the Government against shareholder suits.  According to a December 22, 2008 email from Chairman Bernanke to the Federal Reserve's General Counsel Alvarez, Lewis had just "confirm[ed] his willingness to drop the MAC," but "he fears lawsuits from shareholders for NOT invoking the

1    MAC, given the deterioration at [Merrill]." Thus, Lewis had asked Bernanke "whether he could

2    use as a defense that the [Government] ordered him to proceed for systemic reasons." Bernanke

3    told Lewis "no."

4         395.    Chairman Bernanke then asked Alvarez whether the Federal Reserve supervisors

5    could formally advise Lewis that invoking the MAC was not in the best interests of BOA, and

6    whether Lewis could use such a letter as a defense from suit. Alvarez responded that such a letter

7    was not "appropriate." Alvarez also underscored that Lewis faced liability for BOA's lack of

8    disclosures to shareholders in advance of the shareholder vote. Alvarez wrote:

9            Management may be exposed if it doesn't properly disclose
10           information that is material to investors. There are also Sarbanes-
            Oxley requirements that the management certify the accuracy of
11           various financial reports. . . . ***His potential liability here will be***
            ***whether he knew (or reasonably should have known) the***
12           ***magnitude of the [Merrill] losses when [BOA] made its***
            ***disclosures to get the shareholder vote on the [Merrill] deal in***
13           ***early December***.

     396.    In a follow-up email to Bernanke on this subject, Alvarez specifically noted that
14
Federal Reserve officials' conclusions about Lewis's knowledge of Merrill's losses before the
15
shareholder vote caused "problems" for Lewis under the securities laws:
16
        [O]nce we're in the litigation, all our documents become subject to
17           discovery and, as you'll remember from Deborah's presentation,
            ***some of our analysis suggests that Lewis should have been aware***
18           ***of the problems at [Merrill] earlier (perhaps as early as mid-***
            ***November) and not caught by surprise. That could cause other***
19           ***problems for him around the disclosures [BoA] made for the***
            ***shareholder vote***.
20
        **8.**      **Internal BOA Emails Establish That, At The Same Time BOA's**
21               **Senior Officers Decided Not To Disclose The Bailout Prior To The**
              **Merger's Close, They Internally Acknowledged That The Market Was**
22               **Being Misled As To Merrill's True Financial Condition**

23        397.    Significantly, at the same time Defendants Lewis and Price were seeking the

24   taxpayer bailout, BOA's senior officers and BOA's counsel were acknowledging internally that

25   the failure to disclose the bailout and Merrill's losses was affirmatively misleading the market,

26   which had "no inkling" that Merrill had suffered such devastating losses. These same emails

27   make clear that BOA's senior officers knew that disclosure of this information would cause the

28   deal to "fall apart," and "confirm [the] materiality of the fourth quarter losses."

398.   On December 17, 2008, the same day that Lewis approached the government for the bailout, Jeff Brown, BOA's Treasurer, sent Defendant Price an email regarding a conversation he had had with Standard & Poor's ("S&P").  Brown made clear that he was "concerned" that S&P had no idea of Merrill's true financial condition:

> *What concerns me is that they are not expecting poor results from ML this quarter* and he [S&P] said the ratings committee noted substantial improvements in ML risk/balance sheet management.
>
> *             *             *
>
> But in light of ML's 4Q performance that we know relative to what they know . . .  This could be an issue and result in another downgrade.  This is just my view, but *they clearly think ML is more healthy than they are and that they have shed the worst risks*.

399.   Brown further noted in that email that S&P believed that BOA was in significantly better shape than its competitors because, unlike them, BOA did not need government assistance:

> They are also moving to a new approach to assess relative ratings in this environment.  Basically all this means is that there are different rankings within a particular rating – ie) we are A+; another institution may have the same headline but be worse-off on a relative basis since they may need government programs to survive.  *The view of S&P is that we do not need government assistance* . . . ie) we are now A+ regardless.  He noted that previously 5 institutions on a global basis were rated at the same or higher than BAC.  Now there are only 3 intuitions [*sic*] that would be considered higher and 2 of those were domestic (I presume WFC and JPM).

400.   Similarly, on December 17, 2008, Brown received an email from a member of BOA's Corporate Treasury Department regarding a conversation she had had with Moody's.  According to that email, Moody's had stated in this meeting that "you guys [BOA] are getting a great deal on this acquisition.  We think very highly of the Merrill franchise."  The email concluded with the sarcastic comment, "So, we have that going for us."

401.   Despite the fact that Brown had again expressed his "concerns" that the market was being misled, Defendant Price took no action.  Thus, two days later, on December 19, Brown forwarded the email he had received on December 17 directly to in-house disclosure counsel at BOA.  Brown wrote the following on that email:

CASE NO. _____

COMPLAINT

1    *Moody's comment on the deal—again another sign agencies don't
2    know what is coming.*

3    402.    In-house counsel immediately forwarded Brown's email to Wachtell. Wachtell

4    then spoke to both Brown and BOA's in-house counsel. According to notes of that December 19

5    discussion that were taken by Wachtell senior partner Peter Hein, the parties agreed that the

6    failure to disclose Merrill's massive losses had resulted in a "fundamental issue of lack of

7    credibility" with the market. Significantly, the parties also agreed that, if those losses were

8    disclosed prior to the Merger close, it would cause rating agency downgrades, resulting in the

9    deal falling apart, and confirming the materiality of Merrill's undisclosed losses:

10       *Fundamental issue of lack of credibility* with rating agencies to
         whom Target may not have disclosed the ever increasing losses for
11       the fourth quarter; if Target now belatedly makes that disclosure,
         *likely to have adverse impact on perception of rating agencies (who
12       do not have an inkling this is coming); such a rating agency
         reaction would, if such reaction occurred after deal fell apart,
13       presumably confirm materiality of the fourth quarter losses*[.]

14    403.    These emails show that, at the time that BOA's most senior executive officers

15    decided not to disclose the taxpayer bailout and Merrill's losses, they knew that (i) this

16    information was highly material to investors; (ii) the market had no idea that Merrill had suffered

17    such massive losses in the fourth quarter; (iii) disclosure of these material facts before the Merger

18    closed would inevitably cause rating agency downgrades and result in the deal falling apart; and

19    (iv) the market was being misled by the failure to disclose these facts. Indeed, on December 22,

20    2008, only five days after Brown informed Defendant Price that BOA's ratings depended on

21    keeping the rating agencies in the dark about Merrill's losses and the need for the bailout, Lewis

22    told that BOA Board that "of course, we do not want" public disclosure of these facts.

23                    **9.    Additional Evidence Of Lewis's Scienter**

24    404.    Lewis has admitted in sworn testimony before Congress and the New York

25    Attorney General's office that he received regular updates on the financial condition of both BOA

26    and Merrill throughout the Relevant Period and knew of the companies' escalating,

27    unprecedented losses before the Merger vote. As described more fully above at paragraphs 343 –

28    344 Lewis admitted that BOA in general, and he in particular, received "detailed financial reports

935174.3                          - 113 -
                          CASE NO. _____
                                                              COMPLAINT

1  every week" from Merrill, and that he received profit and loss statements for BOA and regular

2  projections of Merrill's losses. Indeed, during his congressional testimony, when asked whether

3  any of the 200 financial analysts that BOA stationed at Merrill reported Merrill's losses to Lewis

4  before the shareholder vote, Lewis responded: "The—*we did have people there, and we did know*

5  *that there were losses. And that was clear both at our company and theirs*." Similarly, as noted

6  above in paragraph 341, during Thain's *PBS Frontline* interview, he stated that senior executives

7  at both companies "*knew about the losses at the same time we did*."

8       405.    Indeed, throughout the fourth quarter, Defendants Lewis and Price continuously

9  communicated about all issues relating to the Merger including, among others, Merrill's fourth

10  quarter losses. As Defendant Price testified, "Ken and I . . . are in and out of each other's offices

11  all the time. . . . I keep him informed all the time on matters."

12       406.    Lewis knew or recklessly disregarded in advance of the shareholder vote that BOA

13  would report pre-tax losses for the months of October and November of approximately

14  $15 billion, and that Merrill's fourth quarter loss was already by far the worst quarter in Merrill's

15  history as of the date of the vote, and that additional losses were expected for the remainder of the

16  quarter. On December 3, 2008, Defendant Lewis participated in a meeting with, among others,

17  Defendants Price and Thain, specifically to discuss Merrill's deteriorating financial condition. At

18  that meeting, Lewis was informed that Merrill's November losses would be billions of dollars

19  more than what was reflected in current forecasts—news that created, in Cotty's words, a "very

20  somber environment." The revised report set forth Merrill's November losses at $5 billion—or

21  more than $1 billion per week. Thus, by December 3, two days before the shareholder vote,

22  Lewis knew or recklessly disregarded that Merrill's pre-tax losses for October and November

23  2008 were approximately $15 billion and that Merrill was expecting to report at least an

24  additional $1 billion in additional losses for December, bringing the expected loss for the quarter

25  to more than $16 billion.

26       407.    Despite his knowledge or reckless disregard of these material losses, Defendant

27  Lewis took no steps to determine whether they should be disclosed. Significantly, despite the fact

28  that Lewis had unfettered access to experienced counsel, he did not seek any legal advice

1   regarding the Company's disclosure responsibilities.  Lewis did not consult with BOA's own

2   General Counsel, and he did not consult with BOA's deal counsel, Wachtell.  Lewis also took no

3   steps to make sure that BOA's counsel was provided with the most recent and complete

4   information regarding Merrill's financial condition.  Prior to the shareholder vote, Lewis also

5   failed to discuss Merrill's losses and BOA's disclosure responsibilities with Merrill's auditors,

6   BOA's auditors, or the BOA Board, notwithstanding the obvious magnitude of the losses.  Had

7   Lewis truly intended to make sure that BOA fully complied with its disclosure obligations under

8   the federal securities laws, he would have consulted with BOA's in-house and/or outside counsel.

9   Indeed, given the importance of the Merger, and the magnitude of the losses, there is no plausible

10  innocent explanation for Lewis's failure to ask any of his lawyers for their advice.  In light of his

11  knowledge of Merrill's losses, Lewis's utter failure to consult with counsel—or any other

12  advisor—regarding BOA's disclosure responsibilities was extremely reckless, highly

13  unreasonable, and represented an extreme departure from the standards of ordinary care.

14       408.    In addition to his violations of the securities law prior to the shareholder vote, in

15  his capacity as CEO and Chairman of the BOA Board, Lewis led the Board meetings on

16  December 9, December 22, and December 30, 2008, during which the BOA Board discussed

17  Merrill's losses and decided—even though BOA senior management (including Lewis) claimed

18  to the Government that a material adverse change had occurred in Merrill's financial condition—

19  to consummate the Merger and accept a $138 billion taxpayer bailout to allow BOA to absorb

20  Merrill's losses, without disclosing any of these critical facts to BOA shareholders or investors.

21  Lewis was also personally involved in the discussions with Secretary Paulson, Chairman

22  Bernanke, and other regulators regarding all of those subjects, as described more fully above.

23       409.    Further, Lewis personally chose not to disclose the bailout prior to the close of the

24  Merger, despite knowing that BOA had a definitive agreement with federal regulators.  As set

25  forth at paragraphs 397 – 403, Lewis understood that the market had been led to believe that

26  Merrill would be profitable in the fourth quarter and, thus, that BOA was viewed positively in the

27  marketplace because it would not need Government assistance.  Lewis further understood that if

28  the market became aware of the bailout (and, thus, Merrill's losses) before the close of the

935174.3

- 115 -

CASE NO. _____

COMPLAINT

1   Merger, BOA would suffer credit rating agency downgrades and the deal would "fall apart."

2   Accordingly, at the time Lewis made the decision not to disclose the taxpayer bailout, Lewis

3   knew that concealing this information would mislead the market but affirmatively chose to do so

4   in order to ensure that the Merger closed.

5          410.    Lewis's deliberate concealment of the bailout is evidenced in his instructions to

6   the Board.  In his December 22, 2008 email to the BOA Board, Lewis expressly told members of

7   the BOA Board that BOA did not want the government to commit the terms of the bailout to

8   writing because that would require "public disclosure, which of course we do not want."

9   Moreover, in a meeting with the Board on December 30, 2008, Lewis admonished the members

10  of BOA's Board not to "leak/disclos[e]" this information.

11         411.    Further, when questioned by the New York Attorney General about his reasons for

12  failing to disclose the bailout to shareholders prior to the close of the Merger, Lewis lied.  Lewis

13  falsely claimed that Secretary Paulson "instructed" him not to disclose the taxpayer bailout.

14  Lewis's lie was publicly exposed in an April 23, 2009 letter from the New York Attorney General

15  to Congress (the "April 23 Letter").  The April 23 Letter stated that Secretary Paulson had

16  informed the New York Attorney General's office that Secretary Paulson did *not* issue any such

17  instruction.

18         412.    After receiving the April 23 Letter, in June 2009 Congress summoned Lewis to

19  testify on issues related to the Merger.  During his Congressional testimony, Lewis *recanted* his

20  prior testimony to the New York Attorney General and testified that "[n]either Secretary Paulson

21  nor the chairman of the Federal Reserve, Mr. Bernanke, ever told me not to disclose something,"

22  adding "*nobody* ever told us that we should not disclose a disclosable event."  Secretary Paulson

23  unequivocally confirmed in his own sworn testimony before Congress that he never instructed

24  Defendant Lewis not to disclose the bailout.  As Secretary Paulson later testified to Congress,

25  "[T]he suggestion has been made that I discouraged Mr. Lewis from making required disclosures

26  to the public markets about losses at Merrill Lynch.  *That simply did not happen and Mr. Lewis*

27  *has denied it unambiguously* in testimony before this committee."

28

CASE NO. _____

COMPLAINT

413.    Lewis's attempted cover-up is further probative evidence of Lewis' culpable state of mind.  There is no plausible innocent explanation for why Lewis would falsely state, under oath, his reasons for failing to disclose the bailout – and then tell the truth only once he knew that his misrepresentation had been revealed.  The most plausible explanation is that Lewis knew or recklessly disregarded that he had a duty to disclose the firm commitment from the Government to provide the taxpayer bailout, and sought to evade responsibility for his violation of that duty.  Indeed, Lewis was so conscious of his liability to shareholders for proceeding with the Merger without disclosing Merrill's losses or the taxpayer bailout that, in an attempt to immunize himself from lawsuits, he explicitly sought a letter from Chairman Bernanke stating that the Merger was forced upon Lewis.  Federal Reserve officials refused.  *See* paragraph 394.

414.    Moreover, Lewis's repeated inconsistencies in his statements to regulators and sworn testimony to Congress and the New York Attorney General, and in his public statements to BOA shareholders, serve as further strong circumstantial evidence of Lewis's fraudulent state of mind.  For example, on December 17, 2008, Lewis told federal regulators that he only became aware of Merrill's losses in mid-December, after the shareholder vote, because they purportedly "accelerated" at that time.  Likewise, during the January 16, 2009 conference call to discuss Merrill's losses, Lewis told investors that the "loss materialized late in the quarter in December." As set forth above, numerous facts establish that these statements were false, and amounted to nothing more than an attempt to cover up the fact that Lewis and his senior officers had personal knowledge of or reckless disregard for Merrill's severe and accelerating losses throughout the entire fourth quarter and intentionally failed to disclose them even though they knew that disclosure should be made.  For example, on *PBS Frontline*, Thain—who, as Merrill's CEO, had personal knowledge of the pace and timing of Merrill's losses—stated that Lewis's version of the facts was exactly the opposite of "what actually happened":

> Question:   Ken Lewis tells us that in the time between the Dec. 5 stockholders' meeting and his going to Washington and asking for the get-out-of-jail clause, something substantial changed.  What would it have been, do you think?

Thain:     *I don't know what he's referring to.  If you look at what actually happened in the fourth quarter, October was the worst month*, which is not surprising, because it comes right after the Lehman bankruptcy.  We lost about $7 billion in the month of October. . . .  *October was by far the worst*.

415.   Corroborating Thain's first-hand account, at the request of Congress, an impartial expert reviewed Merrill's internal loss data and independently concluded that any acceleration in Merrill's losses was clear by mid-November at the latest.  Indeed, according to Congress's expert analysis of Merrill's weekly internal loss data, "*the evidence for a constantly deteriorating [] trend [in Merrill's losses] is much stronger on November 14 than it is on December 12*."  Moreover, even without the benefit of this evidence, the country's most senior banking regulators, after reviewing Merrill's loss data, concluded that Lewis's claim of mid-December "surprise" was "not credible," as set forth above at paragraphs 384 – 387.

416.   Lewis's knowledge of more than $16 billion in Merrill losses before the shareholder vote (with the projection of $1 billion in post-vote losses) further corroborates the conclusion that his claim of surprise was false.  Indeed, as early as November 12, 2008, based principally on Merrill's October losses which had already occurred, senior BOA executives debated whether to disclose these losses, and by no later than December 1, 2008, senior BOA executives sought legal advice from BOA's General Counsel regarding whether Merrill's ever-increasing losses were significant enough to terminate the Merger.  As the New York Attorney General wrote, these facts were "*of tremendous significance because [they are] at odds with Bank of America's position that it only became concerned with mounting losses after the shareholder vote*."

417.   As another example of Lewis's knowing and/or recklessly false and inconsistent statements, during Lewis's June 11, 2009 Congressional testimony, he initially stated that he "did not recall" asking Chairman Bernanke for a letter immunizing Lewis from shareholder suits—even though this request was highly unique and Lewis had made it just months earlier during a personal conversation between him and his chief regulator:

CASE NO. _____
COMPLAINT

| | | |
|---|---|---|
| 1 | Rep. Kucinich: | You requested a letter from the government saying that the government ordered you to close the deal to acquire Merrill.  Wasn't there such a letter? |
| 2 | | |
| 3 | Lewis: | I don't recall such a letter. |
| 4 | Rep. Kucinich: | You're under oath.  But your answer is you do not recall? |
| 5 | | |
| 6 | Lewis: | I do not recall a letter. |
| 7 | Rep. Kucinich: | Isn't it true that your request of that letter was motivated by your desire to protect yourself from your shareholders? |
| 8 | | |
| 9 | Lewis: | Well, sir, if I can't recall it, I can't answer the second question. |

418.     Lewis also made false statements to Congress regarding his involvement in approving Merrill's bonuses.  Lewis portrayed his involvement in approving the bonuses as "very limited," stating that Merrill was "a public company until the first of the year.  They had a separate board, separate compensation committee and we had no authority to tell them what to do, just urged them what to do."  In reality, as set forth above at paragraphs 106 – 112, Lewis was directly involved in Merrill's bonus payments because he specifically authorized Merrill to pay up to $5.8 billion of bonuses on an accelerated basis at the time he negotiated the Merger Agreement.  This was a key term of the Merger, which Lewis approved.  Thain himself has stated that Lewis was "lying" when he sought to minimize his involvement in the bonuses.

**10.     Additional Evidence Of Price's Scienter**

419.     As the Company's CFO, Price received the daily, "step-by-step" updates on Merrill's financial condition.  Indeed, as the documents and testimony cited above establish, Defendant Price kept close watch on Merrill's losses and impairments throughout the entire fourth quarter, regularly received Merrill's loss reports, repeatedly discussed with other BOA executives whether to invoke the MAC or otherwise disclose Merrill's deteriorating financial condition, and made the conscious decision not to disclose these facts, as set forth above at paragraphs 345 – 372.  Further evidencing his actual knowledge of Merrill's losses, after the shareholder vote, Price (along with Lewis) was the individual who reported Merrill's mounting losses to the BOA Board on December 9, 22, and 30, 2008.

420.     Moreover, as set forth above at paragraphs 345 – 355, on November 13, 2008, based on a November 12 Merrill report of an estimated $8.9 billion in pre-tax fourth quarter losses, BOA's in-house and outside counsel concluded that BOA needed to disclose these loss figures and informed Price of their conclusion.  On November 20, despite this reasoned legal advice, Price and Mayopoulos, who had become concerned that shareholders would likely vote down the Merger if BOA disclosed the losses, reversed this decision.  In doing so, Price never informed Mayopoulos of the fact that during the week since BOA's in-house and outside counsel had initially concluded that disclosure was necessary, Merrill's losses had jumped by more than $4 billion.  In sum, Price misled BOA's legal counsel in order to obtain the legal advice that Price wanted—namely, that BOA did not have to disclose Merrill's losses to shareholders or investors prior to the Merger.

421.     Similarly, as set forth above at paragraphs 368 – 371, on December 3, when Price learned that Merrill's fourth quarter losses had exceeded $10 billion (BOA's unsupported, self-imposed threshold for disclosure), Price lied to Mayopoulos, telling him that the forecasted loss for the fourth quarter was "approximately $7 billion."  Then, as discussed above at paragraphs 376 – 379, after the shareholder vote, when Mayopoulos learned that the losses were materially greater than Price had represented to him and sought to confront Price about the discrepancy, Mayopoulos was summarily fired and escorted off BOA's premises.  Given Price's prior discussions with Mayopoulos regarding disclosure of Merrill's losses, there is no plausible innocent explanation for why Price did not provide Mayopoulos with the most complete, accurate, and up-to-date loss results.  Similarly, the manner and timing of Mayopoulos's termination is strong circumstantial evidence that he was fired because he, in effect, knew too much, and BOA wanted to avoid the possibility that Mayopoulos, upon learning of the true extent of Merrill's losses, would recommend that the losses be disclosed before the Merger closed.

422.     In addition, as discussed above at paragraphs 365 – 366, Price ignored the advice of BOA's Treasurer, who, for fear that BOA's senior officers would be subject to criminal penalties for failing to disclose the losses, pleaded with Price to disclose the losses shortly before the shareholder vote.

1

**11.** **Additional Evidence Of Thain's Scienter**

2      423.     Defendant Thain has admitted in sworn testimony that he had personal knowledge

3  of the secret bonus agreement at the time it was being negotiated during the September 13-14,

4  2008 weekend.  In his deposition, Thain testified that "I was aware that [the bonus agreement]

5  was being negotiated." Thain further testified that he was kept apprised of all the salient terms of

6  the agreement "[t]hrough discussions with, primarily, Greg Fleming," including the terms

7  allowing "us, Merrill Lynch, to be able to pay bonuses to our employees prior to the deal

8  closing," as well as the "cap on the amount that we could pay out."

9      424.     Moreover, Thain was intimately involved in finalizing the accelerated Merrill

10  bonuses throughout the fourth quarter of 2008.  In early November 2008, he and Alphin, BOA's

11  Chief Administrative Officer, determined the final size of the bonus pool; on November 11, 2008,

12  Thain presented the final bonus figures and the accelerated payment schedule to Merrill's

13  Compensation Committee, which approved the accelerated schedule; and on November 12, 2008,

14  Thain informed Alphin of this schedule.

15      **D.**     **Loss Causation For Claims Under Section 10(b) And Rule 10b-5 Of The Exchange Act**

16

17      425.     At all relevant times, BOA's common stock traded on the NYSE. As described

18  above, Defendants' material misrepresentations and omissions had the effect of creating and

19  maintaining an artificially inflated price for BOA's common stock during the Relevant Period.

20  Those misrepresentations and omissions that were not immediately followed by an upward

21  movement in the Company's stock price served to maintain the share price at artificially inflated

22  levels by supporting the false positive public perception of BOA's business, operations,

23  performance and prospects.

24      426.     Defendants had a duty to promptly disseminate accurate and truthful information

25  with respect to BOA's financial and operational condition or to cause and direct that such

26  information be disseminated, and to promptly correct or update any previously disseminated

27  information that was materially misleading to the market. As a result of their failure to do so, the

28

935174.3

CASE NO. _____

COMPLAINT

1    price of BOA's common stock was artificially inflated during the Relevant Period, directly

2    causing Plaintiffs to suffer damages when Defendants eventually disclosed the truth.

3         427.    Defendants' materially false and misleading statements and omissions of material

4    fact in press releases, SEC filings and other public statements during the Relevant Period directly

5    caused losses to Plaintiffs. On the strength of these false statements, the Company's common

6    stock was artificially inflated to a Relevant Period high of $38.13 at the close of trading on

7    October 1, 2008.

8         428.    From the time that the truth about BOA's losses and its secret negotiations with

9    the government for an additional capital infusion to absorb Merrill's losses and salvage the

10   Merger first emerged, until the time that BOA finally acknowledged the extent of Merrill's losses

11   and Merrill's secret bonus payments, the price of BOA common stock declined in a series of

12   material steps from $12.86 per share at the beginning of trading on January 12, 2009, to $5.71 per

13   share at the close of trading on January 22, 2009—a total decline of over 50%—as the market

14   processed each set of previously undisclosed facts. Each such disclosure removed a portion of the

15   artificial inflation from the price of BOA's common stock caused by Defendants' prior material

16   misrepresentations and omissions, and directly caused Plaintiffs to suffer damages.

17        E.    **Group Pleading**

18        429.    The Officer Defendants are liable for the materially false and misleading

19   statements pleaded herein in support of Plaintiffs' claim under Section 10(b) and Rule 10b-5 of

20   the Exchange Act that were issued by or in the name of the Company, as each of those statements

21   was "group-published" information, and resulted from the collective actions of these Defendants.

22   It is appropriate to treat the Officer Defendants as a group and to presume that the public filings,

23   press releases and other public statements complained of herein are the product of the collective

24   actions of this narrowly defined group of Defendants.

25        430.    The Officer Defendants, by virtue of their high-level positions within BOA,

26   directly and actively participated in the management and day-to-day operations of the Company,

27   and were privy to confidential non-public information concerning the business and operations of

28   BOA, including material financial information pertaining to Merrill, to which the Officer

CASE NO. _____

COMPLAINT

1   Defendants had unfettered and continuous access throughout the Relevant Period pursuant to the

2   Merger Agreement.

3        431.    The Merger was negotiated, agreed to, voted upon, and closed in an accelerated

4   period during which the Officer Defendants were directly involved on a daily basis in numerous

5   matters relating specifically to the Merger, including, but not limited to:

6              i.     recommending the Merger to the BOA Board;

7              ii.    reviewing and authorizing the filing and dissemination of the Proxy
                      Statement and the amendments thereto;
8

9              iii.   monitoring and receiving reports and updates concerning Merrill's
                      financial condition;

10             iv.    discussing the possibility of terminating the Merger prior to the
                      Shareholder Vote based upon the billions of dollars in fourth quarter 2008
11                    losses that BOA and the Officer Defendants knew Merrill had already
                      sustained by November 2008;
12
               v.     agreeing on behalf of BOA to accept significant additional government
13                    funding to rescue the Merger; and

14             vi.    electing to not disclose their December 17, 2008 request for additional
                      federal financial aid until well after the Closing Date.
15

16       432.    In addition, the Officer Defendants were involved in drafting, reviewing and/or

17  disseminating the materially false and misleading statements issued by BOA and approved or

18  ratified those statements, and, therefore, adopted them as their own.

19       **F.    Fraud On The Market Presumption**

20       433.    At all relevant times, the market for BOA common stock was an efficient market

21  for the following reasons, among others:

22             i.     BOA's common stock was listed and actively traded on the NYSE, a
                      highly efficient national market, with more than 6.3 billion shares issued
23                    and outstanding and a public trading float of more than 6.3 billion shares as
                      of the end of the Relevant Period;
24
               ii.    as a registered and regulated issuer of securities, BOA filed periodic
25                    reports with the SEC, in addition to the frequent voluntary dissemination of
                      information described in this Complaint;
26
               iii.   BOA regularly communicated with public investors through established
27                    market communication mechanisms, including through regular
                      dissemination of press releases on the national circuits of major newswire
28                    services and through other wide-ranging public disclosures such as

communications with the financial press and other similar reporting services;

iv.    BOA was followed by several different securities analysts employed by major brokerage firms and financial institutions, including Goldman Sachs, JPMorgan Chase & Co., Citigroup Inc., UBS and Morgan Stanley, which followed BOA's business and wrote reports which were distributed to the sales force and customers of their respective brokerage firms. Those reports were publicly available and affected the public marketplace;

v.     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of BOA's securities; and

vi.    without knowledge of the misrepresented or omitted facts, Plaintiffs purchased BOA common stock on the open market between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of BOA securities was artificially inflated by Defendants' misrepresentations and omissions.

434.    As a result of the above, the market for BOA common stock promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the price of BOA's securities. Under these circumstances, all purchasers of BOA common stock during the Relevant Period suffered similar injuries through their purchases of shares on the open market at prices which were artificially inflated by Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

**G.    The Safe Harbor Provision Of The PSLRA Is Inapplicable To Plaintiffs' Claims Under Section 10(b) And Rule 10b-5 Of The Exchange Act**

435.    As alleged herein, Defendants acted with scienter in connection with the materially false and misleading statements and omissions of material fact giving rise to claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder because at the time they issued public documents and other statements in BOA's name, each of the Defendants knew or recklessly disregarded the fact that such statements were materially false and misleading or omitted material facts. Moreover, each of the Defendants knew that such documents and statements would be issued or disseminated to the investing public; knew that persons were likely to rely upon those misrepresentations and omissions; and knowingly and/or recklessly

1   participated in the issuance and/or dissemination of such statements and/or documents as a

2   primary violator of the federal securities laws.

3       436.    As set forth in detail in this Complaint, the Officer Defendants participated in

4   and/or knew of the misconduct alleged herein by virtue of their control over, and/or receipt of,

5   BOA's materially false and misleading statements and/or their association with the Company,

6   which made them privy to confidential proprietary information concerning BOA that was used to

7   artificially inflate its financial results. The Officer Defendants knew and/or recklessly disregarded

8   the falsity and misleading nature of that information, which they caused to be disseminated to the

9   investing public.

10      437.    The statutory safe harbor for certain forward-looking statements does not apply to

11  any of the false statements pleaded in this Complaint because none of the statements pleaded

12  herein are "forward-looking" and/or no such statement was appropriately identified as a

13  "forward-looking statement" when made. Rather, the statements alleged herein as materially false

14  and misleading under Section 10(b) and Rule 10b-5 all relate to facts and conditions existing at

15  the time the statements were made. Moreover, meaningful cautionary statements did not

16  specifically identify important factors that could cause actual results to differ materially from

17  those in any putatively forward-looking statements.

18      438.    In the alternative, to the extent that the statutory safe harbor does apply to any

19  statement pleaded herein in support of Plaintiffs' claims under Section 10(b) and Rule 10b-5 of

20  the Exchange Act which is deemed to be forward-looking, Defendants are liable for the false

21  forward-looking statements because at the time each such statement was made, each Defendant

22  actually knew that any such forward-looking statement was materially false or misleading, and/or

23  that each such statement was authorized and/or approved by a director and/or executive officer of

24  BOA who actually knew that each such statement was false and/or misleading when made. None

25  of the historic or present tense statements made by Defendants was an assumption underlying or

26  relating to any plan, projection or statement of future economic performance, as they were not

27  stated to be such an assumption underlying or relating to any plan, projection or statement of

28  future economic performance when made, nor were any of the projections or forecasts made by

1    Defendants expressly related to or stated to be dependent on those historic or present tense

2    statements when made.

3                                    **COUNT III**

4    **For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5**
     **(Against Defendants BOA, Lewis, And Price For Misstatements And Omissions Regarding**
5    **The Secret Bonus Agreement, Merrill's Pre-Vote Losses, and BOA's Pre-Vote Losses)**

6            439.    Plaintiffs repeat and re-allege the allegations contained above in paragraphs 8, 34 –

7    42, 50 – 122, 124, 239 – 241, 247 – 251, 253 – 257, 259 – 260, 280, and 301 – 438 as if fully set

8    forth herein.

9            440.    During the Relevant Period, BOA, Lewis, and Price disseminated or approved the

10   false statements and omissions set forth above and summarized below, which they knew or

11   recklessly disregarded were misleading in that they contained misrepresentations and failed to

12   disclose material facts necessary in order to make the statements made, in light of the

13   circumstances under which they were made, not misleading.  Defendants BOA, Lewis, and Price

14   acted with scienter in failing to disclose Merrill's fourth quarter 2008 losses, and BOA's fourth

15   quarter losses.  Defendants BOA and Lewis also acted with scienter in making materially false

16   and misleading statements and omissions regarding the agreement authorizing Merrill to pay up

17   to $5.8 billion in bonuses before the Merger closed.

18           441.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in

19   that they:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of

20   material facts or omitted to state material facts necessary in order to make the statements made, in

21   light of the circumstances under which they were made, not misleading; and/or (iii) engaged in

22   acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in

23   connection with their purchases or acquisitions of BOA common stock during the Relevant

24   Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted

25   from, Defendants' public statements included, but were not limited to, false and misleading

26   representations and omissions regarding Merrill's financial condition and losses, BOA's financial

27   condition and losses, and the agreement authorizing Merrill to pay up to $5.8 billion in bonuses

28   before the Merger closed.

442.   These Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various false and/or misleading statements of material facts and omitted to state material facts that were required to be disclosed; made the above statements and omissions with knowledge or a reckless disregard for the truth; and employed devices, schemes and artifices to defraud in connection with the purchase or sale of securities, which were intended to, and did: (i) deceive the investing public, including Plaintiffs, regarding, among other things, the events that had materially adverse effects on Merrill's financial condition, BOA's financial condition, and the undisclosed agreement to allow Merrill to pay billions of dollars in bonus compensation prior to the Merger; (ii) artificially inflate, distort, and/or maintain the market price of BOA common stock; and (iii) cause Plaintiffs to purchase BOA common stock during the Relevant Period at artificially inflated and/or distorted prices.

443.   As described above, these Defendants had a duty to disclose Merrill's highly material losses and the secret bonus agreement when the Proxy was filed, before the shareholder vote, and before the Merger closed, and to disclose the impact that these undisclosed events would have on BOA's ability to absorb Merrill's losses.  These Defendants also had a duty to disclose the secret bonus agreement at the time they filed the Merger Agreement.

444.   These Defendants also had a duty to disclose this information because they were required to update and/or correct their prior misstatements and/or omissions, and to update any statements or omissions that had become false or misleading as a result of intervening events. Further, by continuing to speak about the Merger in supplements to the Proxy, Defendants were under a duty to correct and update prior misstatements and statements that had become misleading, and to speak completely and truthfully about the Merger.  Defendants also had a duty to disclose known trends affecting liquidity, income, and revenues in the Proxy, and in supplements to the Proxy, including the losses at both BOA and Merrill.  Defendants were also under a duty to disclose infrequent or unusual changes and events affecting income in the Proxy and in supplements to the Proxy.

445.    Defendants BOA and Lewis are liable for all materially false and misleading statements made during the Relevant Period, as alleged above, including, without limitation, the false and misleading statements and omissions set forth above which appeared in (i) BOA's September 18, 2008 Form 8-K; (ii) the Proxy; (iii) BOA's November 21, 2008 Form 8-K, which supplemented the Proxy; and (iv) BOA's November 26, 2008 Proxy Supplement.  These statements were materially false and misleading because, among other things, they misrepresented the terms of the Merger Agreement, and failed to disclose Merrill's and BOA's losses and the secret bonus agreement, and the impact that these undisclosed events would have on BOA's ability to absorb Merrill's losses.  They also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

446.    Defendant Price is also liable for failing to disclose Merrill's losses and BOA's losses.  He also failed to correct and update prior misrepresentations or statements that had become misleading by intervening events.

447.    As described above, the Defendants named in this Count acted with scienter throughout the Relevant Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.  Specifically, Defendants BOA, Lewis, and Price knew or were reckless in not knowing, inter alia, that the financial condition of Merrill was severely deteriorating throughout the fourth quarter of 2008, such that BOA could not absorb Merrill's losses without Government assistance.  Similarly, Defendants BOA and Lewis knew or were reckless in not knowing that the Merger Agreement included an undisclosed side agreement to allow Merrill to pay up to $5.8 billion in bonuses before the Merger occurred.

448.    As a result of these Defendants' conduct, the price of BOA common stock was artificially inflated and/or distorted during the Relevant Period.

449.    Plaintiffs have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for BOA common stock.  Plaintiffs would not have purchased or otherwise acquired these securities at the prices they paid, or at all, if they had been

1  aware that the market price had been artificially and falsely inflated by these Defendants'

2  materially false and misleading statements and/or omissions of material facts.

3      450.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs

4  suffered damages in connection with their purchases or acquisitions of BOA common stock

5  during the Relevant Period.

6  <div align="center">**COUNT IV**</div>

7  <div align="center">**For Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5**</div>
   <div align="center">**(Against Defendants Merrill And Thain for Misstatements Regarding**</div>
8  <div align="center">**The Secret Bonus Agreement)**</div>

9      451.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 8,

10  34 – 35, 50 – 122, 124, 262 – 264, 280, and 301 – 438 above as if fully set forth herein.

11      452.    During the Relevant Period, Defendants Merrill and Thain disseminated or

12  approved the false statements specified herein, which they knew or recklessly disregarded were

13  false and misleading in that they contained misrepresentations and failed to disclose material facts

14  necessary in order to make the statements made, in light of the circumstances under which they

15  were made, not misleading.

16      453.    These Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in

17  that they:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of

18  material facts or omitted to state material facts necessary in order to make the statements made, in

19  light of the circumstances under which they were made, not misleading; and/or (iii) engaged in

20  acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in

21  connection with their purchases or acquisitions of BOA common stock during the Relevant

22  Period.  As detailed herein, the misrepresentations contained in Defendants' public statements

23  included statements relating to Merrill's ability to pay bonuses before the Merger closed.

24      454.    These Defendants, individually and in concert, directly and indirectly, by the use

25  of means or instrumentalities of interstate commerce and/or of the mails, engaged and

26  participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs;

27  made various false and/or misleading statements of material facts; made the above statements

28  with knowledge or a reckless disregard for the truth; and employed devices, schemes, and

1    artifices to defraud in connection with the purchase or sale of securities, which were intended to,

2    and did: (i) deceive the investing public, including Plaintiffs, regarding the undisclosed

3    agreement to allow Merrill to pay billions of dollars in bonus compensation prior to the Merger;

4    (ii) artificially inflate, distort and/or maintain the market price of BOA common stock; and

5    (iii) cause Plaintiffs to purchase BOA common stock at artificially inflated prices.

6         455.   Defendants Merrill and Thain are liable for all materially false and misleading

7    statements made during the Relevant Period, as alleged above, including, without limitation, the

8    false and misleading statements set forth above which appeared in: (i) Merrill's September 18,

9    2008 Form 8-K; (ii) the Proxy; and (iii) Merrill's November 21, 2008 Proxy Supplement. These

10   statements were materially false and misleading because, among other things, they

11   misrepresented the terms of the Merger Agreement, including that the agreement authorized

12   Merrill to pay up to $5.8 billion in bonuses before the Merger closed. They also failed to correct

13   and update prior misrepresentations.

14        456.   As described above, the Defendants named in this Count acted with scienter in that

15   they either had actual knowledge of the misrepresentations set forth herein, or acted with reckless

16   disregard for the truth in that they failed to ascertain and disclose the true facts, even though such

17   facts were available to them. Specifically, these Defendants knew or were reckless in not

18   knowing that the Merger Agreement included an undisclosed side agreement to allow Merrill to

19   pay up to $5.8 billion in bonuses before the merger occurred.

20        457.   As a result of these Defendants' conduct, the prices of BOA common stock were

21   artificially inflated throughout the Relevant Period.

22        458.   Plaintiffs have suffered damages in that, in direct reliance on the integrity of the

23   market, they paid artificially inflated prices for BOA common stock. Plaintiffs would not have

24   purchased or otherwise acquired these securities at the prices they paid, or at all, if they had been

25   aware that the market price had been artificially and falsely inflated by these Defendants'

26   materially false and misleading statements, or, with respect to put options, would not have sold

27   them at the prices they did, if at all, had they been aware that the market price had been distorted

28   by these Defendants' materially false and misleading statements.

459.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases or acquisitions of BOA common stock during the Relevant Period.

## COUNT V

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Lewis and Price)

460.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 8, 34 – 42, 50 – 122, 124, 239 – 241, 247 – 251, 253 – 257, 259 – 260, 280, and 301 – 450 above as if fully set forth herein.

461.    This Count is asserted against Defendants Lewis and Price for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

462.    During their tenures as officers of BOA, each of these Defendants was a controlling person of BOA within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers of BOA, these Defendants had the power and authority to cause BOA to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by BOA during the Relevant Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

463.    In their capacities as senior corporate officers of BOA, and as more fully described above, these Defendants were made aware of the circumstances surrounding the Merger, including the terms of the Merger, the bonus agreement, and the financial condition of Merrill and BOA.  In addition, these Defendants were also aware of the undisclosed events of December 2008 discussed above and the decision not to disclose those material events.

464.    As a result of the foregoing, Lewis and Price were control persons of BOA within the meaning of Section 20(a) of the Exchange Act.

465.    As set forth above, BOA violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of BOA and, as a result of their own aforementioned conduct, Lewis and Price are liable pursuant to

1    Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as BOA is

2    liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to

3    Plaintiffs who purchased or otherwise acquired BOA common stock during the Relevant Period.

4    Moreover, as detailed above, during the respective times these Defendants served as officers of

5    BOA, each of these Defendants is responsible for the material misstatements and omissions made

6    by BOA.

7         466.    As a direct and proximate result of these Defendants' conduct, Plaintiffs suffered

8    damages in connection with their purchase or acquisition of BOA common stock during the

9    Relevant Period.

10                                    **COUNT VI**

11            **For Violations Of Section 20(a) Of The Exchange Act**
                                    **(Against Thain)**
12

13        467.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 8,

14   34 – 35, 50 – 122, 124, 262 – 264, 280, 301 – 438, and 451 – 459 above as if fully set forth

15   herein.

16        468.    This Count is asserted against Defendant Thain for violations of Section 20(a) of

17   the Exchange Act, 15 U.S.C. § 78t(a).

18        469.    During his tenure as Merrill's CEO and Chairman, Defendant Thain was a

19   controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act.  By

20   reason of his positions of control and authority as Merrill's CEO and Chairman, Defendant Thain

21   had the power and authority to cause Merrill to engage in the wrongful conduct complained of

22   herein.  Defendant Thain was able to and did control, directly and indirectly, the content of the

23   public statements made by Merrill during the Relevant Period, thereby causing the dissemination

24   of the false and misleading statements and omissions of material facts as alleged herein.

25        470.    In his capacity as Merrill's CEO and Chairman, and as more fully described above,

26   Defendant Thain was made aware of the circumstances surrounding the Merger, including the

27   terms of the Merger and the bonus agreement.  As a result of the foregoing, Thain was a

28   controlling person of Merrill within the meaning of Section 20(a) of the Exchange Act.

471.     As set forth above, Merrill violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person of Merrill and, as a result of his own aforementioned conduct, Thain is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Merrill is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs who purchased or otherwise acquired BOA common stock during the Relevant Period. Moreover, as detailed above, during the respective times that Thain served as Merrill's CEO and Chairman, he was responsible for the material misstatements made by Merrill.

472.     As a direct and proximate result of Defendant Thain's conduct, Plaintiffs suffered damages in connection with their purchase or acquisition of BOA common stock during the Relevant Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment including:

A.     Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

B.     Awarding Plaintiffs their costs and expenses incurred in this action, including counsel fees and expert fees; and

C.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all triable claims.

CASE NO. _____

COMPLAINT

1  Dated: October 11, 2011

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _____

Richard M. Heimann (State Bar No. 063607)
Joy A. Kruse (State Bar No. 142799)
Eric B. Fastiff (State Bar No. 182260)
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Steven E. Fineman (State Bar No. 140335)
Daniel P. Chiplock
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, New York  10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

Lowell Haky (State Bar No. 178526)
Vice President and Associate General Counsel
CHARLES SCHWAB & CO., INC.
211 Main Street
San Francisco, California  94105
Telephone:  (415) 667-0622
Facsimile:  (415) 667-1638

*Counsel for Plaintiffs*